## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                                        No. CR 15-3940 JB

EVERETT RAMOS,

     Defendant.

### <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Defendant's Motion to Suppress Evidence, filed March 21, 2016 (Doc. 26)("Motion").  The Court held an evidentiary hearing on May 25, 2016.  The primary issues are: (i) whether New Mexico State Police Officer Joshua Campos unreasonably delayed Defendant Everett Ramos during his traffic stop without reasonable suspicion; (ii) whether Ramos' consent to allow Campos to search his vehicle was voluntary; and (iii) if Campos unlawfully detained Ramos, whether the unlawful actions were too attenuated from Ramos' voluntary consent to be suppressed.  First, Campos did not unlawfully extend the traffic stop when he questioned Ramos and Perez and inspected the vehicle's VIN.  Second, after the traffic stop had ended, Ramos voluntarily consented to answer further questions.  Although this questioning evolved into a lawful detention justified by reasonable suspicion, Ramos nonetheless freely and voluntarily consented to a vehicle search during the detention.  Accordingly, Campos' vehicle inspection was lawful.  Third, even if Campos had unlawfully extended the traffic stop, Ramos' consent was too attenuated from any unlawful actions to suppress the evidence.  The Court therefore denies the Motion and will not suppress the evidence.

## FACTUAL BACKGROUND

Rule 12(d) of the Federal Rules of Criminal Procedure requires that the Court state its essential findings on the record when deciding a motion that involves factual issues.  See Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a [pretrial] motion, the court must state its essential findings on the record.").  This Memorandum Opinion and Order's findings of fact shall serve as the Court's essential findings for rule 12(d) purposes.  The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure, and the voluntariness of an individual's confession or consent to search.  See United States v. Merritt, 695 F.2d 1263, 1269-70 (10th Cir. 1982).  In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court.  See Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible.  In so deciding, the court is not bound by evidence rules, except those on privilege.").  Thus, the Court may consider hearsay in ruling on a motion to suppress.  See United States v. Raddatz, 447 U.S. 667, 679 (1980)(noting that "the interests at stake in a suppression hearing are of a lesser magnitude than those in the criminal trial itself"); United States v. Ramirez, 388 F. App'x 807, 810 (10th Cir. 2010)("The Supreme Court has not yet indicated whether the Confrontation Clause applies to hearsay statements made in suppression hearings."); United States v. Garcia, 324 F. App'x 705, 708 (10th Cir. 2009)(unpublished)[1]("We need not resolve whether Crawford[ v.

---

[1]United States v. Garcia is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

Washington, 541 U.S. 36 (2004)]'s[2] protection of an accused's Sixth Amendment confrontation right applies to suppression hearings, because even if we were to assume this protection does apply, we would conclude that the district court's error cannot be adjudged 'plain.'"), cert. denied, 130 S. Ct. 223 (2009); United States v. Merritt, 695 F.2d at 1269 ("The purpose of the suppression hearing was, of course, to determine preliminarily the admissibility of certain evidence allegedly obtained in violation of defendant's rights under the Fourth and Fifth Amendments. In this type of hearing the judge had latitude to receive it, notwithstanding the hearsay rule."); United States v. Ramirez, 388 F. App'x at 810 ("It is beyond reasonable debate that Ramirez's counsel were not ineffective in failing to make a Confrontation Clause challenge to the use of the confidential informant.  The Supreme Court has not yet indicated whether the Confrontation Clause applies to hearsay statements made in suppression hearings."); United States v. Gonzalez, 121 F. Supp. 3d 1094, 1103 (D.N.M. 2015)(Browning, J.)("Thus, the Court may consider hearsay in ruling on a motion to suppress."); United States v. Christy, No. 10-1534, 2011 WL 3933868, at *2 (D.N.M. Sept. 2, 2011)(Browning, J.)(concluding the that the Court "may consider hearsay in ruling on a motion to suppress").  The Court has previously held that Crawford v. Washington does not apply to pre-trial hearings, because "the Sixth Amendment is a

---

In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court concludes that United States v. Garcia has persuasive value with respect to material issues, and will assist the Court in its preparation of this Memorandum Opinion and Order.

[2]Crawford v. Washington decided that out-of-court statements against an accused are inadmissible at trial unless the witness is unable to testify and the defendant had a previous opportunity to cross-examine the witness.  See 541 U.S. at 53-54.

trial right and does not apply to pretrial proceedings." United States v. Hernandez, 778 F. Supp.

2d 1211, 1226 (D.N.M. 2011) (Browning, J.)(concluding "that Crawford v. Washington does not

apply to detention hearings").[3]

## I.      CAMPOS IS TRAINED IN PERFORMING HIGHWAY INTERDICTIONS.

1.      Campos currently serves on the New Mexico State Police's Criminal Enforcement

Unit.  See Transcript of Hearing at 4:9-12 (Campos)(taken May 25, 2016)("Tr.").[4]

2.      The Criminal Enforcement Unit is a "K-9 unit," meaning that Campos is trained

to use a dog.  Tr. at 4:15-16 (Campos).

3.      As part of this unit, Campos received additional training, including a specialty

course on highway interdiction.  See Tr. at 5:15-21 (Campos).

4.      He tries to attend various highway interdiction trainings "at least once a year."

Tr. at 6:5-6 (Campos).

---

[3]Ramos does not object under Crawford v. Washington to any evidence in this case.  The Court, therefore, need not decide whether Crawford v. Washington applies to suppression hearings.  The Court notes, however, that the courts that have decided whether the Confrontation Clause applies to suppression hearings have found that Crawford v. Washington does not apply to suppression hearings.  See Ebert v. Gaetz, 610 F.3d 404, 414 (7th Cir. 2010)(Tinder, J., joined by Posner & Rovner, JJ.)(holding the right of confrontation does not apply at a suppression hearing); United States v. Garcia, 324 F. App'x at 708 ("There is no binding precedent from the Supreme Court or this court concerning whether *Crawford* applies to pretrial suppression hearings.  To the extent that we can divine clues from our case law concerning the resolution of this issue, they do not benefit Mr. Garcia.").  Cf. United States v. Morgan, 505 F.3d 332, 339 (5th Cir. 2007)("[W]e hold that *Crawford v. Washington* does not apply to the foundational evidence authenticating business records in preliminary determinations of the admissibility of evidence."); United States v. Saneaux, 365 F. Supp. 2d 493, 498 n.5 (S.D.N.Y. 2005)(concluding that *Crawford v. Washington* does not apply to determining whether a statement is admissible under the co-conspirators hearsay exception: "[B]ecause the Court is not bound by the Rules of Evidence in the disposition of preliminary matters such as this one, I may properly consider such evidence even if it cannot be introduced at trial.").

[4]The Court's citations to the transcript of the hearing refer to the Court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

5.      At those classes, he learns traffic stop techniques, different trends for smuggling narcotics, tools that traffickers use to avoid detection, and recent federal case law regarding traffic stops.  See Tr. at 6:9-22 (Campos, Mysliwiec).

6.      Campos has also been trained as a Vehicle Identification Number ("VIN") Inspector, so he can better determine whether vehicles have been tampered with, and whether a car is stolen.  See Tr. at 107:22-25 (Campos).

7.      At the VIN training, Campos learned about a VIN's characteristics, how to identify when a certain car make or model should have a longer VIN, where "hidden VINs can be located" if an officer is unable to verify a VIN from the dashboard or the doorjamb, and how to identify if a VIN has been replaced.  Tr. at 108:5-110:11 (Campos, Mysliwiec).

8.      As part of Campos's normal citation writing and traffic stop process, Campos checks a vehicle's VIN so he can ensure that the vehicle was not stolen.  See Tr. at 20:19-21:2 (Campos, Mysliwiec).

9.      State police officers are not trained to check VINs and a vehicle's VIN is not on the citation form.  See Tr. at 106:12-107:2 (Campos, Pori).

10.     Even though state police officers do not always check the VIN, the Criminal Enforcement Unit officers, who perform highway drug interdictions, routinely compare both of a vehicle's VINs during traffic stops because either or both VINs might reveal tampering or other evidence of crime.  See Tr. at 18:13-19:18 (Campos, Mysliwiec); id. at 112:2-5 (Campos).

11.     Checking the VIN ensures that the officer writes the correct ticket for the correct driver and the correct car in every traffic stop.  See Tr. at 104:24-105:2 (Campos, Mysliwiec).

12.     Although the Court does not have extensive evidence of how long an individual VIN inspection usually takes, the Court does not believe that Campos needed one minute and

twenty-six seconds to inspect this particular VIN, when it took him only six to eight seconds to inspect the dashboard VIN and he did not write down any numbers to use as comparison.  See Tr. at 23:5-10 (Campos, Mysliwiec); id. 65:4-8 (Campos)(explaining that, to adequately check that the VIN has not been tampered with, Campos needed to check each of the rivets on the dash and the stamp on the door, as well as all of the letters and numbers in the VIN); id. at 67:15-22 (Campos)(noting that he did not write anything down and he did not remember how he compared the two VINs, but maintaining that he did actually compare the VINs).

13.     The Court acknowledges, however, that Campos may have spent some time trying to locate the VIN on the rental agreement so he "could compare it to their contract to make sure that vehicle actually belonged to the contract that they had."  Tr. at 73:7-21 (Campos, Pori).

## II.     **THE INITIAL TRAFFIC STOP WAS LAWFUL.**

14.     On October 14, 2015, Ramos rented a Mercedes G-300 Sedan in Southern California.  See Tr. at 14:18 (Campos).

15.     At about 8:40 a.m. on October 15, 2015, Campos saw the Mercedes speeding on Interstate 40, west of the Route 66 hotel and casino, near mile marker 134, outside of Albuquerque, New Mexico.  See Tr. at 8:6-8 (Campos); id. at 11:8-24 (Campos, Mysliwiec).

16.     Campos would later learn that the driver was Ramos and that a female passenger was Laura Perez, Ramos' wife at the time.  See Tr. at 24:7-9 (Campos).

17.     Before initiating the traffic stop, Campos spoke with the Albuquerque area State Police dispatcher and provided her with the Mercedes' license plate number.  See Tr. at 11:11-16 (Campos).

18.     In response, the dispatcher told Campos that the vehicle was "negative on any wants or warrants."  Tr. at 60:7-10 (Campos).

19. Campos thus knew from the conversation with his dispatcher that there were no warrants associated with the Mercedes' license plate and that the Mercedes had not been reported stolen. See Tr. at 11:11-16 (Campos).

20. Campos stopped the Mercedes for speeding. See Tr. at 11:11-16 (Campos).

21. Campos drove a marked police car and was dressed in a uniform. See Tr. at 7:20-25 (Campos).

22. When the Mercedes came to a stop, Campos approached the Mercedes from the passenger side, as is standard for officer safety reasons, and observed there was one male in the driver's seat and one female in the front passenger's seat. See Tr. at 12:9-13 (Campos).

## III. CAMPOS' VIN INSPECTION AND QUESTIONING DID NOT UNLAWFULLY EXTEND THE TRAFFIC STOP.

23. Campos' vehicle was equipped with a dashboard camera that recorded the events. See Tr. at 43:12-18 (Campos, Pori); State Police Dashboard Cam of Stop (October 15, 2015)("Dashboard Cam").

24. From the Dashboard Cam, the Court can observe Campos, Ramos, and Perez when they are near the Mercedes and in front of the patrol car.

25. The Court can hear all of Campos' statements clearly, and it can hear most, but not all, of Ramos' and Perez' statements clearly.

26. Campos identified himself as a police officer, advised Ramos of the reasons for the stop, and then asked Ramos for his driver's license, vehicle registration, and proof of insurance. See Tr. at 12:9-19 (Campos, Mysliwiec); Dashboard Cam at 8:41:35-8:41:46.

27. In response, Ramos protested that he did not believe that he was speeding, but then produced the requested data. See Tr. at 12:15-19 (Campos); Dashboard Cam at 8:41:45-8:41:52.

28.     After Ramos gave Campos his driver's license and the rental agreement for the Mercedes, Campos asked Ramos to exit the vehicle and meet Campos at the front of Campos's patrol car, which is standard procedure for the New Mexico State Police and for Campos in every traffic stop, for officer safety reasons and for other reasons.   See Tr. at 12:15-14:12 (Campos, Mysliwiec); Dashboard Cam at 8:42:8-8:42:12.

29.     Ramos complied with the request.   See Tr. at 14:13-14 (Campos, Mysliwiec); Dashboard Cam at 8:42:12-8:42:23.

30.     Campos then provided the State Police dispatcher with Ramos' California driver's license information.   See Tr. at 14:21-25 (Campos); Dashboard Cam at 8:42:40-8:43:35.

31.     The dispatcher confirmed that Ramos had a valid driver's license.   See Dashboard Cam at 8:43:36-8:43:44; Tr. at 14:21-25 (Campos).

32.     Campos noticed that the rental agreement allowed Ramos to drive the vehicle "ONLY" in California, Nevada, and Arizona.   See Tr. at 28:15-29:3 (Campos, Mysliwiec); Dashboard Cam at 8:55:30-8:55:40; Enterprise Rental Agreement (Defendant's Exhibit B).

33.     While Campos was retrieving his citation book and starting to write the citation, Ramos asked Campos a question and engaged him in a brief conversation.   See Dashboard Cam at 8:43:45-8:44:22; Tr. at 96:11-16 (Campos).

34.     As he was filling out the form, Campos asked Ramos several questions about his travel plans, including: (i) what brought Ramos to New Mexico; (ii) if Albuquerque was his ultimate destination; (iii) what he was planning to do in Albuquerque; (iv) what time he left his last stop; (v) if he was planning on staying in Albuquerque; and (vi) how long he rented the car. See Dashboard Cam at 8:44:32-8:48:09; Tr. at 17:2-3 (Campos)(asserting that Campos asked these questions while he wrote the citation).

- 8 -

35.     Ramos answered each of Campos' questions and engaged Campos in further conversation.  See Dashboard Cam at 8:44:32-8:48:09.

36.     In response to one of Campos' questions, Ramos stated that he and his wife travelled from California to Las Vegas to Albuquerque, and were in Albuquerque to see the sights.   See Tr. at 17:22-25 (Campos); Dashboard Cam at 8:44:50-8:44:55; id. at 8:45:50-8:46:05.

37.     Ramos stated that, after seeing Albuquerque, they were heading to San Antonio, Texas to visit Perez' friend.  See Tr. at 17:25-18:2 (Campos).

38.     Ramos also stated that they were "passing by" Albuquerque.  Dashboard Cam at 8:46:30-8:46:35; Tr. at 24:5-7 (Campos).

39.     Campos thought it was interesting that Ramos chose this particular route to get to San Antonio when it was such a significant detour from the fastest route.  See Tr. at 23:24-24:7 (Campos)(stating that "the route that they were taking to San Antonio was [] completely off. . . . The fastest would have been down through southern Arizona, through I-10 across to San Antonio, which would have cut their trip approximately about four hours shorter").

40.     Campos routinely asks similar questions while he completes traffic citations, in accordance with New Mexico State Police policy.  See Tr. at 16:15-23 (Campos, Mysliwiec).

41.     This routine questioning does not generally extend or delay the time it takes to write a traffic citation.  See Tr. at 17:4-7 (Campos, Mysliwiec).

42.     Campos' travel plan conversation did not substantially extend the time that it took Campos to write Ramos' traffic citation.  See Dashboard Cam at 8:44:32-8:48:09; See Tr. at 17:4-7 (Campos, Mysliwiec).

43.     Campos asked Ramos to wait to ask further questions until after Campos finished

filling out the citation form.  See Dashboard Cam at 8:47:40-8:48:00.

44.     When Campos had nearly completed the citation, he told Ramos that he needed to check the VIN for the Mercedes.  See Tr. at 97:2-9 (Campos, Court); Dashboard Cam at 8:48:09-8:48:16.

45.     Even though the dispatcher had told Campos that the vehicle was not stolen and Campos had the information he needed to write the citation, Campos checked the vehicle's VIN to confirm that there was no evidence of tampering and that the vehicle matched the license plate, because some vehicles are not reported stolen.  See Tr. at 121:6-22 (Campos, Mysliwiec); id. at 97:24-98:7 (Campos).

46.     After ordering Ramos to remain at the patrol car, Campos approached the driver's side of the vehicle and then examined the VIN in the lower portion of the windshield on the driver's side.  See Tr. at 66:2-67: 11 (Campos, Pori); Dashboard Cam at 8:48:26-8:38:40.

47.     One of the places that the VIN is located is inside the doorjamb of the driver's door.  See Tr. at 63:25-64:3 (Campos).

48.     Campos routinely compares the VIN on the front dashboard with the VIN in the doorjamb, because either or both locations might reveal tampering or other evidence of crime. See Tr. at 18:13-19:18 (Campos, Mysliwiec); id. at 112:2-5 (asserting that the Criminal Enforcement Unit officers, who perform highway drug interdictions, routinely compare both VINs during traffic stops).

49.     Campos did not write down any of the VIN numbers when checking them, but sought to determine whether there was evidence of tampering.  See Tr. at 65:24-66:1 (Campos, Pori); id. at 65:4-8 (Campos).

50.     Campos spent approximately six to eight seconds examining the VIN on the front

dashboard, see Tr. at 67:8-11 (Campos, Pori); Dashboard Cam at 8:48:32-8:48:40, while he spent

approximately one minute and twenty seconds checking the VIN located in the doorjamb, see Tr.

at 69:8-13 (Campos, Pori).

51.     Campos opened the driver's door of the Mercedes, but did not reach his hand into

the passenger compartment to touch any items inside of the vehicle.  See Tr. at 68:23-7 (Campos,

Pori); Dashboard Cam at 8:48:40-8:50:00.

52.     Campos was looking at the rental agreement "to see if it had any of the vehicle

VIN number on it so [he] could compare it to their contract to make sure that vehicle actually

belonged to the contract that they had," because normally, a VIN is included in the vehicle's

registration, but Ramos did not hand him the vehicle's registration.  Tr. at 73:7-21 (Campos,

Pori).

53.     While Campos checked the vehicle's VIN at that location, he engaged Perez in

conversation and proceeded to engage in extensive questioning.  See Tr. at 21:16-22:7 (Campos,

Mysliwiec); Dashboard Cam at 8:48:40-8:50:00.

54.     Campos observed that Perez appeared "nervous" and "very distracted," her hands

were shaking, she paused before answering Campos' questions, and she kept receiving multiple

phone calls on one of two cell phones.  See Tr. at 22:1-7 (Campos).

55.     Based on his training and experience, Campos determined that her hands were

shaking because she was nervous.  See Tr. at 22:15-18 (Campos, Mysliwiec).

56.     Campos looked at the VIN for a moment, then turned his head toward Perez.  See

Dashboard Cam at 8:48:42-8:48:45.

57.     The Court cannot see where Campos looked after that because of the video's poor

quality, but it has no evidence to contradict Campos' statement that he looked back and forth

between Perez and the VIN number so that he could watch Perez while she answered his questions and ensure that she was not trying to reach for anything that could injure him.  See Tr. at 93:2-5 (Campos, Mysliwiec).

58.     Campos was not looking at the VIN toward the end of the time that he was questioning Perez.  See Tr. at 92:24-5 (Campos, Mysliwiec); Tr. at 72:4-6 (Campos)(admitting that, toward the end of his VIN inspection, he "wasn't looking at the VIN at that time.  I was looking at Ms. Perez.").

59.     Campos did not intend to delay or extend the traffic stop.  See Tr. at 22:24-23:2 (Campos, Mysliwiec).

60.     Campos asked Perez about her travel plans.  See Tr. at 21:16-22:7 (Campos, Mysliwiec).

61.     Perez gave different answers to the travel-plan questions than the answers that Ramos gave, and she also changed her story throughout the conversation.  See Tr. at 21:16-22:7 (Campos, Mysliwiec).

62.     Specifically, she stated that she was "going to Albuquerque for a few days, and then they were going to go on their way back to California," and then corrected her story to say that they were going to Texas.  Tr. at 21:23-22:1 (Campos).  See Dashboard Cam at 8:49:08-8:49:12.

63.     Ramos had informed Campos that they were going to San Antonio for a few days to stay with Perez' friend.  See Tr. at 24:1-10 (Campos).

64.     Perez further informed Campos that they had come straight from California and had not stopped anywhere, see Dashboard Cam at 8:49:30-8:50:00, even though Ramos said that they went through Las Vegas, Nevada.  See Dashboard Cam at 8:44:46-8:44:52.

65.     Campos noted the discrepancy between Ramos' story and Perez' story.  See Tr. at 23:17-24:10 (Campos, Mysliwiec).

66.     Campos testified that he developed reasonable suspicion that "something was going on prior, more than . . . the speeding issue," which is "why [he] asked -- was talking more to Ms. Perez."  Tr. at 71:11-17 (Campos).

67.     In total, Campos asked Perez the following questions in the following order: (i) what brought her to New Mexico; (ii) where she was headed; (iii) how long she was planning on staying at her final destination; (iv) when she was traveling back to California; (v) the purpose of her travel; (vi) where Ramos and Perez would stay when they arrived at their destination; (vii) whether Ramos was her husband; (viii) when Ramos rented the Mercedes; (ix) from where Ramos and Perez were coming; (x) what time they left California; (xi) whether they left California in the morning or the evening; (xii) whether they were traveling straight through to their final destination; and (xiii) whether they had made any stops along the way.  See Dashboard Cam at 8:48:47-8:50:00.

68.     Campos' conversation with Perez increased the time that it took Campos to inspect the vehicle's VIN and observe evidence of tampering.  See Tr. at 23:6-7 (Campos).

69.     Campos returned to his patrol car, handed Ramos his driver's license and rental contract, and explained to Ramos that he could contest his citation in court or admit guilt and pay a fine.  See Tr. at 24:14-25 (Campos, Mysliwiec); Dashboard Cam at 8:50:01-8:51:00.

70.     The citation is a one-page document that contains the following fields: (i) the driver's name; (ii) the license number; (iii) the speed at which the vehicle was traveling; (iv) the vehicle's information, including the vehicle's make and model; and (v) whether the driver chooses to contest the citation or to pay it.  See Tr. at 56:18-57:1 (Campos, Pori); Speeding

Citation Issued to Everett Ramos (Defendants' Hearing Ex. C).

71.     After Ramos chose to pay the fine, Ramos signed the citation, stated that he had no further questions, and shook Campos' hand.  See Tr. at 25:2-16 (Campos, Mysliwiec); Dashboard Cam at 8:51:01-8:51:25.

72.     Campos then told Ramos he was "free to leave," and Ramos began to walk back to his vehicle.  Tr. at 25:20-21 (Campos).  See id. at 76:3-5 (Campos); Dashboard Cam at 8:51:26-8:51:29.

73.     From the time that Campos approached the vehicle to the time that he told Ramos he was free to leave, the traffic stop took approximately nine minutes and fifty four seconds.

74.     Campos typically takes ten to fifteen minutes to issue a citation.  See Tr. at 16:6-7 (Campos).

75.     Officers routinely take more than ten minutes to perform all the tasks involved in a traffic stop.  See United States v. Sampson, 388 F. App'x 950, 953 (11th Cir. 2010)("[W]e cannot conclude that a fifteen to twenty minute total detention was unreasonable" in light of the various interruptions involved.); United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001)(holding that a fourteen-minute detention was not unreasonable and citing cases upholding traffic stops of thirty and fifty minutes); United States v. Hill, 195 F.3d 258, 269 (6th Cir. 1999)(concluding that the officer did not unreasonably prolong the traffic stop when it took a "little more than twelve minutes"); United States v. Shareef, 100 F.3d 1491, 1502 (10th Cir. 1996)(concluding that a thirty-minute wait for a computer check during a traffic stop was reasonable); United States v. Hardy, 855 F.2d 753, 761 (11th Cir. 1988)(stating that a fifty-minute traffic stop, by itself, did not invalidate the detention, but demonstrating "some unease" about the detention's length).  Cf. United States v. Place, 462 U.S. 696, 709 (1983)(concluding

that a ninety-minute stop was too long for a <u>Terry</u> stop).

## IV.   **THE CONSENSUAL ENCOUNTER.**

76.     As Ramos was walking back to his vehicle, approximately seventeen seconds after Campos told Ramos he was free to leave, Campos called out, "Excuse me, sir," in a polite, respectful tone.   Tr. at 26:12-18 (Campos, Mysliwiec); <u>id.</u> at 77:20-77:2 (Campos, Pori); Dashboard Cam at 8:51:46-8:51:47.

77.     Ramos turned around and walked back toward Campos' police car, where Campos asked Ramos if Campos could ask a few questions, and Ramos agreed to answer the questions.  <u>See</u> Tr. at 26:1-2 (Campos); Dashboard Cam at 8:51:48-8:51:53.

78.     Campos did not tell Ramos that Ramos was under no obligation to answer the questions.  <u>See</u> Tr. at 77:8-16 (Campos, Pori).

79.     Campos asked Ramos detailed questions about Ramos' travel plans, including: (i) from where Ramos and Perez were coming; (ii) when they left California; (iii) where they travelled and stayed; (iv) whether they had friends and family in the area; (v) whether they planned to spend the night in Albuquerque; and (vi) where they planned to stay while in San Antonio.  <u>See</u> Tr. at 27:16-28:8 (Campos): Dashboard Cam at 8:51:54-8:55:40.

80.     During the initial traffic stop, Campos noticed that the rental agreement did not allow Ramos to drive the car in New Mexico, so he asked Ramos whether the rental company made a mistake.   <u>See</u> Tr. at 28:15-29:3 (Campos, Mysliwiec); Dashboard Cam at 8:55:30-8:55:40.

81.     Ramos stated that Perez altered the rental agreement.  <u>See</u> Dashboard Cam at 8:55:30-8:55:40.

82.     Ramos did not know the last name of the person with whom he would be staying

when he arrived in Texas, despite allegedly knowing her since 1989.  See Dashboard Cam at

8:53:40-8:54:30; Tr. at 28:18-29:4 (Campos, Mysliwiec).

83.    Ramos further asserted that Perez' friend did not know they were coming to visit

and that it was a surprise.  See Tr. at 28:1-8 (Campos).

84.    Campos noticed that the rental agreement required Ramos to return the vehicle in

three days, but Ramos intended to stay in Texas for longer than three days and would not be able

to return it in that time period if he planned on visiting his friend for as long as he said he would.

See Dashboard Cam at 8:54:40-8:54:55.

85.    Ramos did not appear afraid.  He discussed his fear of airplanes, his business

plans, and fun events in Albuquerque, including the Sandia Peak Tramway.  See Dashboard Cam

at 8:51:54-8:55:40.

86.    Campos did not retain any of Ramos' personal items during this encounter.  See

Tr. at 27:7-11 (Campos, Mysliwiec).

87.    During the questioning, Perez left the vehicle, starting walking toward Campos,

and told Campos that she needed to use the restroom.  See Tr. at 29:10-12 (Campos); Dashboard

Cam at 8:54:25-8:54:55.

88.    Campos told Perez to "go ahead and have a seat in the car," and that he would 'be

right there."  Dashboard Cam at 8:54:55-8:55:00.

89.    The Court cannot fully hear Perez, but Campos testified that she suggested that

she wanted to take the car to the nearest gas station to use the restroom.  See Tr. at 83:7-11

(Campos)("[S]he's indicating to me that she wants to leave to go use the restroom at an enclosed

restroom facility . . . ."); id. at 160:19-161:24 (Mysliwiec).

90.    Campos again said: "Just hang out in the car.  I'll be there in a second."

- 16 -

Dashboard Cam at 8:55:02-8:55:05.

91.     Perez protested again and took a few more steps toward Campos before he said: "Ma'am just sit in the car for me, ok?"  Dashboard Cam at 8:55:06-8:55:14.

92.     Campos raised his voice and used a stern tone when he instructed Perez to remain in the vehicle.  See Dashboard Cam at 8:54:55-8:55:14.

93.     Campos had to raise his voice largely because the highway was loud and Perez was a good distance from Campos.  See Dashboard Cam at 8:54:55-8:55:14.

94.     As Perez returned to the vehicle, Ramos explained that Perez suffers from a bladder condition.  See Dashboard Cam 8:55:00-8:5515.

95.      Campos explained to Ramos that he needed Perez to remain in the car for officer safety reasons, because he "deal[s] with dangerous people all day long."  Dashboard Cam at 8:54:55-8:55:20.  See Tr. at 29:12-30:3 (Campos, Mysliwiec).

96.     Campos testified that it endangers his safety if he has to keep his eye on two people standing or sitting close to him.  See Tr. at 30:21-24 (Campos, Mysliwiec).

97.     Campos "would have let her use the restroom on the side of the road" had she asked, but he "didn't think of telling her that."  Tr. at 83:1-3 (Campos).

98.     After Campos finished questioning Ramos, Campos -- using a conversational tone -- told Ramos to "hang out" near the police car while he asked Perez some questions.  See Tr. at 30:6-12 (Campos, Mysliwiec); Dashboard Cam at 8:55:43-8:55:46.

99.     At the Mercedes, Campos asked Perez if he could ask her some questions, and Perez agreed to answer them.  See Tr. at 30:6-8 (Campos); Dashboard Cam at 8:55:54-8:56:00.

100.     Perez' telephone received multiple calls during the conversation.  See Tr. at 31:2-

8 (Campos).[5]

101.    Campos asked Perez the same questions that he had asked Ramos, but this time, Perez' story aligned with Ramos' story.  <u>See</u> Tr. at 31:10-14 (Campos); Dashboard Cam at 8:56:00-8:57:43.

102.    Campos did not know whether Perez received any text messages from Ramos when he could not see her or Ramos.  <u>See</u> Tr. at 33:18-22 (Campos, Mysliwiec).

103.    Perez did not explain why she changed her story about their travel plans.  <u>See</u> Tr. at 33:23-34:2 (Campos, Mysliwiec).

104.    After Campos finished questioning Perez, he returned to his police car where Ramos was standing and told Ramos that Campos had a few more questions for him.  <u>See</u> Dashboard Cam at 8:57:48-8:57:54.

105.    Campos asked Ramos what was wrong with Perez' bladder.  <u>See</u> Dashboard Cam at 8:57:55-8:58:00.

106.    After Ramos explained the problem, Campos asked Ramos several more questions, including whether the vehicle contained any narcotics.  <u>See</u> Dashboard Cam at 8:58:01-8:59:24.

107.    Again, Ramos did not appear afraid and instead discussed his wife's health and his travel plans in a conversational and upbeat manner.  <u>See</u> Dashboard Cam at 8:58:01-8:59:24.

108.    Campos clarified that he was not insinuating that Ramos used narcotics, and was asking only whether the vehicle contained narcotics.  <u>See</u> Dashboard Cam at 8:58:01-8:59:24.

109.     Campos then asked Ramos for consent to search Ramos' vehicle and his property within the vehicle.  <u>See</u> Tr. at 34:23-35:1 (Campos); Dashboard Cam at 8:59:25-9:00:00.

---

[5]The video plays what appears to be the sound of a cell phone ringing.  The sound is audible when Campos stands near Perez.  <u>See, e.g.</u>, Dashboard Cam at 8:55:13-8:55:16.

110.    Campos did not lean on Ramos' vehicle or touch Ramos while asking for consent to search.  See Dashboard Cam at 8:59:25-9:00:00.

111.    Ramos consented and agreed to fill out a form acknowledging that he consented to a vehicle search.  See Dashboard Cam at 8:59:25-9:00:00; Tr. at 35:4-5 (Campos).

112.    Campos asked whether Ramos preferred to read English or Spanish to ensure that Ramos could understand the consent form.  See Dashboard Cam at 8:59:40-8:59:47.

113.    Campos explained that the form granted Campos consent to search the vehicle and asked Ramos to read it.  See Dashboard Cam 8:59:49-9:00:17.

114.    Campos ensured that Ramos signed the consent form only after reading it and understanding what it meant.  See Dashboard Cam at 8:59:49-9:00:17 (instructing Ramos to "sign after you read these two paragraphs")(emphasis added).

115.    Campos asked Ramos to let him know if Ramos had any questions about the form.  See Dashboard Cam at 8:59:49-9:00:17 ("If you have any questions, let me know.").

116.    Campos gave Ramos the option to retract his consent when he said: "If you can read this form . . . if everything is still ok, you can sign."  Dashboard Cam at 8:59:49-9:00:17.

117.    The consent form states:

I _____ hereby grant my consent to _____ officers of the New Mexico Department of Public Safety, to search the following vehicle described below including luggage, containers, and contents therein. If search reveals a false or altered compartment, access to such compartment will be made by any means available; including drilling and/or cutting of compartments.

. . . .

I understand I have the right to refuse to consent to the search described above and to refuse to sign this form. I further state that no promises, threats, force, physical or mental coercion of any kind whatsoever have been used against me to get me to consent to the search described above or to sign this form.

DATE: _____   TIME: _____

1. _____        2. _____

United States v. Harmon, 785 F. Supp. 2d 1146, 1154 (D.N.M. 2011)(Browning, J.)(citing the

Department of Public Safety, Search and Seizure Vehicle Consent to Search Form).[6]

118.    After Ramos verbally consented and started filling out the consent form, Campos

told Ramos: "I know your wife has to use the restroom, but I'll get you guys out of here as soon

as I can."  Dashboard Cam at 9:00:00-9:00:12.

119.    Campos' statement that he would "get [them] out of here as soon as [he could]"

did not implicitly threaten Ramos that Ramos had to consent to a search.  Dashboard Cam at

9:00:00-9:00:12.

120.    Although Campos was wearing his sidearm when he asked for consent to search

the vehicle, it was holstered.  See Tr. at 35:6-12 (Campos, Mysliwiec).

121.    Although Campos' K-9 was in the patrol car, there were no other human officers

around and Campos did not take any physical actions intended to threaten Ramos into signing

the consent form.  See Tr. at 35:13-36:2 (Campos, Mysliwiec).

122.    Campos did not physically touch Ramos.  See Tr. at 35:19-20 (Campos,

Mysliwiec).

123.    Ramos agreed to allow Campos to search the vehicle verbally and in a written

consent form.  See Tr. at 35:2-5 (Campos, Mysliwiec).

124.    Campos also obtained Perez' verbal consent to search the vehicle and her property

within the vehicle.  See Tr. at 36:5-11 (Campos, Mysliwiec); Dashboard Cam at 9:00:55-9:01:26.

125.    Before Perez filled out the consent form, she again explained her bladder problem

to Campos, who said that he understood, but did not offer to let her use the restroom on the side

---

[6]The Court cites the New Mexico consent form from its prior opinion, because the parties
did not introduce the consent form here.

of the road.  See Dashboard Cam at 9:01:50-9:02:20.

126.    Campos directed Perez to exit the vehicle and stand off to the right shoulder while he conducted the search.  See Tr. at 36:14-20 (Campos); Dashboard Cam at 9:02:40-9:03:17.

127.    Campos then informed Perez that she could urinate behind a tree if she did not want to wait until after the search.  See Tr. at 83:16-21 (Campos, Pori); Dashboard Cam at 9:02:53-9:03:00.

128.    Campos instructed Ramos and Perez where to stand, and emphasized that they needed to remain separate for Campos' safety.  See Dashboard Cam at 9:03:00-9:04:50.

129.    After Campos performed a preliminary vehicle search to remove dangerous items from the vehicle, he deployed his K-9, who alerted Campos to the presence of drugs in the trunk area.  See Tr. at 38:1-19 (Campos, Mysliwiec).

130.    While Campos continued the search, other officers arrived at the scene to assist. See Tr. at 38:25-39:3 (Campos).

131.    Campos informed Ramos and Perez that they could ask any questions, but they did not do so.  See Tr. at 39:16-19 (Campos, Mysliwiec).

132.    At no point throughout the search did Perez or Ramos revoke their consent or ask the officers to stop the search.  See Tr. at 39:4-9 (Campos, Mysliwiec).

133.    Throughout various places in the car, Campos found approximately six packages with black axle grease covering them.  See Tr. at 40:1-41:1 (Campos).

134.    Drug-trafficking organizations use axle grease to conceal a narcotic's odor.  See Tr. at 40:7-10 (Campos).

135.    Campos then placed Ramos and Perez under arrest.  See Tr. at 41:2-3 (Campos).

## PROCEDURAL BACKGROUND

On November 5, 2015, a grand jury indicted Ramos for possession of more than 500 grams of methamphetamine with the intent to distribute it, in violation of 21 U.S.C. § 841(A)(1) and (B)(1)(a).  See Indictment, filed November 5, 2015 (Doc. 12). Ramos  moves  the  Court, pursuant to the Fourth Amendment to the Constitution of the United States of America and rule 12(b)(3)(C) of the Federal Rules of Criminal Procedure, to suppress the evidence seized from the rental car under his control on October 5, 2015.  See Motion at 1.  Ramos submits that the Court must suppress the evidence, because it was seized without a warrant after an unreasonable and excessive detention that produced his involuntary consent to search.  See Motion at 1.

Ramos argues that "[n]o part of the stop on October 15, 2015 was consensual."  Motion at 9.  Ramos contends that, instead, he was "unreasonably and excessively detained without any reasonable suspicion or probable cause and for a period which was far longer than necessary to complete a routine traffic citation."  Motion at 9.  He asserts that Campos had all of the information he needed to complete a traffic citation within minutes, but "impermissibly extended the duration of the traffic stop without any reasonable suspicion of criminal activity by extensively questioning Mr. Ramos and Ms. Perez" and by pretending to check the car's Vehicle Identification Number, even though he "had no information of any kind to suspect that the vehicle was stolen."  Motion at 12-13.  Consequently, Ramos contends, the VIN inspection and questioning "unduly prolonged the traffic stop in an effort to develop reasonable suspicion."  Motion at 13.  Moreover, Ramos asserts, "his subsequent consent to search the vehicle was involuntarily obtained during this unlawful and prolonged detention and represented nothing more than a submission to a claim of lawful authority."  Motion at 9.

The United States responded that "Campos engaged in a consensual encounter with

- 22 -

Defendant," and "received Defendant's voluntary and knowing permission to search the car."
United States' Response to Defense Motion to Suppress at 5, filed April 4, 2016 (Doc.
29)("Response").   The United States first explains that Campos' routine questioning "did not
extend the time it took Officer Campos to write the defendant's traffic citation."   Response at 2.
The United States notes that Campos "routinely checks the VIN both on the front dashboard and
in the door well," and that Campos' questioning Perez occurred while he was carrying out this
routine inspection.  Response at 2.  The United States argues that the limited detention remained
lawful as long as Campos' questioning did not unreasonably extend the traffic stop's duration.
See Response at 6.  Here, the United States contends, Campos' questioning and inspections did
not "extend[] the traffic stop beyond the amount of time it would reasonably take to perform that
traffic stop."   Response at 6.   The United States asserts that Campos obtained reasonable
suspicion to search the car while he was conducting his lawful traffic stop, because Perez and
Ramos "gave different answers to the travel plan questions."  Response at 3.

Second, the United States asserts that the traffic stop ended and Ramos began to walk
back to his vehicle, demonstrating that Ramos was free to leave.   See Response at 3-4.
Furthermore, the United States argues, Campos did not brandish a weapon, employ multiple
officers, use physical force, or request that Ramos accompany Campos to the police station.  See
Response at 9.   The United States explains that Ramos voluntarily decided to answer Campos'
further questioning and voluntarily allowed Campos to search his vehicle "without protesting or
refusing."   Response at 4.   Finally, the United States asserts that, even if there was an illegal
detention during the first traffic stop, there was no causal connection between that illegality and
Ramos' consent to search the vehicle.  See Response at 9-10.

Ramos responded on April 15, 2016.   See Defendant's Reply to the Government's

Response to the Motion to Suppress Evidence, filed April 15, 2016 (Doc. 33)("Reply").  Ramos "does not challenge the initial stop for speeding," but insists that Campos' VIN inspection and questioning Perez "unreasonably exceeded the scope and duration of the traffic stop, in violation of the Fourth Amendment."  Reply at 4-5.  Ramos asserts that police officers conducting traffic stops may "generally inquire about a driver's travel plans," but only "so long as the questioning does not prolong the stop."  Reply at 5.  Here, Ramos contends, Campos "measurably extend[ed]" the stop.  Reply at 5.  Ramos argues that this Fourth Amendment violation tainted all of Ramos' subsequent actions.  See Reply at 12-15.

Second, Ramos reiterates his Motion's arguments that he did not voluntarily give his consent.  See Reply at 8-10.  Ramos argues that, even if the questioning began as a consensual encounter, because Campos "repeatedly ordered Ms. Perez to return to the interior of the Mercedes and be seated and then directed Mr. Ramos to remain by the side of the police cruiser," a reasonable person would not have understood he or she was at liberty to ignore the police and leave.  Reply at 11.

The Court held a hearing on May 25, 2016.  At the hearing, the United States called Campos.  See Tr. at 3:5-7 (Mysliwiec).  Campos described the October 15, 2015 traffic stop.  See Tr. at 8:6-41:9 (Campos, Mysliwiec).  Campos explained his normal procedure for conducting traffic stops, which includes engaging the driver in conversation while he issues the citation.  See Tr. at 16:11-23 (Campos, Mysliwiec).  Campos then described his routine process of checking VINs both on the windshield and inside of the car door to confirm that a car is not stolen.  See Tr. at 19:2-18 (Campos, Mysliwiec).  He noted that he is trained to inspect VINs.  See Tr. at 19:22-20:18 (Campos, Mysliwiec); id. at 107:15-109:8 (Campos, Mysliwiec).  Campos later explained his extensive training in conducting traffic stops, and stated that he was instructed to

always check the VIN on the inside of the car, because it would better reveal whether the car was

stolen.  See Tr. at 101:17-107:15 (Campos, Mysliwiec)(asserting that he could not rely on the

dashboard VIN alone, but instead relied on the tamper-proof sticker in the car door, because it

reveals tampering).

On cross-examination, Campos admitted that the citation form did not require him to

record the VIN.  See Tr. at 74:5-6 (Campos).  He stated that he compared the VIN to the rental

agreement "to make sure that vehicle actually belonged to the contract that they had."  Tr. at

73:7-11 (Campos); id. at 98:1-3 (Campos)(explaining that he checks VINs, because vehicles may

be stolen, even if the owner does not report them as stolen).  He noted that the rental agreement

did not contain the vehicle's VIN, but asserted that he could also verify that the car was not

stolen by comparing the VINs to the dispatcher's information.  See Tr. at 73:12-74:9 (Campos,

Pori).  Throughout much of the cross-examination, Campos watched the video dashboard

recording and identified how long it took him to perform certain tasks involved in the traffic

stop.  See Tr. at 76:20-78:2 (Campos, Pori).  Finally, Campos described his interaction with

Perez and explained that he instructed her to remain in the car for "officer safety reasons."  Tr. at

79:18-86:24 (Campos, Pori).

The parties then argued the Motion.  Ramos asserted that Campos' unconstitutional

behavior began when he started checking the VINs.  See Tr. at 127:8-20 (Court, Pori).  He stated

that "there was no evidence that there was [sic] any wants or warrants" or that the car was stolen,

because "the license plate, the rental agreement all confirm that that car belonged to Enterprise

Rent-a-Car and [h]e had a rental agreement in the name of Edward Ramos."  Tr. at 127: 10-16

(Pori).  Further, Ramos argued, there is no evidence "that Enterprise was in possession of a VIN-

switched Mercedes."  Tr. at 127:17-20 (Pori).  Ramos clarified that he did not dispute Campos

asking him to leave his vehicle and stand in front of the police car and to provide proof of license and insurance.  See Tr. at 127:21-129:10 (Court, Pori).  The Court asked Ramos what is different about an officer asking to check the VIN.  See Tr. at 129:11-12 (Court).  Ramos responded that Campos used the VIN inspection as "a ruse to get to the interior portions of the vehicle without probable cause or reasonable suspicion."  Tr. at 129:16-20 (Pori).

Ramos asserted that, if officers can conduct VIN checks in the same way that they investigate proof of insurance, "the officer's actions should be limited to actually checking the VIN" that "is visible in the exterior portion of the windshield" to avoid intruding into the driver's privacy rights.  Tr. at 134:19-23 (Pori).  Ramos further contended that Campos' questions did not relate to checking the VIN.  See Tr. at 135:17-23 (Pori).  Ramos concluded that "the scope of the investigation was excessive when the door was opened, and the length of the detention and the questioning completely unrelated to any VIN analysis" caused the detention to extend further. Tr. at 136:1-4 (Pori).  Ramos argues that Campos obtained Ramos' consent only through the illegal search.  See Tr. at 136:6-22 (Pori).

The United States clarified that Campos did not have reasonable suspicion that there was a stolen car.  See Tr. at 145:10-12 (Mysliwiec).  The United States instead took the position that "the VIN check is properly and legally allowed by the law categorically in every traffic stop without requiring its own reasonable suspicion."  Tr. at 145:17-19 (Mysliwiec).  It explained that, like proof of insurance and registration, the VIN confirmed that "this person can operate this car on this highway."  Tr. at 146:2-3 (Mysliwiec).  The Court asked whether the interior VIN check was lawful when it took so long.  See Tr. at 153:10-16 (Court)("[T]hat's a long time to check the VIN, even if you're trying to keep an eye on Ms. Perez.").  The Court stated that an officer's "primary responsibility has to be on checking the VIN, not on watching her or talking to

her, right?"   Tr. at 153:13-16 (Court).   The United States responded that Campos' primary responsibility was not only to check the VIN, but to ensure that Perez did not pull out any weapons, so he had to keep an eye on her while he was inspecting the VIN.   See Tr. at 153:17-21 (Mysliwiec).

## RELEVANT LAW REGARDING FOURTH AMENDMENT SEARCHES

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV. It also commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.   In determining whether a Fourth Amendment violation has occurred, courts must "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted."  United States v. Jones, 132 S. Ct. 945, 950 (2012)(Scalia, J.)(alteration in original)(quoting Kyllo v. United States, 533 U.S. 27, 31 (2001)(Scalia, J.)).

"Not all searches require a warrant.   The hallmark of the Fourth Amendment is reasonableness."   United States v. Harmon, 785 F. Supp. 2d 1146, 1157 (D.N.M. 2011)(Browning, J.).   See United States v. McHugh, 639 F.3d 1250, 1260 (10th Cir. 2011)("[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'")(quoting Brigham City, Utah v. Stuart, 547 U.S. 398 (1978)).   "In the criminal context, reasonableness usually requires a showing of probable cause."  Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d 1174, 1184 (D.N.M. 2011)(Browning, J.)(quoting Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls, 536 U.S. 822, 828 (2002)).   The Supreme Court of the United States has stated in the law enforcement context that "searches conducted outside the judicial

process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967)(footnotes omitted).

**1.      Reasonable Government Searches.**

"[B]ecause 'the ultimate touchstone of the Fourth Amendment is reasonableness,'" when a search implicating the Fourth Amendment has occurred, the district court must determine whether the search is reasonable.  Kentucky v. King, 131 S. Ct. at 1856 (quoting Brigham City v. Stuart, 547 U.S. 398, 403 (2006)).    See Samson v. California, 547 U.S. 843, 848 (2006)("'[U]nder our general Fourth Amendment approach' we 'examin[e] the totality of the circumstances' to determine whether a search is reasonable within the meaning of the Fourth Amendment.")(quoting United States v. Knights, 534 U.S. 112, 118 (2001)).  "Although the Fourth Amendment ordinarily requires the degree of probability embodied in the term 'probable cause,' a lesser degree satisfies the Constitution when the balance of governmental and private interests makes such a standard reasonable."  United States v. Knights, 534 U.S. at 121 (citing, as an e.g. cite, Terry v. Ohio, 392 U.S. 1 (1968)("Terry")).  The Supreme Court has justified this balancing test with the recognition that "[t]he Fourth Amendment does not protect all subjective expectations of privacy, but only those that society recognizes as 'legitimate.'"  Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 654 (1995)(quoting New Jersey v. T.L.O., 649 U.S. 325, 338 (1985)).

"Whether a search is reasonable 'is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'"  Samson v. California, 547 U.S. at 848 (quoting United States v. Knights, 534 U.S. at 118).  See Banks v. United States, 490 F.3d

1178, 1184 (10th Cir. 2007)(stating that the Supreme Court "described the totality-of-the-circumstances test as one where 'the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy, and on the other, the degree to which it is needed for the promotion of legitimate governmental interests'" (quoting United States v. Knights, 534 U.S. at 119-20)).

> As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is "reasonableness."  At least in a case . . . where there was no clear practice, either approving or disapproving the type of search at issue, at the time the constitutional provision was enacted, whether a particular search meets the reasonableness standard "'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.'"

Vernonia Sch. Dist. 47J v. Acton, 515 U.S. at 652-53 (1995)(quoting Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 617 (1989)).  The Supreme Court has held that the test of reasonableness under the Fourth Amendment is not a concrete test:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application.  In each case [determining reasonableness] requires a balancing of the need for the particular search against the invasion of personal rights that the search entails.  Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

Bell v. Wolfish, 441 U.S. 520, 559 (1979).

In analyzing the first factor -- the intrusion on the individual's privacy -- courts and the Tenth Circuit look to the individual's privacy expectations.  See, e.g., United States v. Knights, 534 U.S. 112, 119-120 (2001)(noting that the petitioner had a "significantly diminished . . . reasonable expectation of privacy," because a condition of his probation was to consent to search of his apartment without notice or probable cause, and because he was clearly notified and informed of the provision); Banks v. United States, 490 F.3d at 1186-87 (noting that the plaintiffs, convicted felons on probation, have a more limited expectation of privacy than the

ordinary citizen, and noting that "[w]hat is 'reasonable' under the fourth amendment for a person on conditional release, or a felon, may be unreasonable for the general population"); Boling v. Romer, 101 F.3d 1336, 1340 (10th Cir. 1999)("[W]hile obtaining and analyzing the DNA or saliva of an inmate convicted of a sex offense is a search and seizure implicating Fourth Amendment concerns, it is a reasonable search and seizure. This is so in light of an inmate's diminished privacy rights . . . .")

As Justice Kagan has noted, property law informs society's expectations about what government intrusions are reasonable: "It is not surprising that in a case involving a search of a home, property concepts and privacy concepts should so align. The law of property 'naturally enough influence[s]' our 'shared social expectations' of what places should be free from governmental incursions." Florida v. Jardines, 133 S. Ct. at 1419 (Kagan, J., concurring)(quoting Georgia v. Randolph, 547 U.S. 103, 111 (2006)). Similarly, in Vernonia Sch. Dist. 47J v. Acton, Justice Scalia, writing for the majority noted: "What expectations are legitimate varies, of course, with context, depending, for example, upon whether the individual asserting the privacy interest is at home, at work, in a car, or in a public park." 515 U.S. at 654 (internal citations omitted).

### 2. **Traffic Stops**.

A traffic stop is an investigative detention, see United States v. Toro–Pelaez, 107 F.3d 819, 823024 (10th Cir. 1997), and is thus analyzed according to the principles that the Supreme Court set forth in Terry, see United States v. Kitchell, 653 F.3d 1206, 1216 (10th Cir. 2011)(concluding that a traffic stop is a Terry stop); United States v. Leon–Quijada, 107 F.3d 786, 792 (10th Cir. 1997). In Terry, the Supreme Court authorized police officers to conduct limited seizures and to search a person's outer clothing when the officer has reasonable suspicion

that criminal activity may be afoot.  See Terry, 392 U.S. at 30-31.  The Tenth Circuit has concluded that traffic stops fall into the category of Terry stops.  See United States v. Toro–Pelaez, 107 F.3d at 823-24 ("A traffic stop is a seizure within the meaning of the Fourth Amendment[, but] it is characterized as an investigative detention, which requires reasonable suspicion of criminal activity before a seizure can be made, rather than a full custodial arrest, which requires probable cause.").  See United States v. Sedillo, No. CR 08-1419 JB, 2010 WL 965743, at *10 (D.N.M. Feb. 19, 2010)(Browning, J.); United States v. Hanrahan, No. CR 04-1978 JB, 2005 WL 2312746, at *4 (D.N.M. Aug. 12, 2005)(Browning, J.), aff'd, 508 F.3d 962 (10th Cir. 2007).

For officers to lawfully stop a vehicle, they must have "a particularized and objective basis for suspecting the particular persons stopped of criminal activity." United States v. Leos–Quijada, 107 F.3d at 792 (citing United States v. Cortez, 449 U.S. 411, 417-18 (1981)).  Police officers may stop a vehicle only when they have "a reasonable, articulable suspicion that the detainee has been, is, or is about to be engaged in criminal activity." United States v. Elkins, 70 F.3d 81, 83 (10th Cir. 1995)(citing United States v. Nicholson, 983 F.2d 983, 987 (10th Cir. 1993)).  Reasonable suspicion is not determined by any one factor, but by the totality of the circumstances that the officer knew.  See United States v. Ceballos, 2009 WL 4642368, at *2-3 (10th Cir. 2009)(unpublished); United State v. Elkins, 70 F.3d at 83 (citing Alabama v. White, 496 U.S. 325, 330 (1990)).  Even if the officer does not form subjective reasonable suspicion, if the circumstances of which he is aware would lead an officer to develop reasonable suspicion, the stop is proper.  See United States v. Ceballos, 2009 WL 4642368, at *2 (holding that an officer's "subjective characterization of his actions is irrelevant").

If a police officer observes a traffic violation, the officer has cause to execute a traffic stop.  See Whren v. United States, 517 U.S. 806, 809-10 (1996)("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."); United States v. Ramstad, 308 F.3d 1139, 1144 & n. 1 (10th Cir. 2002)(acknowledging that Whren v. United States "indicate[d] that probable cause is a *sufficient* ground for a stop," but explaining that reasonable suspicion is all that is necessary) (quoting United States v. Callarman, 273 F.3d 1284, 1286 (10th Cir. 2001)).  Even if the officer has an ulterior motive for executing the traffic stop -- i.e., to investigate some other suspected illegal conduct -- the officer can lawfully pull over a vehicle that he or she observes violating the traffic laws.  See Whren v. United States, 517 U.S. at 813-14; United States v. King, 209 F. App'x 760, 762 (10th Cir. 2006)("The constitutional reasonableness of a traffic stop does not depend on the actual motivations of the officer involved.")(citing Whren v. United States).   In other words, there is no constitutional prohibition on what are colloquially referred to as "pretext stops," so long as the officer also had a constitutional basis for executing the stop.  United States v. Sedillo, 2010 WL 965743, at *10.

"A seizure for a traffic violation justifies a police investigation of that violation." Rodriguez v. United States, 135 S. Ct. 1609 (2015).  See Knowles v. Iowa, 525 U.S. 113, 117 (1998)(observing that the investigation into the traffic offense is "a relatively brief encounter" that is "more analogous to a so-called 'Terry stop' . . . than to a formal arrest" (quoting Berkemer v. McCarty, 468 U.S. 420, 439 (1984))).  The "tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission' -- to address the traffic violation that warranted the stop, . . . and attend to related safety concerns."  Rodriguez v. United States, 135 S. Ct. at 1614.  Because the officer's purpose is to address the traffic infraction, the stop may last

no longer than is necessary to effectuate that purpose.  See Illinois v. Caballes, 543 U.S. 405, 407 (2005).  The authority for the seizure therefore ends when the officer completes -- "or reasonably should have [] completed" -- the tasks tied to the traffic infraction.  Rodriguez v. United States, 135 S. Ct. at 1614.  See United States v. Hunnicutt, 135 F.3d 1345 (10th Cir. 1998)(observing that the traffic stop must last no longer than necessary to confirm or deny the suspicion that justified the stop -- the traffic offense).  In short, absent reasonable suspicion to justify an extended detention, an officer cannot "measurably extend" the stop beyond the time reasonably necessary to complete his traffic-related inquiries.  United States v. Rodriguez, 135 S. Ct. 1609, 1615 (2015).

Beyond writing the traffic citation, an officer's mission includes "ordinary inquiries incident to [the traffic] stop."  Illinois v. Caballes, 543 U.S. at 408.  Typically, these inquiries involve checking the driver's license, registration, and proof of insurance, as well as determining whether any outstanding warrants for the driver exist.  See Delaware v. Prouse, 440 U.S. 648, 658-60 (1979).  These checks serve the same purpose as the traffic code: to ensure that vehicles on the road are operated safely and responsibly.  See Delaware v. Prouse, 440 U.S. at 658-59; 4 W. LaFave, Search and Seizure § 9.3(c), 507-517 (5th ed. 2012).  Similarly, a VIN inspection confirms that the driver can legally operate this particular vehicle -- because it is not stolen -- on the highway.  See New York v. Class, 457 U.S. 106, 115 (1986)(concluding that "a demand to inspect the VIN, like a demand to see license and registration papers, is within the scope of police authority pursuant to a traffic violation stop").  The Supreme Court has held VIN searches "constitutionally permissible in light of the lack of a reasonable expectation of privacy in the VIN and the fact that the officer's observed respondent commit two traffic violations."  New York v. Class, 457 U.S. at 119; id. at 114 ("[I]t is unreasonable to have an expectation of privacy

in an object required by law to be located in a place ordinarily in plain view from the exterior of the automobile.").  Unlike license and insurance, however, checking the VIN located inside of the vehicle's doorjamb requires opening the vehicle's door.  Nonetheless, the Supreme Court has stated that neither of the VIN's two locations -- "either inside the doorjamb, or atop the dashboard and thus ordinarily in plain view of someone outside the automobile" -- is subject to a reasonable expectation of privacy."  New York v. Class, 475 U.S. at 118.  Checking a vehicle's VIN therefore has a similarly close connection to roadway safety as the ordinary inquiries, so it can fairly be characterized as part of the officer's traffic mission.

Officers may also engage in routine questioning while conducting the traffic stop, but "only 'so long as [unrelated] inquiries do not measurably extend the duration of the stop.'" Rodriguez v. United States, 135 S. Ct. at 1614 (quoting Arizona v. Johnson, 555 U.S. 323, 327-28(2009)).  See Muehler v. Mena, 544 U.S. 93, 101 (2005)(noting that, because unrelated inquiries did not "exten[d] the time [the petitioner] was detained[,] . . . no additional Fourth Amendment justification . . . was required").  Accordingly, an officer may conduct certain unrelated checks during a lawful traffic stop, but "he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." Rodriguez v. United States, 135 S. Ct. at 1615.

In United States v. Rodriguez, the Supreme Court held that a "seizure justified only by a police-observed traffic violation, therefore, become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission of issuing a ticket for the violation."  135 S. Ct. at 1612 (alterations in original)(internal quotation marks omitted).  There, a police officer issued a driver a traffic warning, and returned to the driver and to the passenger all of their documents.  See 135 S. Ct. at 1613.  After "the justification for the traffic stop was 'out of the

way,'" the officer, without permission from the driver: (i) instructed the driver to turn off the ignition, exit the vehicle, and stand by the patrol car; and (ii) deployed a K-9 to circle the vehicle twice to sniff for drugs.  135 S. Ct. at 1613.  "[S]even or eight minutes had elapsed from the time [the officer] issued the written warning until the dog indicated the presence of drugs."  135 S. Ct. at 1613.  The Supreme Court rejected the Eighth Circuit's conclusion that the seven- or eight-minute delay constituted an acceptable "*de minimis* intrusion on Rodriguez's personal liberty."  135 S. Ct. at 1614.  The Supreme Court concluded that the dog sniff, if performed without reasonable suspicion, measurably extended the detention and noted that the officer's authority to detain the driver "end[ed] when tasks tied to the traffic infraction are -- or reasonably should have been -- completed."  Rodriguez v. United States, 135 S. Ct. at 1614.  See United States v. Sharpe, 470 U.S. 675, 686 (1985)(stating that, in determining the reasonable duration of a stop, "it [is] appropriate to examine whether the police diligently pursued [the] investigation").

### 3.  Vehicle Searches.

While an automobile stop may be made based on reasonable suspicion that the driver has committed a crime, see United States v. Toro–Pelaez, 107 F.3d at 823-24, an officer must have probable cause to believe that the vehicle contains contraband or other evidence of criminality to execute an automobile search, see United States v. Forbes, 528 F.3d 1273, 1277-78 (10th Cir. 2008)("[T]he Fourth Amendment unquestionably prohibits the search of a vehicle's interior unless law enforcement officials receive consent, have a warrant, or otherwise establish probable cause to support the search.").  Under the automobile-exception to the warrant requirement, however, a warrant is generally not required.  See Maryland v. Dyson, 527 U.S. 465, 466-67 (1999); United States v. Burgess, 576 F.3d 1078, 1087 (10th Cir. 2009)(citing California v. Acevedo, 500 U.S. 565, 580 (1991)).  The ongoing exigent circumstance that the vehicle might

drive away has led the Supreme Court to conclude that a warrant is not required to search a

vehicle.  See Maryland v. Dyson, 527 U.S. at 466-67 ("[W]here there [is] probable cause to

search a vehicle[,] a search is not unreasonable if based on facts that would justify the issuance

of a warrant, even though a warrant has not been actually obtained.")(citing United States v.

Ross, 456 U.S. 798, 809 (1982))(internal quotes omitted); California v. Carney, 471 U.S. 386,

393-94 (1985).  Thus, as long as the investigating officer has probable cause to believe that the

vehicle contains contraband or evidence of criminality, he or she may search the vehicle without

a search warrant.  See United States v. Sedillo, No. CR 08-1419 JB, 2010 WL 965743, at *11.

### 4.    Consensual Searches.

Searches conducted pursuant to consent constitute one exception to the Fourth

Amendment's search warrant and probable-cause requirements.  See Schneckloth v. Bustamonte,

412 U.S. 218, 219 (1973).  When an individual consents to a police search, and the consent is

"freely and voluntarily given," the search does not implicate the Fourth Amendment.  United

States v. Peña, 143 F.3d 1363, 1366 (10th Cir. 1998)(quoting Schneckloth v. Bustamonte, 412

U.S. at 219).  The Tenth Circuit has provided a two-part test for determining voluntariness,

which requires that the government (i) "'proffer clear and positive testimony that consent was

unequivocal and specific and intelligently given'"; and (ii) "the officers must have used no

'implied or express duress or coercion.'"  United States v. Sanchez, 608 F.3d 685, 690 (10th Cir.

2010)(quoting United States v. Taverna, 348 F.3d 873, 878 (10th Cir. 2003)).

Determining whether a party's consent was free and voluntary is a question of fact to be

determined from the totality of the circumstances.  See United States v. Peña, 143 F.3d at 1366.

The Supreme Court and the Tenth Circuit have developed a non-exhaustive list of factors that

courts should consider when trying to determine whether a defendant's consent was voluntarily

given:

> (i) the "threatening presence of several officers;" (ii) the "use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory," or, conversely, the "officer's pleasant manner and [ ] tone of voice;" (iii) the "prolonged retention of a person's personal effects such as identification," or, conversely, "the prompt return of the defendant's identification and papers;" (iv) the "absence of other members of the public," or, conversely, whether the stop occurs in "a public location such as 'the shoulder of an interstate highway, in public view;'" (v) the "officer's failure to advise the defendant that [he or] she is free to leave."   United States v. Ledesma, 447 F.3d [1307,] 1314 [10th Cir. 1997)](citing and quoting numerous sources).   Other factors include: (vi) "the display of a weapon, [and (vii)] physical touching by the officer."   United States v. Anderson, 114 F.3d 1059, 1064 (10th Cir. 1997).

United States v. Sedillo, No. CR 08-1419 JB, 2010 WL 965743, at *12 (D.N.M. Feb. 19, 2010) (Browning, J)(some alterations in original).   See United States v. Fox, 600 F.3d 1253, 1258 (10th Cir. 2010).   The inquiry is an objective one.   See United States v. Ringold, 335 F.3d 1168, 1172 (10th Cir. 2003).   "As long as a reasonable innocent person, as opposed to a person knowingly carrying contraband, would feel free to leave, such encounters are consensual and need not be supported by reasonable suspicion of criminal activity."   United States v. Laboy, 979 F.2d 795, 798 (10th Cir. 1992).

Because courts are required to look at the totality of the circumstances in determining whether an individual's consent was voluntary, see United States v. Peña, 143 F.3d at 1366, no one factor is dispositive in a court's inquiry into the circumstances.   For example, although an officer's failure to advise a defendant that he or she is free to leave might suggest in some circumstances that coercive law enforcement conduct caused the defendant's consent to search, the Supreme Court has ruled that officers do not need to advise an individual of his or her right to refuse to consent to a search for that individual's consent to be voluntary.   See Schneckloth v. Bustamonte, 412 U.S. at 232.   Moreover, the mere presence of officers by exits to a building, threatening no more than to question individuals if they seek to leave, "should not [result] in any

reasonable apprehension by any [individuals] that they would be seized or detained in any meaningful way." United States v. Drayton, 536 U.S. 194, 205 (2002)(internal citations omitted). Additionally, an officer's display of a weapon may contribute to the coercive nature of a situation, but "[t]he presence of a holstered firearm . . . is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon." United States v. Drayton, 536 U.S. at 205. As such, "it is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced. It is this careful sifting of the unique facts and circumstances of each case that is evidenced in our prior decisions involving consent searches." Schneckloth v. Bustamonte, 412 U.S. at 232.

A suspect may give consent through conduct rather than words. "To satisfy the first prong of the voluntariness requirement, a defendant's consent must be clear, but it need not be verbal. Consent may instead be granted through gestures or other indications of acquiescence, so long as they are sufficiently comprehensible to a reasonable officer." United States v. Guerrero, 472 F.3d at 789-90. See Ysasi v. Brown, 3 F. Supp. 3d 1088, 1143 (D.N.M. 2014)(Browning, J.)(noting that consent "need not be spoken, but 'may instead be granted through gestures or other indications of acquiescence'"). For example, in United States v. Ringold, 335 F.3d 1168 (10th Cir. 2003), the Tenth Circuit held that an affirmative nod was sufficient to constitute consent. See 335 F.3d at 1175.

In United States v. Gordon, the suspect moved to suppress all physical evidence an officer seized from a locked duffle bag. See 173 F.3d at 765. The officer then asked to see the suspect-train passenger's ticket and identification, inquired into his travel plans, and asked if he had any luggage. See 173 F.3d at 765. The officer did not inform the suspect that he was free to leave or not answer her questions. See 173 F.3d at 765. The officer asked to search the

suspect's luggage and the suspect gave his consent.   She asked him whether he had any contraband, informing him that contraband was the subject of her search.  See 173 F.3d at 765. When she encountered the suspect's locked bag, she asked him if he could open it.  See 173 F.3d at 765.  Although the suspect did not respond verbally, he "removed the key from his pocket and handed it to [the officer]."  173 F.3d at 766.  The Tenth Circuit concluded that the suspect's "voluntary relinquishment of the key evidenced his consent to search the locked duffle bag." 173 F.3d at 765.

The Tenth Circuit proceeded to describe how the search of the locked bag, which was inside the suspect's other luggage, did not exceed the scope of the suspect's consent to search his luggage.  See 173 F.3d at 766.  The ultimate issue in determining the scope of consent is what a reasonable person would have understood the suspect's consent to include.  See United States v. Wacker, 72 F.3d 1453, 1470 (10th Cir. 1995).  The Tenth Circuit determines whether a search remains within the boundaries of the consent given based on the totality of the circumstances. See United States v. Sanchez, 89 F.3d 715, 719 (10th Cir. 1996).  When an officer tells a suspect the object of his search and the suspect consents to a search for that object within a certain area, the Tenth Circuit has "consistently and repeatedly" held that the suspect thereby consents to a search of any area within the confines of the officer's request where the object may be found. United States v. Peña, 143 F.3d at 1368 (concluding that, "[b]ecause Peña consented to a search for drugs, he consented to a search of any area in the motel room where one might hide drugs"). See United States v. McRae, 81 F.3d 1528, 1538 (10th Cir. 1996)(holding that the search did not exceed the scope of consent given when the suspect gave the officers consent to search his vehicle's trunk, and they found contraband when they lifted up the trunk's carpet); United States v. Wacker, 72 F.3d at 1470 (holding that, "where a suspect does not limit the scope of a search, .

. . an officer is justified in searching the entire vehicle"); <u>United States v. Santurio</u>, 29 F.3d 550, 553 (10th Cir. 1994)(holding that the removal of "a few screws from the strip holding down the carpet which covered the metal compartment containing the packages of cocaine" did not exceed the scope of consent to search the car); <u>United States v. Mains</u>, 33 F.3d 1222, 1227 (10th Cir. 1994)(holding that, because the defendant consented to a search of his apartment for another person, he consented to the search of any area large enough to accommodate that individual).

Notably, if the suspect fails to object to the officer's search, it indicates that "the search was within the scope of consent."  <u>United States v. Gordon</u>, 173 F.3d at 766.  <u>See</u> <u>United States v. Sanchez</u>, 89 F.3d at 719 (concluding that an officer's search of a suspect's car was valid when the suspect gave consent to search the car for weapons, but failed to object when the officer began to search the glove compartment and discovered narcotics).  Accordingly, in <u>United States v. Gordon</u>, the Tenth Circuit found it "most significant[]" that Gordon did not object to a search of the locked bag when the officer discovered it within his larger bags.  173 F.3d at 766 (citing <u>Florida v. Jimeno</u>, 500 U.S. 248, 252 (1991)("A suspect may of course delimit as he chooses the scope of the search to which he consents.")).  The Tenth Circuit emphasized: "We consistently and repeatedly have held a defendant's failure to limit the scope of a general authorization to search, and failure to object when the search exceeds what he later claims was a more limited consent, is an indication the search was within the scope of consent."  173 F.3d at 766.

## **RELEVANT LAW REGARDING THE EXCLUSIONARY RULE**

When evidence is obtained in violation of a person's Fourth or Fifth Amendment rights, the government will generally be prohibited from using that evidence in a criminal prosecution of that person.  <u>See Sanchez–Llamas v. Oregon</u>, 548 U.S. 331, 332-33 (2006)("[T]he exclusionary rule has been used primarily to deter certain Fourth and Fifth Amendment

violations, including, e.g., unconstitutional searches and seizures, and confessions exacted in violation of the right against compelled self-incrimination or due process.")(internal citations omitted); United States v. Calandra, 414 U.S. 338, 347 (1974)("Under this rule, evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure.").  The exclusionary rule will apply if the defendant can show, by a preponderance of the evidence, a constitutional violation under the Fourth Amendment and a causal nexus between the violation and the evidence sought to be excluded. See United States v. Torres–Castro, 470 F.3d 992, 999 (10th Cir.2006).  Once the defendant makes this showing, the burden shifts to the United States to prove that an exception to the exclusionary rule applies.  See United States v. Torres–Castro, 470 F.3d at 999. The Supreme Court has recognized several exceptions to the exclusionary rule.  See United States v. Alabi, 943 F. Supp. 2d 1201, 1255 (D.N.M. 2013), aff'd, 597 F. App'x 991 (10th Cir. 2015).

One such exception is the attenuation doctrine: "Evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" Utah v. Strieff, No. 14-1373, slip op. at 5, 2016 WL 3369419, at *5 (quoting Hudson v. Michigan, 547 U.S. 586, 593 (2006)).  "The attenuation doctrine evaluates the causal link between the government's unlawful act and the discovery of evidence."  Utah v. Strieff, No. 14-1373, slip op. at 5, 2016 WL 3369419, at *5 (2016).  To determine whether there are sufficient intervening acts to break the causal chain between the unlawful stop and the discovery of evidence, courts examine the three factors that the Supreme Court articulated in Brown v. Illinois, 422 U.S. 590 (1975).

First, the Court looks to the "temporal proximity" between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search. Brown v. Illinois, 422 U.S. at 603. This factor often favors suppressing the evidence unless "substantial time" elapses between an unlawful act and the time the evidence is obtained. Kaupp v. Texas, 538 U.S. 626, 633 (2003)(per curiam). The Supreme Court has previously concluded that a time span of "less than two hours" between the unconstitutional arrest and the confession was too short an interval, and, therefore, counseled in favor of suppressing the evidence. Brown v. Illinois, 422 U.S. at 604.

Second, the Court considers "the presence of intervening circumstances." Brown v. Illinois, 422 U.S. at 603-04. The Supreme Court found sufficient intervening circumstances to admit the evidence in Segura v. United States, 468 U.S. 796 (1984), where it applied the independent source doctrine. See 468 U.S. at 799-801, 814. There, agents had probable cause to believe that apartment occupants were dealing cocaine. See 468 U.S. at 799-800. They sought a warrant. See 468 U.S. at 799-800. In the meantime, they entered the apartment, arrested the occupant, and discovered evidence of drug activity during their security sweep. See 468 U.S. at 800-01. The next evening, they obtained a search warrant. See 468 U.S. at 800-01. The Supreme Court deemed the evidence admissible, notwithstanding the illegal search, because the information supporting the warrant was "wholly unconnected with the entry and was known to the agents well before the initial entry." 468 U.S. at 814. The Supreme Court suggested that "the existence of a valid warrant favors finding that the connection between unlawful conduct and the discovery of evidence is 'sufficiently attenuated to dissipate the taint.'" Utah v. Strieff, No. 14-1373, slip op. at 5, 2016 WL 3369419, at *6-7 (quoting Segura v. United States, 468 U.S. at 815).

Third, and "particularly" significant under the Supreme Court's analysis, the Court examines "the purpose and flagrancy of the official misconduct." Brown v. Illinois, 422 U.S. at 604. See Utah v. Strieff, No. 14-1373, slip op. at 6, 2016 WL 3369419, at *5 (observing that the third factor is particularly significant). The exclusionary rule exists to deter police misconduct. See Davis v. United States, 564 U.S. 229, 236-37 (2011). The third factor reflects this rationale by favoring exclusion "only when the police misconduct is most in need of deterrence -- that is, when it is purposeful or flagrant." Utah v. Strieff, No. 14-1373, slip op. at 8, 2016 WL 3369419, at *7. Mere negligence in violating the Fourth Amendment "hardly rise[s] to a purposeful or flagrant violation." Utah v. Strieff, No. 14-1373, slip op. at 8, 2016 WL 3369419, at *7.

## ANALYSIS

Campos did not unlawfully extend the traffic stop when he questioned Ramos and Perez and inspected the vehicle's VIN. After the traffic stop ended, Ramos voluntarily consented to answer further questions. Although this questioning evolved into a lawful detention that reasonable suspicion supported, Ramos nonetheless freely and voluntarily consented to a vehicle search during the detention. Accordingly, Campos' vehicle inspection was lawful. Additionally, even if Campos had unlawfully extended the traffic stop, Ramos' consent was too attenuated from any unlawful actions to justify the suppression of the evidence. The Court therefore denies the Motion and will not suppress the evidence.

## I.   CAMPOS' VIN INSPECTION AND QUESTIONING DID NOT UNLAWFULLY EXTEND THE TRAFFIC STOP'S DURATION.

Ramos admits that he was speeding, making Campos' initial traffic stop a lawful detention under Terry. See United States v. Kitchell, 653 F.3d 1206, 1216 (10th Cir. 2011)(concluding that a traffic stop is a Terry stop). Campos' Terry stop must have lasted no longer than necessary to confirm or deny the suspicion that justified the stop. See United States

v. Hunnicutt, 135 F.3d 1345, 1349 (10th Cir. 1998).  In other words, absent reasonable suspicion to justify an extended detention, Campos could not "measurably extend" the stop beyond the time reasonably necessary to complete his traffic-related inquiries.  United States v. Rodriguez, 135 S. Ct. 1609, 1615 (2015).  Ramos argues that Campos violated the Fourth Amendment when he unnecessarily extended the traffic stop by: (i) checking the doorjamb VIN; and (ii) engaging in prolonged questioning.  See Motion at 12-14.

Campos' VIN inspection did not violate Ramos' Fourth Amendment rights.  The Supreme Court has held VIN searches "constitutionally permissible in light of the lack of a reasonable expectation of privacy in the VIN and the fact that the officer's observed respondent commit two traffic violations."  New York v. Class, 457 U.S. at 119; id. at 114 ("[I]t is unreasonable to have an expectation of privacy in an object required by law to be located in a place ordinarily in plain view from the exterior of the automobile.").  Unlike license and insurance, however, checking the VIN located inside of the vehicle's doorjamb requires opening the vehicle's door.  Nevertheless, the Supreme Court has stated that neither of the VIN's two locations -- "either inside the doorjamb, or atop the dashboard and thus ordinarily in plain view of someone outside the automobile" -- "is subject to a reasonable expectation of privacy."  New York v. Class, 475 U.S. at 118.

In New York v. Class, the officer checked both the VIN on the doorjamb and on the windshield.  See 475 U.S. at 118-19.  The Supreme Court noted that officers cannot "enter a vehicle to obtain a dashboard-mounted VIN when the VIN is visible from outside the automobile."  475 U.S. at 119.  By "entering a vehicle," the Supreme Court was not referencing opening the door to view the VIN located on the doorjamb.  475 U.S. at 119.  It was referencing the officer's actions in the case: reaching into the passenger compartment and moving items

inside of the vehicle.  See 475 U.S. at 118-19.  The Supreme Court made clear that it did not consider the officer's checking the doorjamb VIN to be an intrusion into the vehicle's interior. See 475 U.S. at 118 ("He did not even intrude into the interior at all until after he had checked the doorjamb for the VIN." (emphasis added)).  It observed that "officers were entitled to [check the VIN] as part of an undoubtedly justified traffic stop."  475 U.S. at 119.  Furthermore, Campos was authorized to examine not only the windshield VIN, but also the doorjamb VIN, as part of his lawful traffic stop.

Ramos argues that Tenth Circuit precedent demonstrates that officers cannot check both the windshield and the doorjamb VINs.  See Tr. at 129:24-130:4 (Pori); Motion at 13.  He refers to United States v. Caro, 248 F.3d 1240 (10th Cir. 2001), where, according to Ramos, the Tenth Circuit suggested that doorjamb VIN inspections are illegal "where the dashboard VIN plate is readable from outside the passenger compartment, that VIN matches the VIN listed on the registration, and there are no signs the plate has been tampered with."  United States v. Caro, 248 F.3d at 1246.  Ramos contends that, by finding the doorjamb VIN search illegal, the Tenth Circuit suggested that New York v. Class' references to entering the passenger compartment referred to opening the car door to check the vehicle's doorjamb VIN.  See Tr. at 129:24-130:4 (Pori).  The Tenth Circuit rebuked any such interpretation in in United States v. Chavira, 467 F.3d 1286 (10th Cir. 2006).  There, the Tenth Circuit interpreted its prior opinion regarding VIN inspections to allow officers to check VINs on "the dashboard, the doorjamb, or both," as long as "the officer remains physically outside the car when he examines the VIN."  467 F.3d at 1289 n.1.  The Tenth Circuit observed that:

> According to the district court, "[u]nder United States v. Caro [248 F.3d 1240 (10th Cir. 2001)], Trooper Phillips impermissibly extended the scope of Chavira's detention by entering his truck to check a secondary VIN against the VIN listed on the registration." . . . .  However, New York v. Class, 475 U.S. 106 .

. . (1986), <u>makes clear that an officer does not enter the passenger compartment by merely examining the doorjamb VIN plate while standing outside the vehicle</u>. In *Class*, the officer opened the door to see if there was a VIN plate on the doorjamb and, finding none, reached through the open door and moved papers covering the dashboard VIN.  The Supreme Court began by noting that (1) the officer could lawfully require the driver to open the door and exit the vehicle and (2) he could lawfully approach the car and view the dashboard through the windshield.  Thus, it reasoned, both locations are "ordinarily in plain view of someone outside the automobile," and not subject to a reasonable expectation of privacy.  *Class*, 475 U.S. at 118 . . . (emphasis added).  The Court cautioned that "[i]f the VIN is in the plain view of someone outside the vehicle, there is no justification for governmental intrusion into the passenger compartment to see it."  *Id.* at 119 . . . .  However, the intrusion into the passenger compartment to move the papers was reasonable because the VIN was not in plain view either on the dashboard or the doorjamb.  *Id.* at 118 . . . .

In *Caro*, we held that "where the dashboard VIN plate is readable from outside the passenger compartment, that VIN matches the VIN listed on the registration, and there are no signs the plate has been tampered with, there is insufficient cause for an officer to extend the scope of a detention *by entering a vehicle's passenger compartment* for the purpose of further examining any VIN."  248 F.3d at 1246 (emphasis added).  In light of this holding and the Supreme Court's reasoning in *Class*, we believe it is clear that *Caro* applies only when (1) the officer has verified the dashboard or doorjamb VIN from outside the passenger compartment and (2) the officer nevertheless physically enters the passenger compartment to check the VIN.  <u>There is no unlawful detention under Caro if the officer remains physically outside the car when he examines the VIN on the dashboard, the doorjamb, or both.</u>

<u>United States v. Chavira</u>, 467 F.3d at 1290 (emphasis added).  <u>See</u> <u>United States v. Askew</u>, 529 F.3d 1119, 1137 (D.C. Cir. 2008)("Because there is no expectation of privacy in VINs, the intrusion at issue in *Class* was not the moving of the papers covering the VIN, but rather the officer's *reach into the car* to move those papers.");  <u>United States v. Grajeda</u>, 497 F.3d 879, 883 (8th Cir. 2007)(noting that the Supreme Court implied "in no uncertain terms that checking the doorjamb for a VIN is not an intrusion into the interior of a vehicle");  <u>State v. Metzger</u>, 144 Idaho 397, 400, 162 P.3d 776, 779 (2007)("The Class Court made clear that an officer does not enter a passenger compartment by merely examining the doorjamb VIN while standing outside the vehicle.").  Accordingly, officers may lawfully check not only the dashboard VIN, but also

the doorjamb VIN, so long as they do not "physically enter[] the passenger compartment" to do so.  United States v. Chavira, 467 F.3d at 1290.

Finally, like license and registration, checking the VIN is related to the traffic stop's mission, and Campos did not need reasonable suspicion that the car was stolen to inspect the VIN.  See New York v. Class, 475 U.S. at 963 (upholding the officer's VIN inspection, even though it was "undisputed that the police officers had no reason to suspect that respondent's car was stolen, that it contained contraband, or that respondent had committed an offense other than the traffic violations"); United States v. Samuels, 443 F. App'x 156, 160 (6th Cir. 2011)("As viewing a VIN neither unlawfully extends a lawful traffic stop nor intrudes upon a protectable Fourth Amendment interest, such action need not be supported by reasonable suspicion."); United States v. Ward, 484 F.3d 1059, 1061 (8th Cir. 2007)("A 'demand to inspect the VIN, like a demand to see license and registration papers, is within the scope of police authority pursuant to a traffic violation stop.'" (quoting New York v. Class, 475 U.S. at 115)); United States v. Ellison, 462 F.3d 557, 560 (6th Cir. 2006)("[T]he State's intrusion into a particular area . . . cannot result in a Fourth Amendment violation unless the area is one in which there is a 'constitutionally protected reasonable expectation of privacy.'" (quoting New York v. Class, 475 U.S. at 112)).  Like license and registration, a VIN is merely another means of asking for identification.  See United States v. Askew, 529 F.3d at 1157 (Kavanaugh, J., joined by Sentelle, Henderson, and Randolph, J.J., dissenting).  The Supreme Court "has permitted a variety of identification procedures during Terry stops," including searches "to see the vehicle identification number."  United States v. Askew, 529 F.3d at 1157.  To properly fill out the citation form, officers must identify the vehicle that the motorist was driving.  Although officers

in New Mexico need not write the VIN, inspecting the VIN ensures that the officer identifies the correct vehicle on the citation form.

Similarly, the VIN enforces the traffic code.  See New York v. Class, 457 U.S. 106, 115 (1986)(concluding that "a demand to inspect the VIN, like a demand to see license and registration papers, is within the scope of police authority pursuant to a traffic violation stop"). The Supreme Court has discussed the importance of checking VINs and explained how VIN inspections enforce the traffic code just like checking a driver's license and registration:

> The VIN is a significant thread in the web of regulation of the automobile.  See generally 43 Fed. Reg. 2189 (1978).  The ease with which the VIN allows identification of a particular vehicle assists the various levels of government in many ways.  For the Federal Government, the VIN improves the efficacy of recall campaigns, and assists researchers in determining the risks of driving various makes and models of automobiles.  In combination with state insurance laws, the VIN reduces the number of those injured in accidents who go uncompensated for lack of insurance.  In conjunction with the State's registration requirements and safety inspections, the VIN helps to ensure that automobile operators are driving safe vehicles.  By making automobile theft more difficult, the VIN safeguards not only property but also life and limb.  See 33 Fed. Reg. 10207 (1968) (noting that stolen vehicles are disproportionately likely to be involved in automobile accidents).

New York v. Class, 475 U.S. at 111.  The Honorable Lewis F. Powell, Associate Justice of the Supreme Court, wrote a concurring opinion in which Chief Justice Warren E. Burger joined, solely to emphasize "the unique and important governmental interests served by inspection of the Vehicle Identification Number."  475 U.S. at 120 (Powell, J., concurring).  He explained that "an officer making a lawful stop of a vehicle has the right and duty to inspect the VIN."  475 U.S. at 120 (Powell, J., concurring)(emphasis added).

Similarly, Campos explains that he checks VINs, because some vehicles may be stolen, but the owner has not reported them as stolen.  See Tr. at 97:24-98:3 (Campos).  This situation is not a mere hypothetical; Campos testified to having dealt with this situation before the Ramos stop.  See Tr. at 97:24-98:3 (Campos).  Campos also explained that he checked both the

windshield and the doorjamb VIN, because the windshield VIN can more easily be altered without detection, while the doorjamb VIN more easily reveals tampering.  See Tr. at 107:3-15 (Campos, Mysliwiec).  Finally, Campos inspects VINs for many of the same reasons that he checks license and registration: to ensure that he writes the correct ticket for the correct driver and the correct car in every traffic stop.  See Tr. at 104:24-105:2 (Campos, Mysliwiec).  In short, Campos uses the VIN as a means of identification, which officers may request in Terry stops.  Accordingly, Campos did not need reasonable suspicion to search the VIN.  VIN inspections, like inspections of insurance, license, and registration, investigate traffic offenses and reveal whether this driver has the right to be driving a particular car.  The VIN inspection was a lawful part of the traffic stop.

Here, Ramos makes no allegation that Campos entered the passenger compartment.  The video does not reveal that Campos did so.  See Dashboard Cam at 8:48:47-8:48.  He remained outside of the vehicle.  See Dashboard Cam at 8:48:47-8:48.  Because viewing a VIN from outside of the vehicle neither unlawfully extends a lawful traffic stop nor intrudes upon a protectable Fourth Amendment interest, Campos' VIN inspection was lawful.  See United States v. Ellison, 462 F.3d 557, 560 (6th Cir. 2006)("[T]he State's intrusion into a particular area . . . cannot result in a Fourth Amendment violation unless the area is one in which there is a 'constitutionally protected reasonable expectation of privacy.'" (quoting New York v. Class, 475 U.S. at 112)).

Ramos also argues that the prolonged questioning under the guise of checking the VIN violated the Constitution.  See Motion at 12-14.  At the outset, the Court notes that Campos was authorized to ask routine questions while performing other tasks related to the traffic stop.  See Arizona v. Johnson, 555 U.S. at 333; Muehler v. Mena, 544 U.S. at 101 (stating that the Supreme

Court has "held repeatedly that mere police questioning does not constitute a seizure"); United States v. Wilson, 96 F. App'x 640, 644 (10th Cir. 2004)(explaining that "a police officer may, during a routine traffic stop, 'ask about the driver's authority to operate the vehicle,' check the driver's license and registration, and ask about travel plans" (quoting United States v. Holt, 264 F.3d 1215, 1221 (10th Cir. 2001)(en banc)), overruled on other grounds in United States v. Stewart, 473 F.3d 1265, 1269 (10th Cir. 2007)).   Only if Campos measurably extended the detention by asking questions unrelated to the traffic stop's mission could he have violated Ramos' Fourth Amendment rights.  See Rodriguez v. United States, 135 S. Ct. at 1615 (noting that an officer may not conduct unrelated inquiries "in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual").

Here, Ramos initiated the conversation with Campos.  See Tr. at 96:10-19 (Campos). Then, while Campos wrote the citation, he asked Ramos the following questions:

> (1) what brought Mr. Ramos to New Mexico; (2) if Albuquerque [was] his ultimate destination; (3) what Mr. Ramos was planning to do in Albuquerque; (4) what time he left his last stop; (4) if Mr. Ramos was planning on staying in Albuquerque; (5) how long Mr. Ramos had rented the car; and (6) when he was planning on returning the vehicle.

Motion at 3 (citing Dashboard Cam at 8:44:32-8:48:09).

These questions all relate to Campos' travel plans.  "[Q]uestions about travel plans are routine and 'may be asked as a matter of course without exceeding the proper scope of a traffic stop.'"[7] United States v. West, 219 F.3d at 1176 (quoting United States v. Hernandez, 93 F.3d at

---

[7]There is a tension between Justice Ginsberg's statement in Rodriguez v. United States -- that the traffic stop "may last no longer than is necessary to effectuate th[e stop's] purpose" -- and some of the holdings in the older Supreme Court and Tenth Circuit cases, which are fairly liberal to law enforcement in expanding the scope of a traffic violation.  135 S. Ct. at 1614. While Justice Ginsberg's statement has roots in prior cases, see, e.g., Florida v. Royer, 460 U.S. at 500, and Illinois v. Caballes, 543 U.S. at 407, she may be signaling a new, more restrictive direction in traffic stops.  Although the Supreme Court and Tenth Circuit have said that a police

officer can detain a motorist only as long as necessary to complete the tasks that justified the stop, and they have reiterated the general principle that a <u>Terry</u> stop cannot exceed the scope of the reason for the stop, <u>see Rodriguez v. United States</u>, 135 S. Ct. at 1614, the Supreme Court and the Tenth Circuit have, over the years, incrementally added a permissible task here and a permissible task there.  The tension lies in the fact that officers must take no more time than necessary to perform tasks related the stop, but the tasks supposedly related to the stop are innumerable.  The sparse "no longer than [] necessary" rule has become almost unrecognizable. <u>Rodriguez v. United States</u>, 135 S. Ct. at 1614.

For example, if a police officer stops someone for speeding, it is unclear why a police officer can ask to see the motorist's registration or insurance card.  If the police officer only has probable cause to investigate the speeding crime, the police officer must, when he examines registration and insurance, be investigating to see if the motorist violated any other provisions of the traffic code, such as those requiring valid license and insurance.  The same can be said for VIN inspections.  If a person is stopped for speeding, the only reason to look at the VIN is to investigate for other crimes, such as whether the motorist is complying with federal VIN regulations or whether he or she stole the vehicle.  Again, this work takes time.  And looking at the doorjamb invades more space.  Even if checking license, registration, and insurance "serve the same objective as enforcement of the traffic code," <u>Rodriguez v. United States</u>, 135 S. Ct. at 1615, performing such tasks investigates whether the motorist violated a number of unrelated provisions in the traffic code rather than the one which justified the stop: speeding.  Asking travel-related questions further extends the stop.  In the end, the Supreme Court has added so many "permissible" tasks that they are not consistent with its directions to keep the scope of the stop no longer than necessary.  Despite her limiting language, Ginsburg does not address this tension.  She does not take issue with the officer's questioning the motorist about his travel plans, thereby indicating that travel-related questions are related to the stop and therefore permissible.  <u>See Rodriguez v. United States</u>, 135 S. Ct. at 1613.

Other courts have raised this tension before.  In an opinion that was later vacated on a rehearing en banc, <u>United States v. Holt</u>, the Tenth Circuit questioned whether questions about a driver's travel plans relate to the purpose of a stop.  <u>See</u> 229 F.3d at 936.  It stated that "none of the [Tenth Circuit's previous] decisions explore or explain why it is constitutionally permissible for an officer to ask detainee about his or her travel plans if the questioning is unrelated to the purpose of the stop."  229 F.3d at 936 (citing <u>United States v. Kopp</u>, 45 F.3d 1450, 1454 (10th Cir. 1995)(acknowledging that officer asked detainee questions about his travel plans), <u>United States v. McSwain</u>, 29 F.3d 558, 561 (10th Cir. 1994)(stating "that an officer conducting a routine traffic stop may inquire about 'identity and travel plans'"), and <u>United States v. Rivera</u>, 867 F.2d 1261, 1263 (10th Cir. 1989)(holding that it was permissible for an officer to "ask questions relating to the identity and travel plans")).  The Tenth Circuit nonetheless marked the difference between its former decisions allowing travel-related questions and the case at issue, where the officer questioned whether the motorist's vehicle contained loaded weapons, and appears to have segregated travel-related questions in a different category.  <u>See</u> 229 F.3d at 936. After a rehearing en banc, the Tenth Circuit vacated the decision.  <u>See United States v. Holt</u>, 264 F.3d 1215, 1217-18 (10th Cir. 2001), <u>vacating</u> 229 F.3d 931 ("<u>Holt II</u>").

In describing <u>Holt II</u>, the Tenth Circuit reaffirmed its prior notions that travel-related questions are within the scope of a traffic stop.  It contradicted <u>Holt I</u>'s assertion that the Tenth Circuit had not directly addressed the issue, stating:

When <u>directly confronted</u> with the issue, we have repeatedly held (as have other circuits) that questions relating to a driver's travel plans ordinarily fall within the scope of a traffic stop. *See West*, 219 F.3d at 1176 (stating that "questions about travel plans are routine and 'may be asked as a matter of course without exceeding the proper scope of a traffic stop'")(quoting *United States v. Hernandez*, 93 F.3d 1493, 1499 (10th Cir. 1996)); *see also United States v. Santana–Garcia*, 264 F.3d 1188, 1192-93 (10th Cir. 2001)(quoting *West*, 219 F.3d at 1176); *United States v. Rivera*, 867 F.2d 1261, 1263 (10th Cir. 1989); *United States v. Hill*, 195 F.3d 258, 268 (6th Cir. 1999), *cert. denied*, 528 U.S. 1176 . . . (2000); *United States v. $404,905.00 in U.S. Currency*, 182 F.3d 643, 647 (8th Cir. 1999), *cert. denied*, 528 U.S. 1161 . . . (2000). Though such questions do typically fall within the scope of a traffic stop, citizens' legitimate privacy interests are protected in that they are not legally obligated to answer such questions, nor can an officer compel an answer to these routine questions. *See $404,905.00*, 182 F.3d at 647 n.2 (citing *Terry*, 392 U.S. at 34, 88 S. Ct. 1868 (White, J., concurring)). In addition, a motorist's refusal to answer routine questions may not furnish a basis for arrest, "although it may alert the officer to the need for continued observation." *Terry*, 392 U.S. at 34, 88 S. Ct. 1868 (White, J., concurring).

United States v. Williams, 271 F.3d 1262, 1267 (10th Cir. 2001)(emphasis added). After clarifying that travel-related questions are within the traffic stop's scope, it concluded that "the officer's questioning regarding [the driver's] travel plans was within the scope of the traffic stop." 271 F.3d at 1267.

The Court thinks that many of the tasks that the Supreme Court and the Tenth Circuit allow are inconsistent with the Constitution, and that the federal courts should be cautious about allowing too many unnecessary tasks. The Court suggests that officers should take no longer than necessary to investigate the particular reason for the stop unless: (i) the police officer has reasonable suspicion or probable cause to investigate other crimes; or (ii) the motorist gives consent. The Court has a hard time saying that a police officer should routinely be able to check registration and insurance, VIN, or ask a substantial number of travel-related questions without reasonable suspicion.

At the oral argument for Rodriguez v. United States, the Honorable Antonin Scalia, associate justice of the Supreme Court, also questioned why checking a driver's license, asking travel-related questions, and determining whether the car is stolen "are embraced within the mission [of the traffic stop for a broken taillight] when the only basis for the stop is you have a broken taillight." Transcript of Oral Argument at 9, Rodriguez v. United States, 135 S. Ct. 1609 (2015)(No. 13-9972)("Rodriguez Tr."); id. at 10 ("It's a broken taillight. That's the only thing that comes within the traffic stop. All the rest is added on."). The Honorable Samuel Alito, associate justice for the Supreme Court, similarly asked why "adding any time to the stop in order to do a records check is part of the mission but the dog sniff is not." Rodriguez Tr. at 21. Justice Scalia concluded that courts are "willing to expand the mission to everything up to but not beyond the dog sniff." Rodriguez Tr. at 10.

In the end, the Court thinks that the police should accomplish the narrow set of tasks

1498).  "Travel plans typically are related to the purpose of a traffic stop because the motorist is traveling at the time of the stop.  For example, a motorist's travel history and travel plans may help explain, or put into context, why the motorist was weaving (if tired) or speeding (if there was an urgency to the travel)."  United States v. Holt, 264 F.3d 1221 (citing United States v. Barahona, 990 F.2d 412, 416 (8th Cir. 1993)).  The Tenth Circuit has repeatedly held that officers may ask questions about a person's travel plans during a routine traffic stop without exceeding the traffic stop's permissible scope.  See United States v. Moore, 795 F.3d 1224, 1229 (10th Cir. 2015); United States v. $85,688.00 in U.S. Currency, 577 F. App'x 811, 814 (10th Cir. 2014)(concluding that an officer could lawfully ask the driver about his travel plans); United States v. Simpson, 609 F.3d 1140, 1146 n.1 (10th Cir. 2010); United States v. Briseno, 163 F. App'x 658, 664 (10th Cir. 2006)("[I]t is well established in this Circuit that an officer conducting a routine traffic stop may inquire about identity and travel plans . . . ."); United States v. West, 219 F.3d at 1176; United States v. Anderson, 114 F.3d 1059, 1064 (10th Cir. 1997); United States v. Hernandez, 93 F.3d at 1498.[8]

related to the stop and let the driver go, rather than use a traffic stop to investigate for more crimes.  The Court is, however, a district court, and the Court is bound by Supreme Court and Tenth Circuit precedent.  Even if the Court thinks and hopes that Justice Ginsberg's statement signals the direction that the Supreme Court would go, the Court as a district court cannot ignore Supreme Court and Tenth Circuit cases.

[8]Rodriguez v. United States does not alter this ruling.  In Rodriguez v. United States, the majority noted that the officer "question[ed the passenger] about where the two men were coming from and where they were going."  Rodriguez v. United States, 135 U.S. at 1613.  Like a dog sniff, questioning about travel plans is not related to the traffic stop's mission.  The dissent observes, "[I]t is hard to see how such inquiries fall within the 'seizure's 'mission' [of] address[ing] the traffic violation that warranted the stop,' or 'attend[ing] to related safety concerns.'"  Rodriguez v. United States, 135 S. Ct. at 1620 (Kennedy, J., dissenting)(alterations in original)(quoting the majority opinion).  Regardless, the majority did not measure the length of this questioning, yet it took issue with the seven- or eight-minute dog sniff.  The dissent interprets the majority's distinction between the travel-related questioning and the unrelated dog sniff "to come down to the principle that dogs are different."  Rodriguez v. United States, 135 S.

"[T]he content of police questions during a lawful detention does not implicate the Fourth Amendment as long as those questions do not prolong the detention."  United States v. Stewart, 473 F.3d 1265, 1269 (10th Cir. 2007)(citing Muehler v. Mena, 544 U.S. 93, 10 (2005)). Accordingly, officers "may also generally inquire about the driver's travel plans, . . . and ask questions, whether or not related to the purpose of the stop, so long as they do not prolong the stop." United States v. Moore, 795 F.3d 1224, 1229 (10th Cir. 2015).  See United States v. Simpson, 609 F.3d 1140, 1146 n.1 (10th Cir. 2010).  The Tenth Circuit has not indicated how long an officer may lawfully question a driver about travel plans without exceeding the traffic stop's scope.   Once the questioning becomes an unrelated task, it is subject to Rodriguez v. United States' requirement that the task not prolong the detention.   Here, however, Campos asked many of these questions as part of his conversation with Ramos.   Furthermore, it is undisputed that Campos asked these questions while filling out the citation: in response to three of Ramos' questions, Campos told Ramos that he would answer after he finished filling out the citation.  See Dashboard Cam at 8:47:40-8:48:00.

There is no evidence that this questioning increased the amount of time it took Campos to write the citation.  See United States v. Moore, 795 F.3d 1224, 1229 (10th Cir. 2015)("An officer may also generally inquire about the driver's travel plans, see United States v. Williams, 271 F.3d 1262, 1267 (10th Cir.2001), and ask questions, whether or not related to the purpose of the stop, so long as they do not prolong the stop.")(citing United States v. Simpson, 609 F.3d 1140, 1146 n.1 (10th Cir. 2010)).   Campos testified that this routine conversation about travel plans does not increase the time it takes him to write the citation, and the Court has no reason to doubt Campos' testimony.  See Tr. at 17:4-7 (Campos, Mysliwiec).  See Dashboard Cam at 8:44:32-

Ct. at 1620 (Kennedy, J., dissenting).

8:48:09.   Moreover, the entire detention, including the time it took to call dispatch, write the citation, question Perez and Ramos, and check the license and registration, took less than ten minutes.   The Tenth Circuit has concluded that nineteen minutes was a reasonable amount of time to question the driver and passenger about their travel plans, check their license and registration, and run a computer check.   See United States v. Briseno, 163 F. App'x at 664.   See also United States v. Sampson, 388 F. App'x at 953 ("[W]e cannot conclude that a fifteen to twenty minute total detention was unreasonable" in light of the various interruptions involved.); United States v. Purcell, 236 F.3d at 1277 (holding that a fourteen-minute detention was not unreasonable and citing cases upholding traffic stops of thirty and fifty minutes); United States v. Shareef, 100 F.3d 1491, 1502 (10th Cir. 1996)(concluding that a thirty-minute wait for a computer check during a traffic stop was reasonable); United States v. Hill, 195 F.3d at 269 (concluding that the officer did not unreasonably prolong the traffic stop when it took a "little more than twelve minutes"); United States v. Hardy, 855 F.2d at 761 (stating that a fifty-minute traffic stop, by itself, did not invalidate the detention, but demonstrating "some unease" about the detention's length);.   Cf. United States v. Place, 462 U.S. 696, 709 (1983)(concluding that a ninety-minute stop was too long for a Terry stop).   Consequently, Campos asked only a limited number of questions about Ramos' travel plans and did not measurably extend the traffic stop.

Although Campos' questioning of Ramos did not violate the Fourth Amendment, Campos' questioning of Perez was more extensive.   Nevertheless, "an officer may ask questions, whether or not related to the purpose of a traffic stop, if they do not excessively prolong the stop."   United States v. Kitchell, 653 F.3d 1206, 1217 (10th Cir. 2011)(quoting United States v. Simpson, 609 F.3d 1140, 1146 n.1 (10th Cir. 2010)).   See United States v. $85,688.00 in U.S. Currency, 577 F. App'x at 814; United States v. Stewart, 473 F.3d 1265, 1269 (10th Cir.

- 55 -

2007)("The correct Fourth Amendment inquiry (assuming the detention is legitimate) is whether an officer's traffic stop questions "extended the time" that a driver was detained, regardless of the questions' content.")(quoting Muehler, 544 U.S. at 101)).   Furthermore, Tenth Circuit "precedent explicitly and repeatedly affirms the right of an officer to question both the driver and her passenger as part of a routine traffic stop."  United States v. Jackson, 235 F. App'x 707, 710 (10th Cir. 2007).   See, e.g., United States v. Rivera, 867 F.2d 1261, 1263 (10th Cir. 1989)("Officer Keene could legitimately ask questions relating to the identity and travel plans of Mr. Rivera and Ms. Jones [the passenger] . . . , regardless of Officer Keene's underlying motivation."); United States v. Galindo-Gonzales, 142 F.3d 1217, 1222-23 (10th Cir. 1998).  See also United States v. Foley, 206 F.3d 802, 805 (8th Cir. 2000)(concluding that an officer may question occupants besides the driver).   "The Supreme Court has never questioned an officer's right to interrogate vehicle passengers during a valid *Terry* stop."  United States v. Jackson, 235 F. App'x at 710 (citing United States v. Brignoni-Ponce, 422 U.S. 873, 881-82 (1975)(finding that officers performing vehicular *Terry* stops along the border may question "the driver and passengers")).   Indeed, the Supreme Court has held that an officer may do more than converse with a passenger during a stop; he may order a passenger from the vehicle.  See Maryland v. Wilson, 519 U.S. 408, 414-15 (1997).   Consequently, as the Tenth Circuit has previously observed, Campos "did not convert a legitimate traffic stop into an unconstitutional detention by asking [Perez] about [her] travel plans."  United States v. Jackson, 235 F. App'x at 710.

　　While Campos was inspecting the VIN, he asked Perez the following questions:

(1) what brought her to New Mexico; (2) where she was headed; (3) how long she was planning on staying at her final destination; (4) when she was traveling back to California; (5) the purpose of her travel; (6) where she and Mr. Ramos would stay when they arrived at their destination; (7) if Mr. Ramos was her husband; (8) when Mr. Ramos rented the Mercedes; (9) where the two were coming from; (10) what time they left California; (11) if they left California in the morning or the

evening; (12) if the two were traveling straight through to their final destination; and (13) whether they had made any stops along the way. (Dashboard Cam 8:48:09-8:50:04.)

Motion at 4.

The Court recognizes that Campos spent some time trying to locate the VIN on the rental agreement so he "could compare it to their contract to make sure that vehicle actually belonged to the contract that they had."  Tr. at 73:7-21 (Campos, Pori).  Nevertheless, the questioning of Perez increased the time it should have taken Campos to inspect the VIN, given that he did not write down any numbers.  See Tr. at 67:15-22 (Campos)(noting that he did not write anything down, but maintaining that he did actually compare the VINs).  The entire question-and-answer encounter with Perez, including the VIN check, took approximately one minute and twenty-six seconds.  See Tr. at 23:6-7 (Campos).  Regardless, the questioning did not unlawfully extend the traffic stop's duration, because Campos developed reasonable suspicion to continue questioning Perez.  See Arizona v. Johnson, 555 U.S. at 333 (stating that an "officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop").  Although the questioning extended the time necessary to check a VIN, it did not make the stop unlawful, because Campos had reasonable suspicion to continue the questioning.

First, given that Campos did not write down any numbers, inspecting this VIN to ensure that it had not been tampered with and scanning the rental agreement to locate a VIN, which was not present on the agreement, could reasonably take around thirty seconds.  See Tr. at 23:5-10 (Campos, Mysliwiec); id. at 65:4-8 (Campos); id. at 67:15-22 (Campos)(noting that he did not write anything down and he did not remember how he compared the two VINs, but maintaining that he did actually compare the VINs); Tr. at 73:7-21 (Campos, Pori).  Moreover, because

Campos was eye level with a passenger who could have had a weapon, he might have to devote several seconds to look at Perez and ensure that she was not reaching for a weapon. The time officers spend attending to safety concerns is related to the traffic stop's mission. See Rodriguez v. United States, 135 S. Ct. at 1614 (finding that the "tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission' -- to address the traffic violation that warranted the stop, . . . and attend to related safety concerns")(emphasis added). The Supreme Court has recognized that traffic stops are "especially fraught with danger to police officers," Michigan v. Long, 463 U.S. 1032, 1047 (1983), "so an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely," Rodriguez v. United States, 135 S. Ct. at 1616. Campos used minimally burdensome safety precautions to conduct his doorjamb VIN inspection. Instead of asking Perez to exit the vehicle or patting her down, Campos merely kept an eye on Perez between checking the seventeen VIN digits and searching for evidence of tampering to ensure she did not reach for a weapon. See Tr. at 155:24-157:4 (Mysliwiec)(noting that Campos "was keeping his eye on [] Perez for officer safety while trying to check the VIN").[9] As attending to these safety concerns is a part of the traffic stop's mission, at least some of the time Campos spent looking at Perez rather than solely looking at the VIN was related to such safety concerns, and therefore, did not unnecessarily extend the traffic stop. Despite this finding, not all of the time Campos spent looking at Perez was devoted to safety measures. Some of the time was solely related to asking Perez questions and watching her answer.

      Even if Campos spent several seconds questioning Perez that were not related to

---

[9]As the Court noted in the factual section, the Dashboard Cam does not show where Campos was facing, but the only evidence the Court has is Campos' testimony that he looked back and forth. The Dashboard Cam does not dispute this testimony.

checking the VIN or taking safety precautions, however, Campos developed reasonable suspicion that Ramos and Perez might be traveling to a different destination for an illegal purpose that justified the prolonged questioning.  See Tr. at 71:11-17 (Campos)(stating that he developed reasonable suspicion that led him to continue questioning Perez).  See also United States v. Santillan, 2015 WL 6115865, at *1 (S.D.N.Y. Oct. 15, 2015)(Sweet, J.)(concluding that the officer's prolonged questioning did not measurably extend the detention, because the officer developed "sufficient reasonable suspicion to keep [the defendants] longer for questioning").  First, Campos had already observed questionable behavior while filling out the citation.  Ramos told Campos that they travelled from Las Angeles, California to Las Vegas, Nevada to Albuquerque, and were headed to San Antonio, even though Albuquerque was a significant detour from the quickest route to San Antonio.  See Tr. at 23:24-24:10 (Campos).  Notably, however, there "is nothing criminal about traveling by car to view scenery."  United States v. Simpson, 609 F.3d 1140, 1149 (10th Cir. 2010)(noting that unusual travel choices do not contribute to reasonable suspicion).  Although the travel route did not support reasonable suspicion, Ramos also informed Campos that he was traveling to Albuquerque for "sightseeing."  Dashboard Cam at 8:44:50-8:44:55.  Despite this assertion, Ramos said that they left Las Vegas around three in the morning and passed straight through Albuquerque.  See Dashboard Cam at 8:45:50-8:46:05; id. at 8:46:30-8:46:35 (stating that they were "passing by" Albuquerque).  Driving straight through both cities did not seem consistent with seeing the sights.  Overall, Campos found Ramos' travel plans interesting.  See Tr. at 23:24-24:10 (Campos).

Second, Campos noticed that the rental agreement allowed Ramos to drive the vehicle "ONLY" in California, Nevada, and Arizona.  See Tr. at 28:15-29:3 (Campos, Mysliwiec); Dashboard Cam at 8:55:30-8:55:40; Enterprise Rental Agreement (Defendant's Exhibit B).

Regardless, Campos saw that someone had handwritten numerous states into the rental agreement.  See Tr. at 28:18-29:3 (Campos, Mysliwiec).  If Ramos had rented the car to drive to Texas, it would be unusual for the rental company not to include the states necessary to drive to Texas.  Third, Campos observed that Perez had two cellular telephones and "was receiving multiple phone calls" and kept ignoring them.  Tr. at 21:23-22:7 (Campos); id. at 31:2-8 (Campos).  He noted that Perez was "very distracted" and nervous.  Tr. at 22:15-18 (Campos, Mysliwiec).  Campos observed that Perez' hands were shaking due to nerves, and she "took a little longer to answer anything [Campos] would ask her."  Tr. at 21:23-22:7 (Campos).  See Illinois v. Wardlow, 528 U.S. 119 (2000)("[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion."); United States v. Simpson, 609 F.3d at 1150 (describing how the Tenth Circuit finds reasonable suspicion where the defendant gives "vague, inconsistent, or evasive answers with respect to travel plans"); United States v. Santos, 403 F.3d at 1130 (finding reasonable suspicion where the defendant "gave vague, evasive, and inconsistent answers concerning his length of stay").  Moreover, early in his questioning, Campos noticed that Perez had corrected an aspect of her story.  See Tr. at 24:7-10 (Campos).  Perez initially said that they were returning to California, but later she said that they were going to Texas.  See Tr. at 24:1-10 (Campos).  See also United States v. Davis, 636 F.3d 1281, 1291 (10th Cir. 2011)(identifying "an individual's internally inconsistent statements" as one factor that contributes to an officer's reasonable suspicion); United States v. White, 584 F.3d at 951 ("We have noted numerous times that implausible travel plans can form a basis for reasonable suspicion."); United States v. Santos, 403 F.3d at 1131 ("Confusion about details is often an indication that a story is being fabricated on the spot.").  This correction occurred approximately twenty seconds into the questioning.  See Dashboard Cam at 8:48:48-8:49:08.  Campos then

detected a discrepancy between Ramos' account of their travel plans and Perez' account. Perez told Campos that they had come straight from California and had not stopped anywhere, see Dashboard Cam at 8:49:30-8:50:00, even though Ramos said that they went to Las Vegas, which was a detour from their trip to Texas. See Dashboard Cam at 8:44:46-8:44:52. "[C]ommonsense judgments and inferences about human behavior" further support Campos' conclusion that Ramos' and Perez' stories about their trip were likely a cover story for illegal activity. Illinois v. Wardlow, 528 U.S. at 125. "The motorist's or his passengers' inconsistent statements in response to such questions can give rise to reasonable suspicion of criminal activity." United States v. Kitchell, 653 F.3d at 1219; United States v. Davis, 636 F.3d at 1291; United States v. Simpson, 609 F.3d at 1150.

These facts, when combined, could give an officer reasonable suspicion to continue questioning Perez about her travel plans. See United States v. Carpenter, 462 F.3d 981, 986-87 (8th Cir. 2006)(finding reasonable suspicion to deploy a dog to sniff for drugs based on implausible travel plans and nervous conduct); United States v. Ludwig, 641 F.3d 1243, 1248-50 (10th Cir. 2011)(finding reasonable suspicion for a dog sniff where, among other things, the defendant's "account of his travel was suspect" and the defendant "was exceptionally nervous"). Campos' observations gave him reasonable suspicion to question Perez about her travel plans. Even if any of these acts might have innocent explanations, the Supreme Court has made clear that acts that might be innocent by themselves can give rise to reasonable suspicion when taken together. See United States v. Arvizu, 534 U.S. 266, 274-75 (2002). Campos developed this reasonable suspicion while performing tasks related to the traffic stop: (i) writing Ramos' citation; (ii) checking the VIN; and (iii) taking safety precautions. He testified that he was looking at the VIN until "toward the end of his VIN inspection," by which time he had already

developed reasonable suspicion to continue questioning Perez. See Tr. at 92:24-5 (Campos, Mysliwiec); Tr. at 72:4-6 (Campos).

Officers may ask travel-related questions while performing tasks related to the traffic stop's mission. "Where an officer does have reasonable suspicion, [] nothing in *Rodriguez* limits his or her ability to reasonably prolong the stop to conduct an investigation of criminal activity." United States v. Santillan, 2015 WL 6115865, at *1 (citing Rodriguez v. United States, 135 S. Ct. at 1615). Because Campos developed reasonable suspicion while performing tasks related to the traffic stop, the questioning did not measurably extend the detention. Campos therefore did not violate Ramos' Fourth Amendment rights.

## II.   RAMOS VOLUNTARILY CONSENTED TO THE SEARCH.

Ramos argues that his consent to search the vehicle was not voluntary, because: (i) Ramos "simply acquiesced to Officer Campos' ongoing and escalating show of authority"; and (ii) Campos obtained Ramos' consent "by exploiting the prior excessive detention." Motion at 16. First, because the substantial majority of factors indicate that Ramos was not coerced, Ramos' consent was "given without implied or express duress or coercion." United States v. Salas, 756 F.3d 1196, 1203 (10th Cir. 2014). Second, even if Campos unlawfully extended the traffic stop's duration and thereby violated Ramos' Fourth Amendment rights, the consent is too attenuated from the illegal detention to suppress the evidence.

### A.   RAMOS FREELY AND VOLUNTARY CONSENTED TO A SEARCH OF THE MERCEDES.

Without an unlawful seizure, the United States need not prove "a sufficient attenuation or break in the causal connection between the illegal [stop] and the consent." United States v. Salas, 756 F.3d at 1203 (quoting United States v. Fox, 600 F.3d 1253, 1257 (10th Cir. 2010)). Instead, it must show that: (i) "consent was unequivocal and specific and freely given;" and (ii)

"consent was given without duress or coercion, express or implied."  United States v. Guerrero, 472 F.3d 784, 789 (10th Cir. 2007).  Ramos gave consent; the issue is whether he gave consent freely and voluntarily.  See Florida v. Royer, 460 U.S. 491, 497 (1983).  Ramos contends that a reasonable person would not feel free to decline consent to search, because: (i) Campos' doorjamb VIN check and extensive questioning impermissibly extended the detention; and (ii) Campos would not let Perez leave the car to use the restroom or to talk to Ramos.  See Tr. at 139:10-140:2 (Pori).

### 1.    The Initial Questioning Occurred During a Consensual Encounter.

After the traffic stop ended, Ramos voluntarily agreed to answer further questioning. Tenth Circuit precedent demonstrates that, when Campos returned Ramos' documents, he ended the detention as long as he did not constrain Ramos with an overbearing show of authority.  See United States v. West, 219 F.3d 1171, 1176 (10th Cir. 2000)("A traffic stop may become a consensual encounter, requiring no reasonable suspicion, if the officer returns the license and registration and asks questions without further constraining the driver by an overbearing show of authority.").  Here, Ramos signed the citation, stated that he had no further questions, and shook Campos' hand.  See Tr. at 25:2-16 (Campos, Mysliwiec).  Affirming that Ramos had no further questions and shaking Campos' hand signals that the encounter terminated.  See United States v. Hernandez, 93 F.3d at 1499.  Campos clarified any lingering confusion whether the detention had ended by informing Ramos that he was "free to leave."  Tr. at 25:20-21 (Campos); id. at 76:3-5 (Campos).  Ramos signaled his understanding that the encounter had ended by walking to his car.  See Tr. at 25:20-21 (Campos); id. at 76:3-5 (Campos).  A handshake, obtaining one's documents, walking away from a police officer, and the officer's statement that the driver is "free to leave" are actions that demonstrate that a reasonable person would have understood that

he or she is free to leave.  See United States v. Laboy, 979 F.2d 795, 798 (10th Cir. 1992)("As long as a reasonable innocent person . . . would feel free to leave, such encounters are consensual . . . .").

Approximately seventeen seconds passed between the time Campos told Ramos that he was free to leave and the time that Campos addressed Ramos again.  See Tr. at 26:12-18 (Campos, Mysliwiec); id. at 77:20-77:2 (Campos, Pori).  The Tenth Circuit has concluded that a traffic stop ended and a consensual encounter began when only a handful of seconds passed between the two events.  See United States v. Hernandez, 93 F.3d at 1499 (concluding that a consensual encounter began within seconds of the officer handing the driver his license and registration).  Campos did not address Ramos in an overbearing, obtrusive tone.  He instead addressed Ramos politely, saying, "Excuse me, sir."  Tr. at 26:12-18 (Campos, Mysliwiec).  See id. at 77:20-77:2 (Campos, Pori).  Ramos returned to Campos' police car, where Campos again used a polite tone to ask Ramos if Campos could ask a few questions.  See Tr. at 26:1-2 (Campos).  Ramos agreed to answer the questions.  See Tr. at 26:1-2 (Campos).  Ramos voluntarily returned to Campos' police car and agreed to answer further questioning.  See United States v. Hernandez, 93 F.3d at 1499 ("Hernandez must have believed he was free to leave at that point because the district court found he turned to get out of the [patrol] car.")(alteration added).  Accordingly, the detention had ended, and Ramos voluntarily agreed to answer Campos' questions.

## 2.    The Consensual Encounter Turned Into A Lawful Detention.

Although the encounter with Ramos began as a consensual one, it evolved into a detention when Campos refused to allow Perez to use the restroom or to leave the vehicle.  "[I]t is settled that the nature of the police-citizen encounter can change -- what may begin as a

consensual encounter may change to an investigative detention if the police conduct changes and vice versa." United States v. Lopez, 443 F.3d 1280, 1284 (internal quotation omitted). See United States v. Lambert, 46 F.3d 1064, 1068 (10th Cir. 1995). Three times Campos commanded Perez to return to the vehicle. See Dashboard Cam at 8:54:55-8:55:14. Even though Perez protested, and made another request to use the restroom, Campos directed her to wait for him in the car. See Dashboard Cam at 8:55:02-8:55:05. In short, he would not accept no for an answer. See Dashboard Cam at 8:55:06-8:55:14. Although Campos continued using polite language, he used a "tone of voice indicating that compliance with an officer's request is compulsory." United States v. Ledesma, 447 F.3d 1307, 1314 (10th Cir. 2006)(identifying an officer's "tone of voice" as one factor which demonstrates that consent was involuntary). See Dashboard Cam at 8:54:55-8:55:14; United States v. Sedillo, No. CR 08-1419 JB, 2010 WL 965743, at *12. Campos did not physically force Perez into the vehicle, but he would not allow Perez to remain outside of the vehicle, even though she informed him that she wanted to leave. See Dashboard Cam at 8:54:55-8:55:14.

This interaction was not "the voluntary cooperation of a private citizen in response to non-coercive questioning by a law enforcement officer." United States v. Wallace, 429 F.3d 969, 974-75 (10th Cir. 2005). The interaction was instead the submission to what Perez believed was a lawful show of authority. After Campos' three commands, a reasonable person would believe that Campos had lawful authority to control Perez' behavior, even if only for safety reasons. See United States v. Drayton, 536 U.S. 194, 204 (2002)(concluding that an encounter was not coercive, because "[t]here was no application of force, no intimidating movement, no overwhelming show of force, . . . no threat, no command, not even an authoritative tone of voice"). Ordering a person to go somewhere constitutes one factor demonstrating that the

encounter was coercive.  See United States v. Fox, 600 F.3d at 1258-59 (concluding that the officer changed from consensual to a detention when, among other things, an officer "directed a person to drive to a nearby parking lot").

Further, Perez did not consent to further questioning.  That Campos could control Perez' behavior when Perez did not consent to further questioning suggested to Ramos, who expressly consented, that Ramos likewise had to comply with Campos' requests.  A reasonable person in Ramos' position would believe that, because Campos could control his wife's behavior, Campos could control his behavior.  See United States v. Quintero, 648 F.3d 660, 670 (8th Cir. 2011)(concluding that an encounter was coercive, because, among other reasons, the police officer "commanded Michelle to get dressed and come to the door multiple times").  While Campos' actions were directed at Perez, they "communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business."  Florida v. Bostick, 501 U.S. 429, 437 (1991).

Campos amplified the coercive atmosphere when he implied that Perez could not use the restroom until Campos finished his questioning.  By refusing to allow Perez to use the restroom, despite knowing that she wanted to leave, Campos conveyed that he had the authority to detain Ramos and Perez.  See Dashboard Cam at 8:54:55-8:55:14.  "'A show of official authority such that a reasonable person would have believed he was not free to leave' indicates that an arrest has occurred."  Eidson v. Owens, 515 F.3d 1139, 1146 (10th Cir. 2008)(quoting Florida v. Royer, 460 U.S. at 502).  Furthermore, while Campos used conversational language and a pleasant tone, Campos ordered Ramos to stay at the car while he questioned Perez.  Dashboard Cam at 8:55:43-8:55:46.  Campos' actions therefore "convey a message that compliance with [his] request is required" for Ramos to leave the area.  United States v. Griffin, 7 F.3d 1512,

1517 (10th Cir. 1993).  That Campos did not make any overt threats does not mean that there

was no coercion.  See United States v. Hardin, 539 F.3d 404, 424-25 (6th Cir. 2008)(concluding

that, an officer's use of deceit or trickery can taint an otherwise voluntary consent); United States

v. Escobar, 389 F.3d 781, 786 (8th Cir. 2004)(stating that police may not "convey a message that

compliance with their requests is required").   Accordingly, while the encounter began as a

consensual one, it progressed into a detention.[10]

---

[10]Although Campos detained Ramos and Perez, Campos had reasonable suspicion that Ramos and Perez might be transporting illegal narcotics, which justified the extended questioning.  See supra at 58-61.  As the Court explained above, Campos developed reasonable suspicion that Ramos and Perez might be transporting illegal narcotics during the traffic stop when he: (i) noticed that Perez and Ramos gave different answers about their travel plans; (ii) observed Perez acting extremely nervous and distracted; (iii) observed Perez' hands shaking; (iv) noticed that Perez hesitated before answering questions; and (v) noticed that the rental agreement did not allow Ramos to drive the vehicle in New Mexico.  See supra at 58-61; Illinois v. Wardlow, 528 U.S. 119 (2000)("[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion.");  United States v. Kitchell, 653 F.3d at 1219 ("The motorist's or his passengers' inconsistent statements in response to such questions can give rise to reasonable suspicion of criminal activity.").   Campos developed further suspicion during the consensual encounter -- before Campos commanded Perez to remain in the vehicle -- when: (i) Ramos could not identify the last name of the person with whom he would be staying in Texas, despite allegedly knowing her since 1989, and stated that the friend did not know they were coming, see Tr. at 28:1-14 (Campos, Mysliwiec); Dashboard Cam at 8:53:40-8:54:30; (ii) Ramos denied altering the rental agreement and said that Perez did it, see Tr. at 28:18-29:3 (Campos, Mysliwiec); Dashboard Cam at 8:54:40-8:54:55; and (iii) Campos noticed that the rental agreement required Ramos to return the vehicle in three days, but Ramos intended to stay in Texas for longer than three days and would not be able to return it in that time period if he planned on visiting his friend for as long as he said he would, see Dashboard Cam at 8:54:40-8:54:55.  "Implausible travel plans can contribute to reasonable suspicion."   United States v. Simpson, 609 F.3d at 1148.  See United States v. White, 584 F.3d at 951 ("We have noted numerous times that implausible travel plans can form a basis for reasonable suspicion.").

The Tenth Circuit has concluded that similar facts, when combined, could give an officer reasonable suspicion to conduct a dog sniff, which is more invasive than Campos' continued questioning.   United States v. Ludwig, 641 F.3d 1243, 1248-50 (10th Cir. 2011)(finding reasonable suspicion for a dog sniff where, among other things, the defendant's "account of his travel was suspect" and the defendant "was exceptionally nervous").  Further, Campos narrowly tailored his questioning to address the basis for his suspicion.  See United States v. Mendoza-Trujillo, 46 F. Supp. 3d 1204, 1227 (D. Utah 2014).  Campos asked questions about their travel plans to discern whether any other discrepancies existed between Ramos' story and Perez' story, and to ascertain whether Ramos' travel plans were consistent with a visit to a friend.  Finally, the

### 3.    Ramos Freely and Voluntarily Gave His Consent.

"[A] person may voluntarily consent to a search even while being legally detained."

United States v. Jones, 701 F.3d at 1318 (quoting United States v. Contreras, 506 F.3d 1031,

1037 (10th Cir. 2007)).  Being "detained during an investigation no doubt implies an atmosphere

not altogether consensual," even though "an investigative detention, standing alone, is not so

coercive as to render the consent of all detained persons involuntary."  United States v. Olivares-

Campos, 276 F. App'x 816, 824 (10th Cir. 2008).  "[D]etention is only one factor to be

considered in determining whether consent was voluntarily and freely given based on the totality

of the circumstances."  United States v. Contreras, 506 F.3d at 1037.  See United States v.

Mendez, 118 F.3d 1426, 1432 (10th Cir. 1997)("A person who is being detained may give a

voluntary consent to search."); United States v. McRae, 81 F.3d 1528, 1537 (10th Cir. 1996)("A

person who is being detained may still give a voluntary consent."); United States v. Soto, 988

F.2d 1548, 1557 (10th Cir. 1993)("Valid consent may be given by a person being detained.").

The majority of the relevant factors demonstrate that a reasonable person would not have

felt coerced to consent to a search.  Although Campos' tone and language were generally

pleasant and respectful, he raised his voice when ordering Perez to get back into the vehicle.

See United States v. Hernandez, 93 F.3d at 1499.  Notably, however, Campos may have had to

raise his voice because Perez was far away from him on a noisy highway.  Furthermore, Campos

---

detention was limited and lasted no longer than necessary to determine whether Ramos actually
appeared to be visiting a friend in light of the fact that Ramos did not know the friend's last
name, the friend supposedly did not know they were coming, Ramos did not rent the vehicle long
enough for the visit, he did not rent the vehicle to go through New Mexico and Texas, and
altered the rental agreement that originally prohibited them from driving in New Mexico.  See
United States v. Wood, 106 F.3d 942, 945 (10th Cir. 1997).  Accordingly, Campos had
reasonable suspicion to detain Ramos until he finished questioning him about his travel plans and
cleared up the suspicion.  See United States v. Jones, 701 F.3d 1300, 1315-17 (10th Cir.
2012)(concluding that, when a consensual encounter turned into to a detention, the detention was
lawful, because reasonable suspicion justified the detention).

used conversational language, instructing her to "[j]ust hang out in the car," and informing her that he would "be right there."   Dashboard Cam at 8:55:02-8:55:05.   See United States v. Ledesma, 447 F.3d at 1314 (observing that the officer was not coercive when he used "[p]hrases like 'thank you' and 'have a safe one,'" and spoke in "an ordinary, nonthreatening voice"). Overall, Campos used polite, respectful language.   Campos never raised his voice when speaking to Ramos.   Campos' tone and language therefore weigh in favor of finding that the encounter was not coercive.   Only two factors suggest that Ramos merely "acquiesce[ed] to a claim of lawful authority," such that his apparent consent cannot be termed voluntary.   Bumper v. North Carolina, 391 U.S. 543, 548-49 (1968).   First, Ramos was detained.   Second, Campos did not inform Ramos that Ramos could decline consent to search the vehicle before Ramos verbally consented.   See Tr. at 77:8-16 (Campos, Pori).[11]

On the other hand, Campos did not attempt to physically control Ramos.   See United States v. Anderson, 114 F.3d 1059, 1064 (10th Cir. 1997); United States v. McCurdy, 40 F.3d 1111, 1119 (10th Cir. 1994).   He never touched Ramos or Perez.   Campos did not lean on Ramos' vehicle or touch Ramos while asking for consent to search.   See United States v. McSwain, 29 F.3d 558, 563 (10th Cir. 1994)(noting that the consent was involuntarily given when, among other things, the officer "was leaning over and resting his arms on the driver's door when he asked for consent to search").   Similarly, Campos never brandished his weapon.   See United States v. Anderson, 114 F.3d at 1064; United States v. McCurdy, 40 F.3d at 1119. Campos did not withhold any of Ramos' personal items.   See Tr. at 24:14-25 (Campos,

---

[11]As the Court explains below, however, the voluntary consent form that Ramos signed explained that Ramos had "the right to refuse to consent to the search . . . and to refuse to sign this form."   Consent Form at 1.   Campos gave Ramos the option of withdrawing his verbal consent after reading the consent form.

Mysliwiec); Dashboard Cam at 8:50:01-8:51:00.  Moreover, the stop occurred on "'the shoulder of an interstate highway, in public view.'"   United States v. Ledesma, 447 F.3d at 1314. Although additional police officers eventually arrived on the scene, they were not there when Ramos consented.  See United States v. Ledesma, 447 F.3d at 1315 (concluding that multiple officers arrived at the scene after the defendant consented to a vehicle search).  Campos' K-9 was present, but inside of the vehicle.

Although Ramos was detained, Campos did not detain him in a threatening manner that implied Ramos was guilty of committing a crime.  United States v. Mendoza-Salgado, 964 F.2d at 1012 (noting that the "agents also assured Mrs. Garcia that police took her husband into custody only to verify his identity and they intended to bring him home if he was not the same individual named in the warrant").  Instead, Campos explained that Perez needed to remain in the vehicle for safety reasons, because he "deal[s] with dangerous people all day long."  Dashboard Cam at 8:54:55-8:55:20.  See Tr. at 29:12-30:3 (Campos, Mysliwiec).  While the Court has no evidence about whether Ramos felt coerced into signing the consent form, he "appeared calm, friendly and cooperative during this process."  United States v. Mendoza-Salgado, 964 F.2d at 1012 (noting that the defendant "appeared calm, friendly and cooperative during this process," which suggested that the defendant's will was not overborne and that consent was voluntary). See United States v. White, 508 F. App'x 837, 841 (10th Cir. 2013)(concluding that the defendant voluntarily consented to a search when, among other things, "nothing in the record indicates [the officers'] presence made Ms. Webster consent because she 'felt coerced, frightened or otherwise threatened'")(quoting United States v. Iribe, 11 F.3d 1553, 1557 (10th Cir. 1993)); United States v. Ahumada, 2015 WL 685845, at *12 (D. Kan. Feb. 18, 2015)(Crabtree, J.).  As noted above, Campos used a polite tone and easy-going language

throughout the remainder of the encounter.  Nothing suggests that Ramos had a diminished capacity which interfered with his ability to understand Campos.  Furthermore, contrary to Ramos' contentions, Campos did not implicitly threaten Ramos that Perez could not use the restroom unless Ramos consented to a vehicle search.  Rather, as the Court explained above, Campos implied that Perez could not use the restroom until Campos finished <u>questioning</u> them.

Finally, Ramos read and signed a consent form.  <u>See</u> Reply at 4 (stating that Ramos read and signed the consent form).  "A signed consent form is indicative of a voluntary consent." <u>Eidson v. Owens</u>, 515 F.3d at 1147.  Here, Campos explained that the form granted consent to search Ramos' vehicle and directed Ramos to read it.  <u>See</u> Dashboard Cam 8:59:49-9:00:17.  By asking whether Ramos preferred to read the Spanish or the English version of the consent form, Campos ensured that Ramos understood the consent form.  <u>See</u> Dashboard Cam at 8:59:40-8:59:47.  Moreover, Campos ensured that Ramos signed the consent form only after reading it and understanding what it meant.  <u>See</u> Dashboard Cam at 8:59:49-9:00:17 (instructing Ramos to "sign <u>after</u> you read these two paragraphs")(emphasis added).  <u>See</u> <u>United States v. Santurio</u>, 29 F.3d 550, 553 (10th Cir. 1994)(concluding that the defendant voluntarily consented to a search when he read and signed a voluntary consent to search form).  Campos gave Ramos the opportunity to ask questions about the form before Ramos signed it.  <u>See</u> Dashboard Cam at 8:59:49-9:00:17 ("If you have any questions, let me know.").  Notably, Campos did not indicate that Ramos had to sign the form after verbally consenting.  In fact, he instructed Ramos to sign the consent form only after reading it and determining that "everything is still ok."  Dashboard Cam at 8:59:49-9:00:17.  This encounter demonstrates that Campos gave Ramos the option to deny consent.  Moreover, the consent form itself informed Ramos that he had "the right to refuse to consent to the search . . . and to refuse to sign this form."  Consent Form at 1.  The consent

form stated:

> I understand that I have the right to refuse to consent to the search described above and to refuse to sign this form. I further state that no promises, threats, force, physical or mental coercion of any kind whatsoever have been used against me to get me to consent to the search described above or to sign this form.

Consent Form at 1.

Accordingly, Campos did not coerce Ramos into signing the form. If Ramos felt coerced into consenting before reading the consent form, he could not have reasonably held that belief after reading the form. See United States v. Rodriguez-Garcia, 983 F.2d at 1567-68 (concluding that the defendant, who was in custody and facing several officers, voluntarily consented when he read the consent form); United States v. Murphy, 16 F. Supp. 2d 397, 401 (S.D.N.Y. 1998)(concluding that a defendant's "consent unquestionably was valid," even though he was "in custody and had been handcuffed prior to signing the consent form," because the consent form "gave clear notice of his rights"). "The consent-to-search form does not completely resolve the question whether the search was voluntary, but it is a factor weighing strongly in favor of finding that the search was voluntary." United States v. Harmon, 785 F. Supp. 2d 1146, 1173 (D.N.M. 2011)(Browning, J.). Additionally, there is no evidence indicating that Ramos subjectively felt coerced, distressed, or that his will was overborne. Accordingly, on the facts before the Court, an objectively reasonable person would not have felt coerced into allowing a vehicle search.

In situations that involved more coercion, the Tenth Circuit has concluded that a defendant's consent was nonetheless voluntary. For instance, in United States v. McCurdy, the Tenth Circuit reversed a district court's order suppressing fruits of a consensual search where the defendant consented to a search of his truck only after multiple officers apprehended him with their weapons drawn, detained him for three hours, threated "to 'come down real hard' on him" if he did not admit his association with the crime, and twice pushed him to the ground on his

knees.  40 F.3d at 112-13, 1118.  The Tenth Circuit remanded the case for fact-finding about the validity of the search in light of the totality of the factors the Court considers here.  The circumstances here fall short of those in United States v. McCurdy, and even those more coercive circumstances did not preclude a finding of valid consent.

In a situation more similar to the events here, the Tenth Circuit in United States v. Jones again concluded that the defendant -- Jones -- voluntarily consented to a search of his vehicle.  There, three police officers took Jones' license in an alley behind his house and conducted a records check on it.  See 701 F.3d at 1315.  Although the officers detained Jones, the Tenth Circuit concluded that Jones nonetheless voluntarily consented to a search of his home during the detention.  See 701 F.3d at 1316, 1319.  Like Ramos, Jones argued that the officers created "an atmosphere in which he reasonably believed that he was *not free* to disregard or ignore the officers' request to search his residence."  701 F.3d at 1318 (emphasis in original).  See Motion at 20 (arguing that Campos "created an atmosphere in which Mr. Ramos reasonably felt that he was not free to ignore or disregard the Officer's request to search the vehicle").  The Tenth Circuit acknowledged that the officers used "accusatory" and "jolting" language when they stated: "I'm here for your marijuana plants," and "let's clear up what we have here today . . . [and] make sure that there [are no marijuana plants] here at your house."  701 F.3d at 1319 (alterations in original).  These statements imply that the officers knew that Jones had marijuana inside of his residence.  See 701 F.3d at 1319 n.9.  The Tenth Circuit explained how the officers used deception:

> Sergeant Blunt sought to convey the impression to Mr. Jones (albeit falsely) through his accusatory assertion that Mr. Jones's criminal possession was a known fact.  Indeed, Sergeant Blunt's testimony leaves little doubt that he hoped that his accusatory statement would have a jolting effect on Mr. Jones -- specifically, that the statement would prompt Mr. Jones to make a response without carefully considering the possibly incriminating nature of his words or

actions.  *See, e.g.*, R., Vol. II, at 189-90 ("[T]hat's why I used that approach like that, is to see what his visual reaction is to it, to continue the investigation.").

701 F.3d at 1319 n.9.

Despite this "use of deception," the Tenth Circuit did not conclude that "Sergeant Blunt's arguable use of deceit or trickery had a significant impact on the nature of Mr. Jones's consent -- that is, on whether his consent was voluntary."  701 F.3d at 1319 n.9.  Furthermore, after examining all of the other factors, the Tenth Circuit stated that a reasonable person would not have "felt so threatened or cowed by the statement that he or she would have involuntarily complied with an officer's requests or directions."  701 F.3d at 1319.

Like in United States v. Jones, Campos' actions were not "objectively sufficient to overpower Mr. [Ramos'] free will and render him incapable of denying consent" to search his vehicle.  701 F.3d at 1320.  First, like Jones, Ramos was detained.  Second, Campos did not inform Ramos that he could deny consent.  Unlike in United States v. Jones, however, Campos did not suggest that he knew that Ramos was carrying narcotics.  In fact, Campos clarified that he was not insinuating that Ramos used narcotics and was asking only whether the vehicle contained narcotics.  See Dashboard Cam at 8:58:01-8:59:24.  Although Campos implied that Ramos could not leave while Campos was questioning him, Campos never asserted that he had a lawful right to search Ramos' car without consent.  See United States v. Ahumada, 2015 WL 685845, at *12 (concluding that a defendant's consent was voluntary when, among other factors, the police officer "never asserted he had a lawful right to search the defendant's car even without his consent").  Any arguable implication that Perez could not use the restroom until after Campos searched the vehicle occurred after Ramos consented to a vehicle search.

Moreover, unlike in United States v. Jones, Ramos expressly consented not only verbally, but in a consent form that explained his rights.  Both Campos and the consent form clarified that

Ramos did not have to consent to a search.  Finally, there is no evidence that Ramos was fearful or otherwise threatened.  See United States v. Flores, 2016 WL 521079, at *5 (10th Cir. Feb. 10, 2016)(concluding that the defendant voluntarily consented to a vehicle search when, among other things, the police officer's testimony cast doubt on the defendant's testimony that she was "scared and frightened").

In total, the only elements that suggest that the environment was coercive were that Ramos was detained and that Campos did not inform Ramos of his right to decline the request to search before Ramos verbally consented.  As the Court explained above, however, being detained does not "render [Ramos] incapable of denying consent."  701 F.3d at 1320.  See United States v. Herrell, 41 F. App'x 224, 232 (10th Cir. 2002)("While Defendant was detained at the time, detention is only a factor to be considered in determining whether consent was freely and intelligently given; it is not determinative.").  Similarly, the Tenth Circuit has noted that whether a defendant was specifically informed of his or her right to leave or to disregard questions "should carry little weight" in the analysis.  United States v. Thompson, 546 F.3d 1223, 1228 (10th Cir. 2008)(citing United States v. Ringold, 335 F.3d 1168, 1174 (10th Cir. 2003)).  See United States v. Manjarrez, 348 F.3d 881, 886 (10th Cir. 2003)("A police officer does not have to inform the citizen they are free to disregard any further questioning for the encounter to be consensual.").  Moreover, Campos gave Ramos the opportunity to withdraw his verbal consent after reading the consent form, which explained that Ramos had the option to consent.  Ramos never retracted his consent throughout the search.  See United States v. Luna-Santana, 128 F. App'x 42, 48 (10th Cir. 2005)(concluding that the defendant voluntarily consented to a search when, among other things, there was no evidence "to suggest that [the

defendant] revoked his consent or in any way objected to or clarified the scope of the consent to search").

Although United States v. Jones "does not adopt a numerical standard that tallies the pros and the cons, the balance here is one-sided." United States v. Ahumada, 2015 WL 685845, at *12. On these facts, Campos' actions were not "sufficiently potent -- viewed objectively -- to override [Ramos'] free will." 701 F.3d at 1319. The only objectively reasonable conclusion the Court can draw is that Ramos gave his consent freely and voluntarily. There is no factual support for the view that his consent was borne out of duress or coercion. See United States v. McKneely, 6 F.3d 1447, 1453 (10th Cir. 1993); United States v. Iribe, 11 F.3d 1553, 1557 (10th Cir. 1993)(holding that the presence of five officers did not outweigh the numerous factors indicating that the resident voluntarily consented). The United States therefore meets its burden of demonstrating that Ramos freely and voluntarily consented. See United States v. Cody, 7 F.3d 1523, 1526 (10th Cir. 1993); United States v. Angulo-Fernandez, 53 F.3d 1177, 1180 (10th Cir. 1995)(requiring the United States to present "clear and positive testimony that consent was unequivocal and specific and freely and intelligently given").

### B.   IF THE DETENTION WAS EXCESSIVE, THE ILLEGALITY WAS TOO ATTENUATED TO JUSTIFY THE SUPPRESSION OF THE EVIDENCE.

As the Court explained above, Campos did not unlawfully extend the traffic stop. Even if the detention were impermissible, however, Campos did not exploit the prior illegality. See United States v. Melendez-Garcia, 28 F.3d 1046, 1055 (10th Cir. 1994). Where "the government's earlier conduct infringed Fourth Amendment rights, it must proffer objective evidence that 'establish[es] a break in the causal connection between the illegality and the evidence thereby obtained' so the consent is sufficiently removed to be an act of free will." United States v. Sandoval, 29 F.3d 537, 543 (1994)(alterations in United States v.

Sandoval)(quoting <u>United States v. Recalde</u>, 761 F.2d 1448, 1458 (10th Cir. 1985)).  <u>See</u> <u>United</u>

<u>States v. McSwain</u>, 29 F.3d 558, 562 (10th Cir. 1994); <u>United States v. Maez</u>, 872 F.2d 1444,

1453 (10th Cir. 1989)("If the consent is not sufficiently an act of free will to purge the primary

taint of the illegal [seizure], it must be suppressed as fruit of the poisonous tree."); <u>United States</u>

<u>v. Gregory</u>, 79 F.3d 973, 979 (10th Cir. 1996)(stating that, to demonstrate that consent is

voluntary, the United States "must prove, from the totality of the circumstances, a sufficient

attenuation or 'break in the causal connection between the illegal detention and the

consent'")(quoting <u>United States v. McSwain</u>, 29 F.3d at 562 n.2).  Although no single factor

single-handedly demonstrates that Ramos' consent was voluntary, the Tenth Circuit accords

special weight to the three factors in <u>Brown v. Illinois</u>, 422 U.S. at 603-04.  <u>See</u> <u>United States v.</u>

<u>Sandoval</u>, 29 F.3d at 543-44.  Under these factors, as well as other factors that the Tenth Circuit

considers important, there is sufficient attenuation between the detention and the consent.

The first factor -- the temporal proximity between the illegal detention and the consent --

favors suppressing the evidence.  This factor directs the Court to suppress the evidence unless

"substantial time" elapses between an unlawful act and the time the evidence is obtained.  <u>Kaupp</u>

<u>v. Texas</u>, 538 U.S. at 633.  Here, however, Ramos consented to a search approximately ten

minutes after the VIN inspection, which Ramos asserts unlawfully prolonged the detention.  <u>See</u>

Dashboard Cam at 8:50:00-9:00:00.  As the Supreme Court explained in <u>Brown v. Illinois</u>, such

a short time interval counsels in favor of suppression.  <u>See</u> 422 U.S. at 604.  There, the Supreme

Court concluded that the confession should be suppressed, relying in part on the "less than two

hours" that separated the unconstitutional arrest and the confession.  422 U.S. at 604.  The

United States concedes that "the time between the traffic stop and its attendant investigative

detention and the voluntary conversation and search consent was small."  Response at 10.

Consequently, the temporal proximity weighs against admitting the evidence.  See United States v. Fernandez, 18 F.3d 874, 883 (10th Cir. 1994)(concluding that consent was tainted when it took place only "moments" after illegal search); United States v. Recalde, 761 F.2d at 1459 (concluding that consent was tainted where only several minutes passed); United States v. Maez, 872 F.2d at 1447, 1455, 1456 (determining that consent obtained thirty minutes after illegal arrest was tainted); United States v. Mendoza-Salgado, 964 F.2d 993, 1012 (10th Cir. 1992)(stating that, when considered alone, a thirty to forty-five minute time period between the illegal entry and the consent revealed little about the defendant's "decision to permit the search").  Although the short time period here weighs in favor of suppressing the evidence, the Supreme Court admits evidence when the first factor counsels against it.  See Utah v. Strieff, No. 14-1373, slip op., 2016 WL 3369419, at *6.

The second factor -- whether any circumstances intervened -- weighs in favor of admitting the evidence.  The Tenth Circuit requires "'proof of facts or events which ensure that the consent provided . . . [was] not the fruit of the illegal [seizure].  The facts or events must create a discontinuity between the illegal [seizure] and the consent such that the original illegality is weakened and attenuated.'"  United States v. Fox, 600 F.3d at 1260 (alterations in United States v. Fox)(quoting United States v. Gregory, 79 F.3d at 979-80).  See United States v. Reed, 349 F.3d 457, 464 (7th Cir. 2003)("The type of intervening events that serve to attenuate official misconduct are those that sever the causal connection between the illegal [seizure] and the discovery of the evidence.").  Some examples of intervening circumstances include "carefully explain[ing]" a consent form, ensuring that an individual can read the consent form in his or her native language, and advising an individual of the right to withhold consent.[12]  United

---

[12]When police officers discover the contraband before a defendant signs a consent form,

States v. Mendoza-Salgado, 964 F.2d at 1012 (stating that the officer's careful explanation of the consent form in the home owner's native language and advising her of her right to withhold consent "attenuated any duress or coercive effect").  See United States v. Oguns, 921 F.2d 442, 447 (2d Cir. 1990)(signing consent form was an intervening act sufficient to dissipate the taint associated with illegal entry, in part, because agents did not seize any evidence until after the defendant consented to the search).  Along the same lines, Miranda[13] warnings -- although not sufficient alone to establish attenuation -- can be a relevant consideration.  See United States v. Reed, 349 F.3d 457, 463 (7th Cir. 2003)(describing the voluntary confession as "important," although not powerful enough to overcome the other considerations involved).  Similarly, courts have relied upon a defendant's ability to "contact counsel or friends about [the defendant's] predicament" as a factor that favors attenuation.  United States v. Patino, 862 F.2d 128, 133 (7th Cir. 1988).  Other factors include "release from custody, an appearance before a magistrate, or consultation with an attorney."  United States v. Washington, 387 F.3d 1060, 1074 (9th Cir.

---

signing the consent form does not break the causal chain.  In Brown v. Illinois, the Supreme Court noted that the defendant believed that his previous confession during his illegal detention was admissible, which "bolstered the pressures for him to give the second [confession], or at least vitiated any incentive on his part to avoid self-incrimination."  422 U.S. at 605 n.12. Accordingly, signing a consent form in and of itself may not be sufficient to break the causal chain.  See United States v. Santa, 236 F.3d 662, 678 (11th Cir. 2000)(holding that signing a consent form is not an intervening act if the police found drugs earlier and the defendant admitted to the crime); United States v. Robeles-Ortega, 348 F.3d 679, 684 (7th Cir. 1997)(concluding that a signed consent form was not a sufficient intervening circumstance when it was "obtained almost immediately after that forcible entry into the home and subsequent show of force," along with other factors that "weigh[ed] strongly" against attenuation); United States v. Oguns, 921 F.2d 442, 447 (2d Cir. 1990)(signing consent form dissipated the taint associated with illegal entry partially because the defendant consented to the search before the agents seized any evidence).

[13]Miranda warnings refer to the warnings that officers must give to persons subject to "custodial interrogation."  United States v. Hudson, 210 F.3d 1184, 1190 (10th Cir. 2000)(citing Miranda v. Arizona, 384 U.S. 436, 444 (1966))(internal quotations omitted).

2004).  Recently, the Supreme Court clarified that discovering a valid arrest warrant for a person unlawfully detained constitutes a break in the causal chain which "strongly favors" attenuation. Utah v. Strieff, No. 14-1373, slip op., 2016 WL 3369419, at *6.  The Supreme Court noted that the "warrant was valid, it predated [the officer's] investigation, and it was entirely unconnected with the stop."  Utah v. Strieff, No. 14-1373, slip op., 2016 WL 3369419, at *7.

Here, between the traffic stop and the consent, Campos returned all of Ramos' personal possessions, told Ramos that he was free to leave, and Ramos walked away.  The Tenth Circuit has "regularly considered, as 'important factors' on the issue of voluntariness although not dispositive, whether the driver was informed of his right to refuse consent or to proceed on his way."  United States v. Sandoval, 29 F.3d at 544 (citing United States v. Fernandez, 18 F.3d at 882, United States v. Maez, 872 F.2d at 1456, and United States v. Recalde, 761 F.2d 1448, 1458-59 (10th Cir. 1985)).  The detention ended, yet Ramos voluntarily returned to the patrol car and decided to answer several more questions.  Furthermore, Ramos read the consent form.  Like the officer in United States v. Mendoza-Salgado, Campos ensured that Ramos could understand it, encouraged him to ask questions, and briefly explained the form.  See United States v. Mendoza-Salgado, 964 F.2d at 1012.  Notably, Campos did not discover the narcotics until after Ramos consented.  Accordingly, Ramos was not pressured into signing the consent form on the mistaken belief that evidence discovered during an illegal search would be admissible.  See United States v. Oguns, 921 F.2d at 447.  The voluntariness of Ramos' consent -- made after Ramos voluntarily decided to answer more questions, and after he read and signed a consent form explaining his rights -- helps to establish that his consent was "sufficiently an act of free will to purge the primary taint of the unlawful invasion."  Wong Sun v. United States, 371 U.S. 471, 486 (1963).  See United States v. Conrad, 673 F.3d 728, 735 (7th Cir. 2012)(concluding that

the second factor weighed in favor of attenuation when the defendant had been given Miranda warnings, a warning from his father, and had more than one hour to think).  The consensual encounter and explanation of the consent form weigh in favor of attenuation.

The third factor -- the misconduct's purpose and flagrancy -- favors the United States. The Tenth Circuit finds purposeful and flagrant misconduct "where: '(1) the impropriety of the official's misconduct was obvious or the official knew, at the time, that his conduct was likely unconstitutional but engaged in it nevertheless and (2) the misconduct was investigatory in design and purpose and executed 'in the hope that something might turn up.''" United States v. Fox, 600 F.3d at 1261 (quoting United States v. Simpson, 439 F.3d 490, 496 (8th Cir. 2006)). First, there is no evidence that Campos -- or any reasonable officer -- knew that the conduct was unconstitutional, but engaged in it nonetheless.  See United States v. Christy, 785 F. Supp. 2d, 1049 (D.N.M. 2011)(Browning, J.)(concluding that the officer "was not subjectively aware that the entry constituted a Fourth Amendment violation," which "weighs in favor of attenuation"). Campos was at most negligent in extending the detention.  He observed numerous facts throughout his lawful investigation that a reasonable officer would find suspicious.  See supra at 58-61.  Further, any extension in the traffic stop's duration was slight -- only seconds to one minute too long, at most.  See Tr. at 69:8-13 (Campos, Pori); Dashboard Cam at 8:48:40-8:50:00.

Second, Campos did not engage in a fishing expedition.[14]  Ramos argues that Campos checked the VIN solely to fish for evidence.  See Motion at 13.  Although Campos asked Perez numerous questions while inspecting the VIN, he inspected the VIN to determine whether there

---

[14]In United States v. Fox, the Tenth Circuit concluded that an officer engaged in a "fishing expedition" when the officer -- without reasonable suspicion or probable cause -- climbed into a woman's car, directed her to drive across the street to a parking lot where other officers were conducting surveillance, and asked for her identification.  See 600 F.3d at 1262. Upon learning that she did not have a license, the officer asked to search her car, then questioned her.  See 600 F.3d at 1262.

was evidence of tampering, which he does as part of any routine traffic stop.  See Tr. at 18:13-19:18 (Campos, Mysliwiec); id. at 112:2-5 (Campos).  Like checking license and registration, inspecting the VIN is related to the traffic stop's mission.  An officer does not engage in a fishing expedition by checking a driver's license and registration when that driver has been stopped for speeding.   Similarly, an officer does not engage in a fishing expedition by performing other routine tasks related to the traffic stop.  See New York v. Class, 475 U.S. at 963 (upholding the officer's VIN inspection, even though it was "undisputed that the police officers had no reason to suspect that respondent's car was stolen, that it contained contraband, or that respondent had committed an offense other than the traffic violations"); United States v. Samuels, 443 F. App'x at 160 ("As viewing a VIN neither unlawfully extends a lawful traffic stop nor intrudes upon a protectable Fourth Amendment interest, such action need not be supported by reasonable suspicion."); United States v. Ward, 484 F.3d at 1061 ("A 'demand to inspect the VIN, like a demand to see license and registration papers, is within the scope of police authority pursuant to a traffic violation stop.'" (quoting New York v. Class, 475 U.S. at 115)).  As noted above, Campos inspects VINs for the same reasons that he checks license and registration: to ensure that he writes the correct ticket for the correct driver and the correct car in every traffic stop.  See Tr. at 104:24-105:2 (Campos, Mysliwiec).  Additionally, he inspects each VIN, even when the dispatcher informs him that the vehicle is not stolen, because some vehicles are not reported stolen.  See Tr. at 121:6-22 (Campos, Mysliwiec); id. at 97:24-98:7 (Campos).  Accordingly, Campos' VIN inspection was pointed and narrow.  It was not a fishing expedition to search for evidence of an unrelated crime.

Ramos further argues that Campos' conduct was flagrant, because he checked the VIN without reasonable suspicion that it was stolen.  As the Court explained, Campos could lawfully

check the VIN without reasonable suspicion that it was stolen, so it interprets Ramos' argument to mean that Campos could not excessively question Perez without reasonable suspicion.  Even if the facts fell short of reasonable suspicion, such behavior does not amount to flagrant conduct as the Supreme Court has defined it.  See Utah v. Strieff, No. 14-1373, slip op., 2016 WL 3369419, at *8.  "For the violation to be flagrant, more severe police misconduct is required than the mere absence of proper cause for the seizure."  Utah v. Strieff, No. 14-1373, slip op., 2016 WL 3369419, at *8.  See Kaupp v. Texas, 538 U.S. 626, 628, 633 (2003)(finding a flagrant violation where police officers made a warrantless arrest in the arrestee's home after the police were denied a warrant and at least some officers knew that they lacked probable cause).

Campos' actions are different from the officer's actions in United States v. Fernandez, where the officer detained the defendant "based solely on a tension in the air and his vague hunch that something was afoot, with 'the hope that something might turn up.'"  18 F.3d at 883 (quoting Brown v. Illinois, 422 U.S. at 605).  Here, Campos continued questioning Perez after detecting oddities in Ramos' travel plans, noticing that the rental agreement did not allow Ramos to drive in New Mexico, observing Perez' extremely nervous and distracted behavior, witnessing Perez' hands shaking, noticing that Perez paused before answering Campos' questions, detecting that Perez corrected an aspect of her story, and finally, discerning differences between Ramos' and Perez' answers to his questions.  Campos' questioning, therefore, was not a suspicionless fishing expedition "in the hope that something would turn up."  Taylor v. Alabama, 457 U.S. 687, 691 (1982).  See United States v. Peters, 10 F.3d 1517, 1523 (10th Cir. 1993)(finding flagrant misconduct where an agent stopped a vehicle "solely on an unsupported, inarticulable 'hunch'" supplied by another officer who previously had stopped and searched the vehicle, and found no evidence of drugs or illegal activity).

Along the same lines, Campos did not unnecessarily continue questioning after fully completing the traffic stop.  See United States v. McSwain, 29 F.3d at 563 (concluding that the officer's violation was flagrant when he continued irrelevant questioning after determining that the driver committed no traffic violation).  Campos did not obtain consent in the face of clear knowledge that Ramos did not want to consent.  See United States v. Maez, 872 F.2d at 1455 (concluding that the officers were not aware of the impropriety of their actions, even though they "created a frightening scene" by obtaining consent when the defendant "was crying and upset," and "said that she signed the consent forms only because she had to" while holding her two-month-old baby and watching her fifteen-year-old son being handcuffed).  Accordingly, even if reasonable suspicion did not justify Campos' questioning, it was incredibly close.  He was not pursuing a suspicionless hunch.

This case is similar to United States v. Chavira, where the Tenth Circuit concluded that there was no "nexus between the inspection of the VIN located on the doorjamb[15] and the evidence [the defendant] now seeks to suppress."  United States v. Chavira, 467 F.3d at 1291. The Tenth Circuit explained that the VIN inspection "uncovered no contraband," and the defendant "was not confronted with the fruits of that search or questioned about anything that it revealed."  United States v. Chavira, 467 F.3d at 1292.  It determined that there was "no indication that the trooper would not have requested or obtained consent to search the truck but for the inspection of the VIN on the doorjamb."  United States v. Chavira, 467 F.3d at 1292. Similar facts exist here.  Campos discovered no contraband during his VIN inspection and

---

[15]The Tenth Circuit explained that regular doorjamb VIN inspections are lawful.  See United States v. Chavira, 467 F.3d at 1289 ("There is no unlawful detention under *Caro* if the officer remains physically outside the car when he examines the VIN on the dashboard, the doorjamb, or both.").  Nonetheless, because the United States did not challenge the assertion that the search of the doorjamb VIN was an illegal search, the Tenth Circuit assumed for purposes of argument that the search was illegal.  See United States v. Chavira, 467 F.3d at 1289.

questioning.  When Campos questioned Ramos during the voluntary encounter, Campos did not confront Ramos about any of the discrepancies between Ramos' story and Perez' story.  Further, there is no indication that Campos would not have requested or obtained consent to search the vehicle but for the VIN inspection and questioning.

Overall, there is no evidence "showing the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct." United States v. Chavira, 467 F.3d at 1291-92.  "[T]he consent was obtained by means sufficiently distinguishable from that illegal . . . entry so as to be purged of the primary taint."  United States v. Robeles-Ortega, 348 F.3d 679, 683 (7th Cir. 2003).  The causal connection between the VIN inspection and questioning was sufficiently attenuated, because the questioning "merely motivated the decision to seek the consent to search."  United States v. Robeles-Ortega, 348 F.3d at 684 (describing United States v. Liss, 103 F.3d 617 (7th Cir. 1997).  Otherwise, the questioning had no role in the later discovery of the evidence obtained pursuant to the voluntary consent.  Moreover, Campos' conduct was at most negligent, and did not amount to purposeful or flagrant conduct as the Supreme Court defines it.  Applying the Brown v. Illinois factors, the Court holds that the evidence discovered is admissible, because the unlawful detention was sufficiently attenuated by the intervening consensual encounter and Ramos' consent to search his vehicle.  Although the excessive detention was close in time to Campos' discovery, the two factors supporting the United States outweigh the first consideration.

IT IS ORDERED that the Defendant's Motion to Suppress Evidence, filed March 21, 2016 (Doc. 26), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon P. Martinez
  United States Attorney
Paul Mysliwiec
  Assistant United State Attorney
Albuquerque, New Mexico

       *Attorneys for the Plaintiff*

Thomas B. Jameson
Brian A. Pori
   Assistant Federal Public Defenders
Albuquerque, New Mexico

       *Attorneys for the Defendant*