# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                    No. CR 15-3940 JB

EVERETT RAMOS,

     Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Appeal of an Order Revoking the Defendant's Pre-Trial Release, filed October 31, 2016 (Doc. 68)("Appeal"). The Court held a hearing on November 21, 2016. The primary issue is whether, in this case, where the Defendant Everett Ramos is arguing that there is a substantial question of law, and appeals the revocation of the conditions of his pretrial release under "the Eighth Amendment of the United States Constitution and 18 U.S.C. §§ 3143(a)(2) and 3145(b)," the Court should reinstate Ramos' conditions of release. Because the Court concludes that Ramos plead guilty to a crime making mandatory the revocation of his pretrial release unless there are extraordinary circumstances, and because there are no extraordinary circumstances present, the Court will deny the Appeal and will not reinstate Ramos' conditions of release.

## FACTUAL BACKGROUND

On September 16, 2016, Ramos pleaded guilty to these facts:

On October 15, 2015, I, EVERET REA RAMOS, was driving a car in Bernalillo County, in the District of New Mexico, that had over 500 grams of methamphetamine hidden in it. I knew the methamphetamine was there, and I had control over it, and I intended to distribute it to at least one other person.

Plea Agreement at 4, filed September 16, 2016 (Doc. 61)("Plea Agreement").  The Court has also issued, in Ramos' case, a Memorandum Opinion and Order, filed July 11, 2016 (Doc. 44)("MOO").  The Court will adopt and provide the factual background contained in its MOO for the purposes of the factual background related to Ramos' crime.  Those facts are as follows. See MOO at 1-25.

**1.     Campos is Trained in Performing Highway Interdictions.**

1.     New Mexico State Police Officer Joshua Campos currently serves on the New Mexico State Police's Criminal Enforcement Unit.   See Transcript of Hearing at 4:9-12 (Campos)(taken May 25, 2016)("Tr.").[1]

2.     The Criminal Enforcement Unit is a "K-9 unit," meaning that Campos is trained to use a dog.  Tr. at 4:15-16 (Campos).

3.     As part of this unit, Campos received additional training, including a specialty course on highway interdiction.  See Tr. at 5:15-21 (Campos).

4.     He tries to attend various highway interdiction trainings "at least once a year." Tr. at 6:5-6 (Campos).

5.     At those classes, he learns traffic stop techniques, different trends for smuggling narcotics, tools that traffickers use to avoid detection, and recent federal case law regarding traffic stops.  See Tr. at 6:9-22 (Campos, Mysliwiec).

6.     Campos has also been trained as a Vehicle Identification Number ("VIN") Inspector, so he can better determine whether vehicles have been tampered with, and whether a car is stolen.  See Tr. at 107:22-25 (Campos).

---

[1]The Court's citations to the transcript of the hearing refer to the Court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

7.      At the VIN training, Campos learned about a VIN's characteristics, how to identify when a certain car make or model should have a longer VIN, where "hidden VINs can be located" if an officer is unable to verify a VIN from the dashboard or the doorjamb, and how to identify if a VIN has been replaced.  Tr. at 108:5-110:11 (Campos, Mysliwiec).

8.      As part of Campos' normal citation writing and traffic stop process, Campos checks a vehicle's VIN so he can ensure that the vehicle was not stolen.  See Tr. at 20:19-21:2 (Campos, Mysliwiec).

9.      State police officers are not trained to check VINs and a vehicle's VIN is not on the citation form.  See Tr. at 106:12-107:2 (Campos, Pori).

10.      Even though state police officers do not always check the VIN, the Criminal Enforcement Unit officers, who perform highway drug interdictions, routinely compare both of a vehicle's VINs during traffic stops, because either or both VINs might reveal tampering or other evidence of crime.  See Tr. at 18:13-19:18 (Campos, Mysliwiec); id. at 112:2-5 (Campos).

11.      Checking the VIN ensures that the officer writes the correct ticket for the correct driver and the correct car in every traffic stop.  See Tr. at 104:24-105:2 (Campos, Mysliwiec).

12.      Although the Court does not have extensive evidence of how long an individual VIN inspection usually takes, the Court does not believe that Campos needed one minute and twenty-six seconds to inspect this particular VIN, when it took him only six to eight seconds to inspect the dashboard VIN and he did not write down any numbers to use as comparison.  See Tr. at 23:5-10 (Campos, Mysliwiec); id. 65:4-8 (Campos)(explaining that, to adequately check whether anyone has tampered with the VIN, Campos needed to check each of the rivets on the dash and the stamp on the door, as well as all of the letters and numbers in the VIN); id. at 67:15-22 (Campos)(noting that he did not write anything down and he did not remember how he

compared the two VINs, but maintaining that he did compare the VINs).

13.     The Court acknowledges, however, that Campos may have spent some time trying to locate the VIN on the rental agreement so he "could compare it to their contract to make sure that vehicle actually belonged to the contract that they had."  Tr. at 73:7-21 (Campos, Pori).

> **2.     The Initial Traffic Stop Was Lawful.**

14.     On October 14, 2015, Ramos rented a Mercedes G-300 Sedan in southern California.  <u>See</u> Tr. at 14:18 (Campos).

15.     At about 8:40 a.m. on October 15, 2015, Campos saw the Mercedes speeding on Interstate 40, west of the Route 66 hotel and casino, near mile marker 134, outside of Albuquerque, New Mexico.  <u>See</u> Tr. at 8:6-8 (Campos); <u>id.</u> at 11:8-24 (Campos, Mysliwiec).

16.     Campos would later learn that the driver was Ramos and that a female passenger was Laura Perez, Ramos' wife at the time.  <u>See</u> Tr. at 24:7-9 (Campos).

17.     Before initiating the traffic stop, Campos spoke with the Albuquerque area State Police dispatcher and provided her with the Mercedes' license plate number.  <u>See</u> Tr. at 11:11-16 (Campos).

18.     In response, the dispatcher told Campos that the vehicle was "negative on any wants or warrants."  Tr. at 60:7-10 (Campos).

19.     Campos thus knew from the conversation with his dispatcher that there were no warrants associated with the Mercedes' license plate and that the Mercedes had not been reported stolen.  <u>See</u> Tr. at 11:11-16 (Campos).

20.     Campos stopped the Mercedes for speeding.  <u>See</u> Tr. at 11:11-16 (Campos).

21.     Campos drove a marked police car and was dressed in a uniform.  <u>See</u> Tr. at 7:20-25 (Campos).

22.     When the Mercedes came to a stop, Campos approached the Mercedes from the passenger side, as is standard for officer safety reasons, and observed that there was one male in the driver's seat and one female in the front passenger's seat.  See Tr. at 12:9-13 (Campos).

**3.     Campos' VIN Inspection and Questioning did not Unlawfully Extend the Traffic Stop.**

23.     Campos' vehicle was equipped with a dashboard camera that recorded the events. See Tr. at 43:12-18 (Campos, Pori); State Police Dashboard Cam of Stop (October 15, 2015)("Dashboard Cam").

24.     From the Dashboard Cam, the Court can observe Campos, Ramos, and Perez when they are near the Mercedes and in front of the patrol car.

25.     The Court can hear all of Campos' statements clearly, and it can hear most, but not all, of Ramos' and Perez' statements clearly.

26.     Campos identified himself as a police officer, advised Ramos of the reasons for the stop, and then asked Ramos for his driver's license, vehicle registration, and proof of insurance.  See Tr. at 12:9-19 (Campos, Mysliwiec); Dashboard Cam at 8:41:35-46.

27.     In response, Ramos protested that he did not believe that he was speeding, but then produced the requested data.  See Tr. at 12:15-19 (Campos); Dashboard Cam at 8:41:45-52.

28.     After Ramos gave Campos his driver's license and the rental agreement for the Mercedes, Campos asked Ramos to exit the vehicle and meet Campos at the front of Campos's patrol car, which is standard procedure for the New Mexico State Police and for Campos in every traffic stop, for officer safety reasons and for other reasons.  See Tr. at 12:15-14:12 (Campos, Mysliwiec); Dashboard Cam at 8:42:8-12.

29.     Ramos complied with the request.  See Tr. at 14:13-14 (Campos, Mysliwiec); Dashboard Cam at 8:42:12-23.

30.     Campos then provided the State Police dispatcher with Ramos' California driver's license information.  See Tr. at 14:21-25 (Campos); Dashboard Cam at 8:42:40-43:35.

31.     The dispatcher confirmed that Ramos had a valid driver's license.  See Dashboard Cam at 8:43:36-44; Tr. at 14:21-25 (Campos).

32.     Campos noticed that the rental agreement allowed Ramos to drive the vehicle "ONLY" in California, Nevada, and Arizona.   See Tr. at 28:15-29:3 (Campos, Mysliwiec); Dashboard Cam at 8:55:30-8:55:40; Enterprise Rental Agreement (Defendant's Exhibit B, introduced at the hearing).

33.     While Campos was retrieving his citation book and starting to write the citation, Ramos asked Campos a question and engaged him in a brief conversation.  See Dashboard Cam at 8:43:45-8:44:22; Tr. at 96:11-16 (Campos).

34.     As he was filling out the form, Campos asked Ramos several questions about his travel plans, including: (i) what brought Ramos to New Mexico; (ii) if Albuquerque was his ultimate destination; (iii) what he was planning to do in Albuquerque; (iv) what time he left his last stop; (v) if he was planning on staying in Albuquerque; and (vi) how long he rented the car. See Dashboard Cam at 8:44:32-48:09; Tr. at 17:2-3 (Campos)(asserting that Campos asked these questions while he wrote the citation).

35.     Ramos answered each of Campos' questions and engaged Campos in further conversation.  See Dashboard Cam at 8:44:32-48:09.

36.     In response to one of Campos' questions, Ramos stated that he and his wife travelled from California to Las Vegas to Albuquerque, and were in Albuquerque to see the sights.  See Tr. at 17:22-25 (Campos); Dashboard Cam at 8:44:50-55; id. at 8:45:50-46:05.

37.     Ramos stated that, after seeing Albuquerque, they were heading to San Antonio,

Texas to visit Perez' friend.  <u>See</u> Tr. at 17:25-18:2 (Campos).

38.     Ramos also stated that they were "passing by" Albuquerque.  Dashboard Cam at

8:46:30-35; Tr. at 24:5-7 (Campos).

39.     Campos thought it was interesting that Ramos chose this particular route to get to

San Antonio when it was such a significant detour from the fastest route.  <u>See</u> Tr. at 23:24-24:7

(Campos)(stating that "the route that they were taking to San Antonio was [] completely off. . . .

The fastest would have been down through southern Arizona, through I-10 across to San

Antonio, which would have cut their trip approximately about four hours shorter").

40.     Campos routinely asks similar questions while he completes traffic citations, in

accordance with New Mexico State Police policy.  <u>See</u> Tr. at 16:15-23 (Campos, Mysliwiec).

41.     This routine questioning does not generally extend or delay the time it takes to

write a traffic citation.  <u>See</u> Tr. at 17:4-7 (Campos, Mysliwiec).

42.     Campos' travel plan conversation did not substantially extend the time that it took

Campos to write Ramos' traffic citation.  <u>See</u> Dashboard Cam at 8:44:32-48:09; Tr. at 17:4-7

(Campos, Mysliwiec).

43.     Campos asked Ramos to wait to ask further questions until after Campos finished

filling out the citation form.  <u>See</u> Dashboard Cam at 8:47:40-48:00.

44.     When Campos had nearly completed the citation, he told Ramos that he needed to

check the VIN for the Mercedes.  <u>See</u> Tr. at 97:2-9 (Campos, Court); Dashboard Cam at 8:48:09-

16.

45.     Even though the dispatcher had told Campos that the vehicle was not stolen and

Campos had the information he needed to write the citation, Campos checked the vehicle's VIN

to confirm that there was no evidence of tampering and that the vehicle matched the license

plate, because some vehicles are not reported stolen.  See Tr. at 121:6-22 (Campos, Mysliwiec); id. at 97:24-98:7 (Campos).

46.     After ordering Ramos to remain at the patrol car, Campos approached the driver's side of the vehicle and then examined the VIN in the lower portion of the windshield on the driver's side.  See Tr. at 66:2-67:11 (Campos, Pori); Dashboard Cam at 8:48:26-40.

47.     One of the places that the VIN is located is inside the doorjamb of the driver's door.  See Tr. at 63:25-64:3 (Campos).

48.     Campos routinely compares the VIN on the front dashboard with the VIN in the doorjamb, because either or both locations might reveal tampering or other evidence of crime. See Tr. at 18:13-19:18 (Campos, Mysliwiec); id. at 112:2-5 (asserting that the Criminal Enforcement Unit officers, who perform highway drug interdictions, routinely compare both VINs during traffic stops).

49.     Campos did not write down any of the VIN numbers when checking them, but sought to determine whether there was evidence of tampering.  See Tr. at 65:24-66:1 (Campos, Pori); id. at 65:4-8 (Campos).

50.     Campos spent approximately six to eight seconds examining the VIN on the front dashboard, see Tr. at 67:8-11 (Campos, Pori); Dashboard Cam at 8:48:32-8:48:40, while he spent approximately one minute and twenty seconds checking the VIN located in the doorjamb, see Tr. at 69:8-13 (Campos, Pori).

51.     Campos opened the driver's door of the Mercedes, but did not reach his hand into the passenger compartment to touch any items inside of the vehicle.  See Tr. at 68:23-7 (Campos, Pori); Dashboard Cam at 8:48:40-50:00.

52.     Campos was looking at the rental agreement "to see if it had any of the vehicle

VIN number on it so [he] could compare it to their contract to make sure that vehicle actually belonged to the contract that they had," because, normally, a VIN is included in the vehicle's registration, but Ramos did not hand him the vehicle's registration. Tr. at 73:7-21 (Campos, Pori).

53.    While Campos checked the vehicle's VIN at that location, he engaged Perez in conversation and proceeded to engage in extensive questioning. See Tr. at 21:16-22:7 (Campos, Mysliwiec); Dashboard Cam at 8:48:40-50:00.

54.    Campos observed that Perez appeared "nervous" and "very distracted," her hands were shaking, she paused before answering Campos' questions, and she kept receiving multiple telephone calls on one of two cellular telephones. See Tr. at 22:1-7 (Campos).

55.    Based on his training and experience, Campos determined that her hands were shaking because she was nervous. See Tr. at 22:15-18 (Campos, Mysliwiec).

56.    Campos looked at the VIN for a moment, then turned his head toward Perez. See Dashboard Cam at 8:48:42-45.

57.    The Court cannot see where Campos looked after he turned his head toward Perez, because of the video's poor quality, but it has no evidence to contradict Campos' statement that he looked back and forth between Perez and the VIN number so that he could watch Perez while she answered his questions and to ensure that she was not trying to reach for anything that could injure him. See Tr. at 93:2-5 (Campos, Mysliwiec).

58.    Campos was not looking at the VIN toward the end of the time that he was questioning Perez. See Tr. at 92:24-5 (Campos, Mysliwiec); Tr. at 72:4-6 (Campos)(admitting that, toward the end of his VIN inspection, he "wasn't looking at the VIN at that time. I was looking at Ms. Perez.").

59.     Campos did not intend to delay or extend the traffic stop.  See Tr. at 22:24-23:2 (Campos, Mysliwiec).

60.     Campos asked Perez about her travel plans.  See Tr. at 21:16-22:7 (Campos, Mysliwiec).

61.     Perez gave different answers to the travel-plan questions than the answers that Ramos gave, and she also changed her story throughout the conversation.  See Tr. at 21:16-22:7 (Campos, Mysliwiec).

62.     Specifically, she stated that she was "going to Albuquerque for a few days, and then they were going to go on their way back to California," and then corrected her story to say that they were going to Texas.  Tr. at 21:23-22:1 (Campos).  See Dashboard Cam at 8:49:08-12.

63.     Ramos had informed Campos that they were going to San Antonio for a few days to stay with Perez' friend.  See Tr. at 24:1-10 (Campos).

64.     Perez further informed Campos that they had come straight from California and had not stopped anywhere, see Dashboard Cam at 8:49:30-50:00, even though Ramos said that they went through Las Vegas, Nevada, see Dashboard Cam at 8:44:46-52.

65.     Campos noted the discrepancy between Ramos' story and Perez' story.  See Tr. at 23:17-24:10 (Campos, Mysliwiec).

66.     Campos testified that he developed reasonable suspicion that "something was going on prior, more than . . . the speeding issue," which is "why [he] asked -- was talking more to Ms. Perez."  Tr. at 71:11-17 (Campos).

67.     In total, Campos asked Perez the following questions in the following order: (i) what brought her to New Mexico; (ii) where she was headed; (iii) how long she was planning on staying at her final destination; (iv) when she was traveling back to California; (v) the purpose of

her travel; (vi) where Ramos and Perez would stay when they arrived at their destination; (vii)

whether Ramos was her husband; (viii) when Ramos rented the Mercedes; (ix) from where

Ramos and Perez were coming; (x) what time they left California; (xi) whether they left

California in the morning or the evening; (xii) whether they were traveling straight through to

their final destination; and (xiii) whether they had made any stops along the way.  See Dashboard

Cam at 8:48:47-50:00.

68.     Campos' conversation with Perez increased the time that it took Campos to

inspect the vehicle's VIN and observe evidence of tampering.  See Tr. at 23:6-7 (Campos).

69.     Campos returned to his patrol car, handed Ramos his driver's license and rental

contract, and explained to Ramos that he could contest his citation in court, or admit guilt and

pay a fine.  See Tr. at 24:14-25 (Campos, Mysliwiec); Dashboard Cam at 8:50:01-51:00.

70.     The citation is a one-page document that contains the following fields: (i) the

driver's name; (ii) the license number; (iii) the speed at which the vehicle was traveling; (iv) the

vehicle's information, including the vehicle's make and model; and (v) whether the driver

chooses to contest the citation or to pay it.  See Tr. at 56:18-57:1 (Campos, Pori); Speeding

Citation Issued to Everett Ramos (Defendants' Hearing Ex. C).

71.     After Ramos chose to pay the fine, Ramos signed the citation, stated that he had

no further questions, and shook Campos' hand.  See Tr. at 25:2-16 (Campos, Mysliwiec);

Dashboard Cam at 8:51:01-8:51:25.

72.     Campos then told Ramos he was "free to leave," and Ramos began to walk back

to his vehicle.  Tr. at 25:20-21 (Campos).  See id. at 76:3-5 (Campos); Dashboard Cam at

8:51:26-29.

73.     From the time that Campos approached the vehicle to the time that he told Ramos

he was free to leave, the traffic stop took approximately nine minutes and fifty-four seconds.

74.     Campos typically takes ten to fifteen minutes to issue a citation.  See Tr. at 16:6-7 (Campos).

75.     Officers routinely take more than ten minutes to perform all the tasks involved in a traffic stop.  See United States v. Sampson, 388 F. App'x 950, 953 (11th Cir. 2010)("[W]e cannot conclude that a fifteen to twenty minute total detention was unreasonable" in light of the various interruptions involved.); United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001)(holding that a fourteen-minute detention was not unreasonable, and citing cases upholding traffic stops of thirty and fifty minutes); United States v. Hill, 195 F.3d 258, 269 (6th Cir. 1999)(concluding that the officer did not unreasonably prolong the traffic stop when it took a "little more than twelve minutes"); United States v. Shareef, 100 F.3d 1491, 1502 (10th Cir. 1996)(concluding that a thirty-minute wait for a computer check during a traffic stop was reasonable); United States v. Hardy, 855 F.2d 753, 761 (11th Cir. 1988)(stating that a fifty-minute traffic stop, by itself, did not invalidate the detention, but demonstrating "some unease" about the detention's length).  Cf. United States v. Place, 462 U.S. 696, 709 (1983)(concluding that a ninety-minute stop was too long for a Terry v. Ohio, 392 U.S. 1 (1968), stop).

**4.      The Consensual Encounter.**

76.     As Ramos was walking back to his vehicle, approximately seventeen seconds after Campos told Ramos he was free to leave, Campos called out, "[e]xcuse me, sir," in a polite, respectful tone.   Tr. at 26:12-18 (Campos, Mysliwiec); id. at 77:20-77:2 (Campos, Pori); Dashboard Cam at 8:51:46-47.

77.     Ramos turned and walked toward Campos' police car, where Campos asked Ramos if Campos could ask a few questions, and Ramos agreed to answer the questions.  See Tr.

at 26:1-2 (Campos); Dashboard Cam at 8:51:48-53.

78.     Campos did not tell Ramos that Ramos was under no obligation to answer the questions.  See Tr. at 77:8-16 (Campos, Pori).

79.     Campos asked Ramos detailed questions about Ramos' travel plans, including: (i) from where Ramos and Perez were coming; (ii) when they left California; (iii) where they travelled and stayed; (iv) whether they had friends and family in the area; (v) whether they planned to spend the night in Albuquerque; and (vi) where they planned to stay while in San Antonio.  See Tr. at 27:16-28:8 (Campos): Dashboard Cam at 8:51:54-55:40.

80.     During the initial traffic stop, Campos noticed that the rental agreement did not allow Ramos to drive the car in New Mexico, so he asked Ramos whether the rental company made a mistake.  See Tr. at 28:15-29:3 (Campos, Mysliwiec); Dashboard Cam at 8:55:30-40.

81.     Ramos stated that Perez altered the rental agreement.  See Dashboard Cam at 8:55:30-40.

82.     Ramos did not know the last name of the person with whom he would be staying when he arrived in Texas, despite allegedly knowing her since 1989.  See Dashboard Cam at 8:53:40-54:30; Tr. at 28:18-29:4 (Campos, Mysliwiec).

83.     Ramos further asserted that Perez' friend did not know they were coming to visit and that it was a surprise.  See Tr. at 28:1-8 (Campos).

84.     Campos noticed that the rental agreement required Ramos to return the vehicle in three days, but Ramos intended to stay in Texas for longer than three days and would not be able to return it in that time period if he planned on visiting his friend for as long as he said he would.  See Dashboard Cam at 8:54:40-8:54:55.

85.     Ramos did not appear afraid; He discussed his fear of airplanes, his business

plans, and fun events in Albuquerque, including the Sandia Peak Tramway.  See Dashboard Cam at 8:51:54-55:40.

86.    Campos did not retain any of Ramos' personal items during this encounter.  See Tr. at 27:7-11 (Campos, Mysliwiec).

87.    During the questioning, Perez left the vehicle, starting walking toward Campos, and told Campos that she needed to use the restroom.  See Tr. at 29:10-12 (Campos); Dashboard Cam at 8:54:25-55.

88.    Campos told Perez to "go ahead and have a seat in the car," and that he would 'be right there."  Dashboard Cam at 8:54:55-55:00.

89.    The Court cannot fully hear Perez, but Campos testified that she suggested that she wanted to take the car to the nearest gas station to use the restroom.  See Tr. at 83:7-11 (Campos)("[S]he's indicating to me that she wants to leave to go use the restroom at an enclosed restroom facility . . . ."); id. at 160:19-161:24 (Mysliwiec).

90.    Campos again said: "Just hang out in the car.  I'll be there in a second." Dashboard Cam at 8:55:02-05.

91.    Perez protested again and took a few more steps toward Campos before he said: "Ma'am just sit in the car for me, ok?"  Dashboard Cam at 8:55:06-14.

92.    Campos raised his voice and used a stern tone when he instructed Perez to remain in the vehicle.  See Dashboard Cam at 8:54:55-55:14.

93.    Campos had to raise his voice largely because the highway was loud and Perez was a good distance from Campos.  See Dashboard Cam at 8:54:55-55:14.

94.    As Perez returned to the vehicle, Ramos explained that Perez suffers from a bladder condition.  See Dashboard Cam 8:55:00-15.

95.     Campos explained to Ramos that he needed Perez to remain in the car for officer safety reasons, because he "deal[s] with dangerous people all day long."  Dashboard Cam at 8:54:55-55:20.  See Tr. at 29:12-30:3 (Campos, Mysliwiec).

96.     Campos testified that it endangers his safety if he has to keep his eye on two people standing or sitting close to him.  See Tr. at 30:21-24 (Campos, Mysliwiec).

97.     Campos "would have let her use the restroom on the side of the road" had she asked, but he "didn't think of telling her that."  Tr. at 83:1-3 (Campos).

98.     After Campos finished questioning Ramos, Campos -- using a conversational tone -- told Ramos to "hang out" near the police car while he asked Perez some questions.  Tr. at 30:6-12 (Campos, Mysliwiec); Dashboard Cam at 8:55:43-46.

99.     At the Mercedes, Campos asked Perez if he could ask her some questions, and Perez agreed to answer them.  See Tr. at 30:6-8 (Campos); Dashboard Cam at 8:55:54-56:00.

100.    Perez' telephone received multiple calls during the conversation.  See Tr. at 31:2-8 (Campos).[2]

101.    Campos asked Perez the same questions that he had asked Ramos, but this time, Perez' story aligned with Ramos' story.  See Tr. at 31:10-14 (Campos); Dashboard Cam at 8:56:00-57:43.

102.    Campos did not know whether Perez received any text messages from Ramos when he could not see her or Ramos.  See Tr. at 33:18-22 (Campos, Mysliwiec).

103.    Perez did not explain why she changed her story about their travel plans.  See Tr. at 33:23-34:2 (Campos, Mysliwiec).

104.    After Campos finished questioning Perez, he returned to his police car where

---

[2]The video plays what appears to be the sound of a cellular telephone ringing.  The sound is audible when Campos stands near Perez.  See, e.g., Dashboard Cam at 8:55:13-8:55:16.

Ramos was standing and told Ramos that Campos had a few more questions for him.   See Dashboard Cam at 8:57:48-54.

105.    Campos asked Ramos what was wrong with Perez' bladder.   See Dashboard Cam at 8:57:55-58:00.

106.    After Ramos explained the problem, Campos asked Ramos several more questions, including whether the vehicle contained any narcotics.   See Dashboard Cam at 8:58:01-59:24.

107.    Again, Ramos did not appear afraid, and instead discussed his wife's health and his travel plans in a conversational and upbeat manner.   See Dashboard Cam at 8:58:01-59:24.

108.    Campos clarified that he was not insinuating that Ramos used narcotics, and was asking only whether the vehicle contained narcotics.   See Dashboard Cam at 8:58:01-59:24.

109.    Campos then asked Ramos for consent to search Ramos' vehicle and his property within the vehicle.   See Tr. at 34:23-35:1 (Campos); Dashboard Cam at 8:59:25-9:00:00.

110.    Campos did not lean on Ramos' vehicle or touch Ramos while asking for consent to search.   See Dashboard Cam at 8:59:25-9:00:00.

111.    Ramos consented and agreed to complete a form acknowledging that he consented to a vehicle search.   See Dashboard Cam at 8:59:25-9:00:00; Tr. at 35:4-5 (Campos).

112.    Campos asked whether Ramos preferred to read English or Spanish to ensure that Ramos could understand the consent form.   See Dashboard Cam at 8:59:40-47.

113.    Campos explained that the form granted Campos consent to search the vehicle and asked Ramos to read it.   See Dashboard Cam 8:59:49-9:00:17.

114.    Campos ensured that Ramos signed the consent form only after reading it and understanding what it meant.   See Dashboard Cam at 8:59:49-9:00:17 (instructing Ramos to

"sign <u>after</u> you read these two paragraphs")(emphasis added).

115.    Campos asked Ramos to let him know if Ramos had any questions about the

form.  <u>See</u> Dashboard Cam at 8:59:49-9:00:17 ("If you have any questions, let me know.").

116.    Campos gave Ramos the option to retract his consent when he said: "If you can

read this form . . . if everything is still ok, you can sign."  Dashboard Cam at 8:59:49-9:00:17.

117.    The consent form states:

> I _____ hereby grant my consent to _____ officers of the
> New Mexico Department of Public Safety, to search the following vehicle
> described below including luggage, containers, and contents therein. If search
> reveals a false or altered compartment, access to such compartment will be made
> by any means available; including drilling and/or cutting of compartments.
>
> . . . .
>
> I understand I have the right to refuse to consent to the search described above
> and to refuse to sign this form. I further state that no promises, threats, force,
> physical or mental coercion of any kind whatsoever have been used against me to
> get me to consent to the search described above or to sign this form.
>
> DATE: _____    TIME: _____
> 1. _____        2. _____

<u>United States v. Harmon</u>, 785 F. Supp. 2d 1146, 1154 (D.N.M. 2011)(Browning, J.)(citing the

Department of Public Safety, Search and Seizure Vehicle Consent to Search Form).[3]

118.    After Ramos verbally consented and started filling out the consent form, Campos

told Ramos: "I know your wife has to use the restroom, but I'll get you guys out of here as soon

as I can."  Dashboard Cam at 9:00:00-12.

119.    Campos' statement that he would "get [them] out of here as soon as [he could]"

did not implicitly threaten Ramos that Ramos had to consent to a search.  Dashboard Cam at

9:00:00-12.

---

[3]The Court cites the New Mexico consent form from its prior opinion, because the parties
did not introduce the consent form here.

120.    Although Campos was wearing his sidearm when he asked for consent to search the vehicle, it was holstered.  See Tr. at 35:6-12 (Campos, Mysliwiec).

121.    Although Campos' K-9 was in the patrol car, there were no other human officers around and Campos did not take any physical actions intended to threaten Ramos into signing the consent form.  See Tr. at 35:13-36:2 (Campos, Mysliwiec).

122.    Campos did not physically touch Ramos.  See Tr. at 35:19-20 (Campos, Mysliwiec).

123.    Ramos agreed to allow Campos to search the vehicle verbally and in a written consent form.  See Tr. at 35:2-5 (Campos, Mysliwiec).

124.    Campos also obtained Perez' verbal consent to search the vehicle and her property within the vehicle.  See Tr. at 36:5-11 (Campos, Mysliwiec); Dashboard Cam at 9:00:55-01:26.

125.    Before Perez completed the consent form, she again explained her bladder problem to Campos, who said that he understood, but did not offer to let her use the restroom on the side of the road.  See Dashboard Cam at 9:01:50-02:20.

126.    Campos directed Perez to exit the vehicle and stand off to the right shoulder while he conducted the search.  See Tr. at 36:14-20 (Campos); Dashboard Cam at 9:02:40-03:17.

127.    Campos then informed Perez that she could urinate behind a tree if she did not want to wait until after the search.  See Tr. at 83:16-21 (Campos, Pori); Dashboard Cam at 9:02:53-03:00.

128.    Campos instructed Ramos and Perez where to stand, and emphasized that they needed to remain separate for Campos' safety.  See Dashboard Cam at 9:03:00-04:50.

129.    After Campos performed a preliminary vehicle search to remove dangerous items from the vehicle, he deployed his K-9, who alerted Campos to the presence of drugs in the trunk

area.  See Tr. at 38:1-19 (Campos, Mysliwiec).

130.    While Campos continued the search, other officers arrived at the scene to assist.
See Tr. at 38:25-39:3 (Campos).

131.    Campos informed Ramos and Perez that they could ask any questions, but they
did not do so.  See Tr. at 39:16-19 (Campos, Mysliwiec).

132.    At no point throughout the search did Perez or Ramos revoke their consent or ask
the officers to stop the search.  See Tr. at 39:4-9 (Campos, Mysliwiec).

133.    Throughout various places in the car, Campos found approximately six packages
with black axle grease covering them.  See Tr. at 40:1-41:1 (Campos).

134.    Drug-trafficking organizations use axle grease to conceal a narcotic's odor.  See
Tr. at 40:7-10 (Campos).

135.    Campos then placed Ramos and Perez under arrest.  See Tr. at 41:2-3 (Campos).

## PROCEDURAL BACKGROUND

On November 5, 2015, a grand jury indicted Ramos for possession of more than 500
grams of methamphetamine with the intent to distribute it, in violation of 21 U.S.C. § 841(A)(1)
and (B)(1)(a).  See Indictment, filed November 5, 2015 (Doc. 12).  On October 19, 2015, the
Honorable Laura Fashing, Magistrate Judge for the United States District Court for the District
of New Mexico, had, following the Indictment, initially released Ramos to the La Posada
Halfway House.  See Order Setting Conditions of Release, filed October 19, 2015 (Doc. 9).
Subsequently, on October 26, 2015, Magistrate Judge Fashing then released Ramos "on his own
recognizance, allowing the Defendant to return to his residence in Pomona, California where Mr.
Ramos will be under the Supervision of the United States Probation Office in California."  Order
to Modify Conditions of Release, filed October 26, 2016 (Doc. 10).

Ramos then moved the Court, pursuant to the Fourth Amendment to the Constitution of the United States of America and rule 12(b)(3)(C) of the Federal Rules of Criminal Procedure, to suppress the evidence seized from the rental car under his control on October 5, 2015.  See Defendant's Motion to Suppress Evidence at 1, filed March 21, 2016 (Doc. 26)("Motion to Suppress").  Ramos submitted that the Court must suppress the evidence, because it was seized without a warrant after an unreasonable and excessive detention that produced his involuntary consent to search.  See Motion to Suppress at 1.  The Court denied Ramos' Motion to Suppress. See MOO at 85.  The primary issues were: (i) whether New Mexico State Police Officer Joshua Campos unreasonably delayed Defendant Everett Ramos during his traffic stop without reasonable suspicion; (ii) whether Ramos' consent to allow Campos to search his vehicle was voluntary; and (iii) if Campos unlawfully detained Ramos, whether the unlawful actions were too attenuated from Ramos' voluntary consent to be suppressed.  The Court denied the Motion to Suppress, holding:

> First, Campos did not unlawfully extend the traffic stop when he questioned Ramos and Perez and inspected the vehicle's VIN.  Second, after the traffic stop had ended, Ramos voluntarily consented to answer further questions.  Although this questioning evolved into a lawful detention justified by reasonable suspicion, Ramos nonetheless freely and voluntarily consented to a vehicle search during the detention.  Accordingly, Campos' vehicle inspection was lawful.  Third, even if Campos had unlawfully extended the traffic stop, Ramos' consent was too attenuated from any unlawful actions to suppress the evidence.

MOO at 1.  Ramos' Plea agreement was conditioned upon his reservation of his right to appeal the MOO.  See Plea Agreement at 2.

As stated, on September 16, 2016, Ramos entered into a Plea Agreement.  See Plea Agreement at 1.  The Honorable William Lynch, Magistrate Judge for the United States District Court for the District of New Mexico, accepted Ramos' guilty plea.  See Order, filed September 16, 2016 (Doc. 63).  As a consequence of Ramos' guilty plea, however, Magistrate Judge Lynch

further ordered that "the conditions of release previously imposed are hereby revoked and that the Defendant Everette Rea Ramos be remanded to the custody of the U. S. Marshal pending final disposition in this matter."  Order at 1.

1.   **Ramos' Appeal.**

Ramos appealed Magistrate Jude Lynch's Order revoking his conditions of release pursuant to "the Eighth Amendment of the United States Constitution and 18 U.S.C. §§ 3143(a)(2) and 3145(b)."  Appeal at 1.  In support, Ramos argues that he has been fully compliant with his conditions of pretrial release, and has not otherwise violated Magistrate Judge Fashing's orders setting his conditions of release.  Regarding Magistrate Judge Lynch's Order, Ramos explains that

> Judge Lynch concluded that there were no exceptional circumstances which justifies Mr. Ramos' release, despite Mr. Ramos' faithful compliance with the Order setting conditions of Release, his conditional guilty plea and Mr. Ramos' role as the sole caretaker for his elderly mother who suffered from a variety of debilitating medical conditions.

Appeal at 2-3.

Accordingly, Ramos requests that the Court set aside Magistrate Judge Lynch's Order, and "continue him on pretrial release pending sentencing on the same terms and conditions which Judge Fashing previously imposed."  Appeal at 3.  In addition to the "clear and convincing evidence that he will not flee the jurisdiction of the Court nor pose a danger to any other person or the community" because of his "exemplary performance on pre-trial release for the year," Ramos maintains that "his case presents a substantial question of law on the issue of whether New Mexico State Police Officers violated the Fourth Amendment when they secured Mr. Ramos' consent to search his vehicle during an arguably excessive detention."  Appeal at 3. With respect to the Court's MOO which denied Ramos' Motion to Suppress on these grounds,

Ramos argues that the issue presented was nonetheless a "close question of law which, if favorably decided by the Tenth Circuit Court o[f] Appeal, will result in the withdrawal of his Conditional Plea . . . ." Appeal at 3-4.  Because of the "close" nature of the issue, then, Ramos asserts that he stands to be "wrongfully imprisoned for an offense which was only discovered after an alleged violation of the Fourth Amendment." Appeal at 4-5.

    **2.**   **<u>The November 21, 2016, Hearing</u>.**

The Court held a hearing on Ramos' Appeal on November 21, 2016. <u>See</u> Transcript of Hearing (taken November 21, 2016)("Appeal Tr.").[4]  At the hearing, Ramos began argument by stating that

> the good thing about being a defense attorney is all you have to have is a good faith belief in the extension of the law, and so as I read the statute certainly if we were here only with respect to exceptional circumstances and presumption of detention, Mr. Ramos would remain detained.  There were factors presented to Judge Lynch, particularly his mother is on dialysis, and he's her primary caregiver.

Appeal Tr. at 1:23-2:8 (Pori).  Before the Court, Ramos added that his son was just starting college, and that his daughter and youngest son live at home, and are his primary responsibility. <u>See</u> Appeal Tr. at 2:19-3:1 (Pori).  Thus, Ramos conceded that, "if we were here only with respect to exceptional circumstances and the presumption of detention, [] Ramos would remain detained." Appeal Tr. at 2:1-4 (Pori).  Ramos further explained that "other family members are stepping up, and including -- I know his children are helping to the extent that they can." Appeal Tr. at 3:18-20 (Pori).  At this point, Ramos explained to the Court that his argument in favor of his release was that the Court has the "authority to release Mr. Ramos after sentencing if the

---

[4]The Court's citations to the transcript of the hearing refer to the Court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

Court finds that," the plea is conditional and has "some merit."  Appeal Tr. at 3:20-25 (Pori).

Thus, Ramos argues that the Court should view its authority in the post-sentence release context

as being instructive as to its authority in the entry of appeal context -- that is, Ramos is arguing

for a "good faith extension of the law."  Appeal Tr. at 4:1-6 (Pori).

 Ramos then provided more detail about the nature of his argument in favor of release,

stating:

> You have the power to release him if there are exceptional circumstances. . . .
> [O]ur argument is a little different.  Even if there is [sic] not exceptional
> circumstances you also have the power to release him if you determine that his
> appeal presents a viable claim that's not made for purposes of delay.  It seems that
> the statutes are in the disjunctive, not conjunctive.  If you're going to release
> someone pending appeal post-sentencing, nothing in the statute talks about
> exceptional circumstances, and of course the exceptional circumstances is a very
> narrow condition, but the post sentence meritorious appeal is a bit broader.

Appeal Tr. at 4:11-23 (Pori).  In sum, Ramos argued that the standard used in the meritorious

appeal post-sentencing context should be extended to the pre-sentencing context in which Ramos

finds himself.  See Appeal Tr. at 5:21-6:20 (Pori).

 The United States then argued, simply stating that "I do not think the Court can apply the

interesting appeal justification for post sentencing release to the exceptional circumstances test

that applies for presentencing release."  Appeal Tr. at 8:3-7 (Mysliwiec).  Addressing

nonetheless the post-sentence meritorious appeal standard, the United States provided that "it

was my impression that the Court's analysis was very thorough," with respect to the MOO

concerning the suppression issue, and that "I couldn't point to any problems that I had with it

that would allow me to agree that success on appeal is likely."  Appeal Tr. at 9:16-24

(Mysliwiec).

 The Court then readdressed Ramos and attempted to clarify his arguments.  See Appeal

Tr. at 11:8-14 (Court).  Ramos explained: "Your Honor, what I'm saying is there is a tension

between 3143(A) and 3143(B).  3143(A) says if you've been convicted of a controlled substance offense, you must be detained, 3143(A) doesn't use the exceptional circumstances language.  I think that's been developed in case law."  Appeal Tr. at 12:3-9 (Pori).  The Court then worked with Ramos to clarify that the standard for "3143(A)" is that if you can "produce exceptional circumstances then, even though it's mandatory to retain him, you can let him go."  Appeal Tr, at 12:14-17 (Court).  The argument Ramos was making, then, was that

> then you have 3143(B), which says if it comes to sentencing and you've determined that the appeal presents a substantial question of law, close question and the appeal is not meant for purposes of delay, then the Court, as long as defendant shows by clear and convincing evidence that he's not danger, not a flight risk, then the Court has the authority to release him.

Appeal Tr. at 12:15-13:5 (Pori).  In response, then, the United States argued that "the law currently demands that you find exceptional circumstances to release him, given that he pled to a felony drug traffic offense."  Appeal Tr. at 17:18-21 (Mysliwiec).  The Court took the matter under advisement, but indicated that, if it needed to make a finding of exceptional circumstances to reinstate Ramos' release, it was not inclined to make such a finding.  See Tr. at 18:15-19 (Court).

## LAW REGARDING PRETRIAL DETENTION

Pursuant to the Bail Reform Act of 1984, 18 U.S.C. §§ 3141 through 3150, a court may detain a defendant pending trial only after a hearing, held pursuant to 18 U.S.C. § 3142(f), and upon a finding "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e).  At such a hearing, the United States bears the burden of proving risk of flight by a preponderance of the evidence, and the burden of proving dangerousness by clear-and-convincing evidence.  See 18 U.S.C. § 3142(f); United States v. Cisneros, 328 F.3d 610, 616

(10th Cir. 2003). "The rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing." 18 U.S.C. § 3142(f). To determine whether pretrial detention is warranted, the judicial officer must consider the statutory factors that 18 U.S.C. § 3142(g) lists:

> (g)     **Factors to be considered.** -- The judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, take into account the available information concerning
>
> > (1)     the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
> >
> > (2)     the weight of the evidence against the person;
> >
> > (3)     the history and characteristics of the person, including
> >
> > > (A)     the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
> > >
> > > (B)     whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
> >
> > (4)     the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

> In considering the conditions of release described in subsection (c)(1)(B)(xi) or (c)(1)(B)(xii) of this section, the judicial officer may upon his own motion, or shall upon the motion of the Government, conduct an inquiry into the source of the property to be designated for potential forfeiture or offered as collateral to secure a bond, and shall decline to accept the designation, or the use as collateral, of property that, because of its source, will not reasonably assure the appearance of the person as required.

18 U.S.C. § 3142(g).

When a defendant is charged with certain crimes, however, a presumption arises that the defendant is a flight risk and a danger to the community.  See 18 U.S.C. § 3142(e)(3); United States v. Villapudua-Quintero, 308 F. App'x 272, 273 (10th Cir. 2009)(unpublished)(per curiam)(recognizing that 18 U.S.C. § 3142(e) establishes a rebuttable presumption favoring detention in the case of, among other defendants, certain alleged drug offenders).  18 U.S.C. § 3142(e)(3)(A) provides that a presumption of detention arises when "there is probable cause to believe that the person committed" certain drug offenses, specifically "an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act, the Controlled Substances Import and Export Act, or chapter 705 of title 46."  18 U.S.C. § 3142(e)(3)(A).  The United States Court of Appeals for the Tenth Circuit has explained that "[t]he grand jury indictment is sufficient to establish the finding of probable cause that defendant committed a federal drug offense with a maximum prison term of ten years or more."  United States v. Silva, 7 F.3d 1046, 1046 (10th Cir. 1993).  Accord United States v. Holguin, 971 F. Supp. 2d 1082, 1088 (D.N.M. 2011)(Browning, J.).  "'Once the presumption is invoked, the burden of production shifts to the defendant.'"  United States v. Holguin, 791 F. Supp. 2d at 1087 (quoting United States v. Stricklin, 932 F.2d 1353, 1354-55 (10th Cir. 1991)).

To determine whether there are conditions that will reasonably assure the defendant's appearance and the community's safety, a court must consider: (i) the nature and circumstances of the crime charged; (ii) the weight of the evidence against the defendant; (iii) the defendant's history and characteristics, including family ties, employment, financial resources, community ties, drug or alcohol abuse history, and past conduct; and (iv) the nature and seriousness of the danger to the community or to an individual that release would pose.  See 18 U.S.C. § 3142(g). "Should the defendant satisfy his or her burden of production under 18 U.S.C. § 3142(f), the United States must then show by a preponderance of the evidence that the defendant presents a risk of flight, or by clear-and-convincing evidence that the defendant presents a danger to the community."  United States v. Holguin, 791 F. Supp. 2d at 1087 (citing United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001); United States v. Stricklin, 932 F.2d at 1354-55 ("[T]he burden of persuasion regarding risk-of-flight and danger to the community always remains with the government.")).  Notably, however, even if the defendant meets his or her burden of production under 18 U.S.C. § 3142(f), "the presumption remains a factor for consideration by the district court in determining whether to release or detain."  United States v. Stricklin, 932 F.2d at 1355.  Accord United States v. Mercedes, 254 F.3d at 436.

## THE DISTRICT COURT'S STANDARD OF REVIEW

Section 3145(a) of Title 18 of the United States Code provides that a "court having original jurisdiction over the offense" may review a Magistrate Judge's detention order or release order.  18 U.S.C. § 3145(a)-(b).  "The standard of review for the district court's review of a Magistrate Judge's detention or release order under § 3145(a) is de novo."  United States v. Cisneros, 328 F.3d at 616 n.1.  "When the district court acts on a motion to revoke or amend a magistrate's pretrial detention order, the district court acts de novo and must make an

independent determination of the proper pretrial detention or conditions for release."  United States v. Rueben, 974 F.2d 580, 585-86 (5th Cir. 1992).  See United States v. Maull, 773 F.2d 1479, 1481 (8th Cir. 1985)(stating that a district court's review of a Magistrate Judge's order setting bond is de novo).

## LAW REGARDING RELEASE PENDING SENTENCING

Under 18 U.S.C. § 3143(a)(2), the Court "shall order that a person who has been found guilty of an offense in a case described in subparagraph (A), (B), or (C) of subsection (f)(1) of section 3142 and is awaiting imposition or execution of sentence be detained."  18 U.S.C. § 3143(a)(2).  When a defendant pleads guilty, this mandatory detention provision applies unless: (i) the United States recommends that no sentence of imprisonment should be imposed; and (ii) the Court finds by clear-and-convincing evidence that the defendant is neither a flight risk nor a danger to the community.  18 U.S.C. §§ 3143(a)(2)(A)(ii), (B).  Offenses falling under 18 U.S.C. § 3142(f)(1)(A) through (C) include cases that involve:

**(A)** a crime of violence, a violation of section 1591, or an offense listed in section 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed;

**(B)** an offense for which the maximum sentence is life imprisonment or death;

**(C)** an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), or chapter 705 of title 46;

18 U.S.C. § 3142(f)(1).

If the defendant cannot meet § 3143's requirements, the only way a defendant may remain out of custody pending sentencing is by showing that there are "exceptional reasons why detention would not be appropriate," and by showing by clear-and-convincing evidence that he

or she is not a flight risk or a danger to the community.  18 U.S.C. § 3145(c).  Section 3145(c)

provides:

> **(c)**   **Appeal from a release or detention order.** -- An appeal from a release or detention order, or from a decision denying revocation or amendment of such an order, is governed by the provisions of section 1291 of title 28 and section 3731 of this title. The appeal shall be determined promptly. A person subject to detention pursuant to section 3143(a)(2) or (b)(2), and who meets the conditions of release set forth in section 3143(a)(1) or (b)(1), may be ordered released, under appropriate conditions, by the judicial officer, if it is clearly shown that there are exceptional reasons why such person's detention would not be appropriate.

18 U.S.C. § 3145(c).[5]  Accordingly, in addition to showing that the defendant poses no danger to

the community or flight risk, a defendant covered by § 3143(b) must show that there are

exceptional reasons that make the person's detention inappropriate.  See 18 U.S.C. § 3145(c);

United States v. Jones, 979 F.2d at 805.  A defendant bears the "burden of proof to clearly show

exceptional circumstances" when seeking release pursuant to 18 U.S.C. § 3145(c).  United States

---

[5]Notably, § 3145(c) refers expressly only to appeals from a release or detention order. See 18 U.S.C. § 3145(c).  The Tenth Circuit has, however, decided that a district court may apply this subsection even when there is no appeal of a detention order.  See United States v. Jones, 979 F.2d 804, 806 (10th Cir. 1992)(per curiam)(citing United States v. Herrera-Soto, 961 F.2d 645, 647 (7th Cir. 1992)(per curiam); United States v. DiSomma, 951 F.2d 494, 496 (2d Cir. 1991); United States v. Carr, 947 F.2d 1239, 1240 (5th Cir. 1991)(per curiam)("All the other circuits that have addressed the issue have ruled that the 'exceptional reasons' provision does apply to district courts.  We now join those circuits and hold that a district court may consider whether exceptional reasons exist to release a defendant under 18 U.S.C. § 3145(c)." (citations omitted)).  Once a jury has found a defendant guilty of an offense that triggers the § 3143(a)(2)'s provisions, a court may, under § 3145(c), order a defendant's release if a court finds that the defendant is not a danger or a flight risk, and there exists exceptional reasons to justify release.  See 18 U.S.C. § 3145(c); United States v. Peterson, 185 F.3d 875, 1999 WL 407493, at *1 (10th Cir. 1999)(table decision)(unpublished); United States v. Kinslow, 105 F.3d 555, 556-57 (10th Cir. 1997)(stating that a defendant who sought release pending sentencing for a crime of violence must show by clear-and-convincing evidence that he was "not likely to flee or pose a danger to any other person or the community," and by "making a clear showing of exceptional reasons why his detention would not be appropriate"); United States v. Jager, 2011 WL 831279, at *18 (D.N.M. 2011)(Browning, J.)("Once a court finds that a defendant meets the criteria of § 3143(a)(2), a court may order a defendant's release if a court finds that the defendant is not a danger and there exists exceptional circumstances to justify release.").

v. Rodella, 101 F. Supp. 3d 1075, 1133 (D.N.M. 2015)(Browning, J.)(citing 18 U.S.C. § 3145(c) and United States v. Bonczek, 2009 WL 2924220, at *2 (S.D.N.Y. 2009)(Crotty, J.)).

Sections 3143 and 3145 do not define the phrase "exceptional reasons."  18 U.S.C. §§ 3143, 3145.  See United States v. Jager, 2011 WL 831279, at *18 (D.N.M. 2011)(Browning, J.)("Section 3143 does not define 'exceptional reasons.'").  In determining what is exceptional under § 3145(c), courts have closely analyzed the "only useful historical document" on the issue: a letter from the Department of Justice to Senator Paul Simon, the provision's sponsor.  The letter "propos[ed] the 'exceptional reasons' provision and suggest[ed] two hypothetical situations where it might apply."  United States v. DiSomma, 951 F.2d at 497-98 (citing Letter from Assistant Attorney General Carol T. Crawford to Honorable Paul Simon (July 26, 1989)("Crawford Letter")).  See United States v. Garcia, 340 F.3d 1013, 1016-17 (9th Cir. 2003)(same).  The two situations in the Crawford Letter were:

> [F]irst, an elderly man with lifelong community ties, [who was] convicted under the federal murder statute of the mercy killing of his wife, challenges the applicability of that statute to mercy killings, a question of first impression in the circuit.  The second example posited a seriously wounded drug dealer whose appeal raised a novel search and seizure issue which could change the outcome of his trial.

United States v. DiSomma, 951 F.2d at 497-98.  As a whole, the Crawford Letter suggested that "exceptional reasons exist where, due to a truly unusual circumstance or combination of circumstances, it would be unreasonable, despite the general policy favoring incarceration contained in section 3145(c), to order a particular defendant to be incarcerated pending [sentencing or] appeal."  United States v. Garcia, 340 F.3d at 1017.

Case law interpreting § 3145(c)'s provision has generally adhered to the Crawford Letter's principles.  The Tenth Circuit has stated that "a unique combination of circumstances giving rise to situations that are out of the ordinary" must exist.  United States v. Wages, 271 F.

App'x 726, 727 (10th Cir. 2008)(per curiam)(unpublished).  It noted that "exceptional reasons" means "being out of the ordinary: uncommon, rare."  United States v. Wages, 271 F. App'x at 727.  See United States v. DiSomma, 951 F.2d 494, 497 (2d Cir. 1991)(stating that exceptional circumstances are "a unique combination of circumstances giving rise to situations that are out of the ordinary," and finding that a defendant's status as a student, as employed, or as a first-time offender did not constitute exceptional circumstances).  Courts also generally agree that "a case by case evaluation is essential," United States v. Wages, 271 F. App'x at 727, and that the district court has "broad discretion . . . to consider all the particular circumstances of the case before it," United States v. Garcia, 340 F.3d at 1016-17 (observing that a "wide range of factors may bear upon the analysis").  Accordingly, the "Tenth Circuit . . . refrains from placing contours around the outer limits of the circumstances that may constitute 'exceptional reasons,' while finding that particular circumstances fail to meet that exception."  United States v. Westover, 2003 WL 22953091, at *1 (D. Kan. 2003).

Following the Tenth Circuit's approach, the Court similarly provides guidance regarding what is "exceptional" by cataloguing what is not exceptional under § 3145(c).  The Court draws from its own experience sentencing criminal defendants in defining what is exceptional.  The Court sentences more than 100 defendants each year, often many more.[6]  In fact, the District of New Mexico sees more felony cases than any other federal district in the country, and more criminal cases than most courts in the country.[7]  See Criminal Cases Commenced, by Number of

---

[6]The Clerk of Court's internal statistical records approximate that the Court sentenced 156 criminal defendants in 2015, 180 defendants in 2014, and 134 defendants in 2013.

[7]In 2015 alone, 4,227 criminal cases were filed in the District of New Mexico.  See Criminal Cases Commenced, Terminated, and Pending (Including Transfers), During the 12-Month Periods Ending March 31, 2014 and 2015, JNET, Criminal Caseload Tables, http://jnet.ao.dcn/resources/statistics/caseload-tables/criminal-caseload-tables        ("Criminal

Felony Defendants, Excluding Reopens, During the 12-Month Period Ending March 31, 2015, JNET, Criminal Caseload Tables, http://jnet.ao.dcn/resources/statistics/caseload-tables/criminal-caseload-tables (listing New Mexico as having the highest number of criminal cases involving felony defendants in the nation); Criminal Cases Commenced, Terminated, and Pending (Including Transfers), During the 12-Month Periods Ending March 31, 2014 and 2015, JNET, Criminal Caseload Tables, http://jnet.ao.dcn/resources/statistics/caseload-tables/criminal-caseload-tables. After sentencing so many defendants and listening to their stories, the Court has some thoughts about what is not exceptional. It is difficult to describe "exceptional" in the abstract without a finite context: it is, however, easier to say what is not "exceptional."

First, the aberrant nature of the criminal offense does not constitute an exceptional circumstance. Specifically, a lack of criminal history is not exceptional. See United States v. Wages, 271 F. App'x at 728; United States v. Lea, 360 F.3d 401, 403-04 (2d Cir. 2004)(concluding that "[t]here is nothing 'exceptional' about . . . being a first-time offender"); United States v. Larue, 478 F.3d 924, 925 (8th Cir. 2008)(per curiam)(finding nothing exceptional about a lack of criminal history); United States v. Ganadonegro, 2012 WL 1132166, at *5-6 (D.N.M. 2012)(Browning, J.)(same). Similarly, complying with investigators and police is usually not exceptional under § 3145(c). See United States v. Jager, 2011 WL 831279, at *4 (D.N.M. 2011)(Browning, J.)(finding it unexceptional that a defendant "complied with investigators," and disclosed "his involvement with child pornography, allowing the investigators to search and seize his computer, and admitting that he had received and stored

---

Filings"). Only Arizona, with 5,059, and Texas' Southern and Western Districts, with 5,491 and 6,074, respectively, saw more criminal filings. See Criminal Filings at 1. In comparison, 98 criminal cases were filed in the District of Rhode Island, 128 were filed in Vermont, 116 were filed in the Northern District of Mississippi, 109 were filed in the Western District of Wisconsin, and 61 were filed in the Eastern District of Oklahoma. See Criminal Filings at 1.

child pornography"); United States v. Douglas, 824 F. Supp. 98, 99 (N.D. Tex. 1993)(Means, J.)(finding no exceptional reasons based upon "an agreement to cooperate with the government and testify at the trial" which subjected the defendant "to potential retaliation from his co-defendants"). Cf. United States v. Carretero, 1999 WL 1034508, at *8 (N.D.N.Y. 1999)(Sharpe, M.J.)(denying release, but stating that the court would not "foreclose the possibility that active cooperation which benefits the government, the defendants, and the societal goal of drug eradication may constitute an exceptional circumstance in an appropriate case"). Likewise, complying with pretrial release conditions and appearing at all court proceedings is not exceptional. See United States v. Larue, 478 F.3d at 925; United States v. Little, 485 F.3d 1210, 1210-11 (8th Cir. 2007)(stating that full compliance with pretrial release conditions and timely appearance at all court proceedings are not exceptional reasons). Finally, the defendant's commitment to avoiding crime in the future by undergoing treatment is insufficient. See United States v. Jager, 2011 WL 831279, at *19 ("Jager's participation in treatment is unexceptional."); United States v. Green, 250 F. Supp. 2d 1145, 1151 (E.D. Mo. 2003)(Webber, J.)("[I]t would be unfortunate for this Court to pronounce that achieving success in a drug rehabilitation program is an extraordinary or unique occurrence.")). In sum, a demonstrated history of complying with one's responsibilities and abiding by the law do not make a defendant's situation exceptional.

Second, the defendant's physical conditions, unless extremely irregular, will not often constitute an exceptional circumstance. See United States v. Wages, 271 F. App'x at 727 (finding it unexceptional where the defendant was fifty-three years old, used a wheelchair, needed a special mattress to avoid pain, and had a limited ability to hear); United States v. Brown, 368 F.3d 992, 993 (8th Cir. 2004)(per curiam)(concluding that the defendant's need to undergo treatment for depression was not exceptional); United States v. Rodella, 101 F. Supp. 3d

1075, 1130 (D.N.M. 2015)(Browning, J.)(concluding that the defendant's "poor health," even when combined with his need to provide for his family, was not "sufficiently exceptional to warrant release" when the defendant's health had not deteriorated since he had been imprisoned); United States v. Mellies, 496 F. Supp. 2d 930, 936-37 (M.D. Tenn. 2007)(Higgins, J.)(concluding that the defendant's need to continue extensive dental treatment was not exceptional); United States v. Lieberman, 496 F. Supp. 2d 584 (E.D. Pa. 2007)(Robreno, J.)(holding that the availability of experimental treatment in China for paralysis resulting from being shot by cohort during robbery was not exceptional).  Notably, defendants can often continue treatment for most physical ailments in prison.  See United States v. Rodella, 101 F. Supp. 3d at 1130 (noting that the "medical staff at any federal BOP facility can handle Rodella's health issues"); United States v. Rodriquez, 50 F. Supp. 2d 717, 722 (N.D. Ohio 1999)(Potter, J.)(noting that treatment is available in prison).  After dealing with many defendants with physical and mental problems, the Court has a high degree of confidence in the Bureau of Prisons' ability to deal well with most defendants and with most mental problems.

Third, the nature of the underlying crime is only rarely exceptional.  It is not exceptional that the defendant poses little future danger to the community.  See United States v. Rodella, 101 F. Supp. 3d at 1134-35 ("If a low risk of future violence was sufficient to warrant release of a violent offender, then every defendant who is convicted of a crime of violence would be released as long as he or she met § 3143(a)(2)(B)'s requirements, making § 3145(c)'s exceptional-circumstance's requirement meaningless."); United States v. Koon, 6 F.3d 561, 564 (9th Cir. 1993)(Rymer, J., concurring in the order denying the petition for rehearing en banc)(ruling that danger to the community is a predicate condition of § 3143(a)(1) and thus does not establish an "exceptional reason" absent some other factor making it extraordinary).  The Court concludes

that the better rule is to release a violent offender only when the violent act itself is exceptional, such that the defendant "may not be the type of violent person for whom Congress intended the mandatory detention rule." United States v. Garcia, 340 F.3d at 1019. The Court has previously opined on what acts may be exceptional:

> The Ninth Circuit gives three examples: (i) a violent act that did not involve any specific intent; (ii) a violent act that did not involve a threat or injury; and (iii) a mercy killing. See United States v. Garcia, 340 F.3d at 1019. Each of these examples are exceptional and do not involve defendants who would normally be considered violent. If a defendant commits a violent act, but not with a specific intent, the defendant may not be a violent person and did not intend to commit the violent act. Similarly, if a person committed a violent act that did not involve a threat or injury, the act may not truly be considered violent, considering no violence was done to another. Additionally, a person who commits a mercy killing does not do so out of spite or ill will toward the victim, but out of compassion and a desire to help. At least one district court has noted that a possessor of child pornography's action was exceptional when the defendant's action appeared to be "an aberrational act" that involved "a one-time out-of-character incident, precipitated by large quantities of pain medications [the defendant] was taking for a series of medical conditions" and when the defendant "stopped viewing such images a substantial time prior to the FBI discovering the images." United States v. Syzmanski, No. CR 08–0417, 2009 WL 1212249, at *2-3 (N.D. Ohio Apr. 30, 2009)(Zouhary, J.). Each of these examples involve a crime that is rare, uncommon, or out of the ordinary when compared with similar violent crimes.

United States v. Rodella, 101 F. Supp. 3d at 1134-35. Nonetheless, the offense's nature, without more, is not usually sufficient to constitute an exceptional reason under § 3145(c). It is merely one factor that courts should consider when determining whether exceptional reasons exist.

Notably, however, the act's nature might produce other consequences that weigh on exceptionality. For instance, the crime for which a defendant is imprisoned might subject him or her to mistreatment in prison. The United States Court of Appeals for the Eighth Circuit has held that the underlying crime's nature does not usually present an exceptional circumstance, even when it might subject the defendant to mistreatment in jail. See United States v. Brown, 368 F.3d at 993 ("[W]e do not see how Brown's case is 'clearly out of the ordinary, uncommon, or

rare' when compared to every other defendant convicted of offenses involving the sexual exploitation of children.").  The Eighth Circuit noted, however, that it was only speculation whether the defendant's conviction might subject him to mistreatment and observed that the defendant "was not convicted of child abuse."  368 F.3d at 993.  Similarly, when a defendant did not present any evidence that his safety was in jeopardy, other than a few threats from inmates who were physically separated from the defendant, the Court concluded that the situation was not exceptional.  See United States v. Rodella, 101 F. Supp. 3d at 1136 (noting that "[i]ncarceration is inherently dangerous").

Fourth, detention's effect on the defendant's employment or status as a student does not make the situation exceptional.  See United States v. Lea, 360 F.3d at 403-04 (concluding that "[t]here is nothing 'exceptional' about going to school").  Detention prevents every defendant from maintaining employment.  Fifth, a defendant's prior military service is not usually an exceptional circumstance.  See United States v. Jager, 2011 WL 831279, at *18-19.  Moreover, even when detention affects a defendant's eligibility for lifelong disability benefits resulting from military service, the situation may be unexceptional.  See United States v. Jager, 2011 WL 831279, at *18-19 ("If, however, Jager is taken into custody immediately after sentencing, . . . Jager will be ineligible for a disability rating and lifelong disability benefits.").  The Court found such a situation unexceptional when the defendant would still be "eligible for Veteran's Administration medical benefits and disability benefits until he is taken into custody after sentencing."  United States v. Jager, 2011 WL 831279, at *17.

Finally, detention's effect on a defendant's family, without more, is often insufficient.  See United States v. Velarde, 555 F. App'x 840, 841 (10th Cir. 2014)(per curiam)(stating that "the cases establish that mere personal reasons, including caring for a family or gainful

employment, are not 'exceptional'").  The Tenth Circuit has explained that "familial hardship and disruption to an individual's educational or professional affairs are the natural, if unfortunate, consequences of finding oneself at the mercy of the criminal justice system." United States v. Velarde, 555 F. App'x at 841.   Accordingly, detention's effect on the defendant's reputation, and his or her family's reputation, is not exceptional.  See United States v. Ganadonegro, 2012 WL 1132166, at *5-6 (finding it unexceptional that detention would impair the defendant's and the defendant's family's reputation).  Likewise, detention's effect on a defendant's ability to care for his or her family, without more, is not usually exceptional.  See United States v. Wages, 271 F. App'x at 727 (finding it unexceptional where the defendant, who was middle-aged and suffered from his own physical ailments, had to care for his elderly mother); United States v. Rodella, 101 F. Supp. 3d at 1136-37 (finding it unexceptional when detention would place a strain on the defendant's mother, his wife, and his grown children); United States v. Wright, 2009 WL 87604, at *3 (D. Utah 2009)(Stewart, J.)(holding that a defendant's need to care for his elderly mother, who suffered from emphysema, was not an exceptional reason); United States v. Mellies, 496 F. Supp. 2d at 937 (concluding that the defendant's need to care for his aging parents, who suffered from various medical problems, was not exceptional); United States v. Green, 250 F. Supp. 2d at 1150-51 (finding it unexceptional that detention would prevent the defendant from being able to provide for his nine children); United States v. Lippold, 175 F. Supp. 2d 537, 540 (S.D.N.Y. 2001)(Sweet, J.)(finding it unexceptional that the defendant would be unable to care for his "three young children whom he supports financially," including his seven-month old son suffering from Bell's Palsy); United States v. Burnett, 76 F. Supp. 2d 846, 849 (E.D. Tenn. 1999)(noting that "incarceration regrettably inflicts family hardship on many, if not most, defendants" and that "personal family

hardships are very common and occur in a great number of cases"); United States v. Scott, 1995
WL 723752 (E.D. Tex. 1995)(concluding that the need to assist an infirm parent, including
contributions from employment, were not exceptional); United States v. Mahabir, 858 F. Supp.
504 (D. Md. 1994)(concluding that incarceration's disruption of the family was unexceptional);
United States v. Taliaferro, 779 F. Supp. 836 (E.D. Va. 1992)(concluding that it was
unexceptional that the defendant's daughter was in the midst of a difficult pregnancy).

Although Congress' mandate may produce unfortunate family situations, such is the case
with every defendant facing a custodial sentence.  There may be situations, however, that
produce unusually severe effects on the defendants and their families.  When these situations
combine with the various other factors listed above, an exceptional circumstance may arise.
Accordingly, when "detention imposes an unusually harsh effect of a personal nature not
ordinarily experienced by an individual facing incarceration," United States v. Green, 250 F.
Supp. 2d at 1150, combined with other factors that make the situation truly unusual, the
circumstance may truly be exceptional, see United States v. Reyes, 9 F. Supp. 3d 1196, 1213
(D.N.M. 2014)(Browning, J.)(finding it exceptional, when the "United States suggested that it
would not oppose release if the Court were to find exceptional circumstances," that the defendant
"has a new, young child for whom she must care," coupled with her good performance on
pretrial release, but noting that "it might come to a different decision if it had more time to
consider the issue").  The Court concludes that an exceptional family situation may arise "when
the defendant is raising small children by himself or herself, and the children have special needs
for which only the defendant can provide."  United States v. Rodella, 101 F. Supp. 3d at 1137.
Without such unusual circumstances, the Court will not find an exceptional reason to release the
defendant pending sentencing under § 3145(c).

## LAW REGARDING POST-SENTENCING RELEASE

18 U.S.C. § 3143(b) regards release post sentencing during pendency of a likely successful appeal.  See 18 U.S.C. § 3143(b).  The provision reads:

> **(b) Release or detention pending appeal by the defendant.** -- **(1)** Except as provided in paragraph (2), the judicial officer shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment, and who has filed an appeal or a petition for a writ of certiorari, be detained, unless the judicial officer finds --
>
>> (A) by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c) of this title; and
>>
>> (B) that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in--
>>
>>> (i) reversal,
>>>
>>> (ii) an order for a new trial,
>>>
>>> (iii) a sentence that does not include a term of imprisonment, or
>>>
>>> (iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.
>
>> If the judicial officer makes such findings, such judicial officer shall order the release of the person in accordance with section 3142(b) or (c) of this title, except that in the circumstance described in subparagraph (B)(iv) of this paragraph, the judicial officer shall order the detention terminated at the expiration of the likely reduced sentence.

18 U.S.C. § 3143(b).  By its express terms, and under Tenth Circuit law, § 3143(b) establishes separate requirements for release pending appeal from those requirements that §3143(a) establishes for release pending sentencing.  See United States v. Tucker, 745 F.3d 1054 (10th Cir. 2014)(referring to the relevant provisions, and explaining that § 3143(a) and (b) "establish[] separate requirements for release pending sentence and appeal").  The Tenth Circuit has not

otherwise eradicated the distinction between the two provisions -- one expressly governs Defendants' release pending sentencing, and the other release pending appeal.  See 18 U.S.C. § 3143(a)-(b).

**ANALYSIS**

Ramos has pleaded guilty pursuant to a conditional plea agreement, which allows him to appeal the Court's order denying his Motion to Suppress.  The Court has not, however, sentenced Ramos.  Accordingly, the law regarding release pending sentencing applies, and Ramos' case does not present and exceptional circumstances.

**I.      RAMOS HAS NOT BEEN SENTENCED, MEANING THAT THE LAW REGARDING RELEASE PENDING SENTENCING APPLIES.**

At present time, Ramos is awaiting the Court's sentencing following his guilty plea pursuant to the Plea Agreement.  Ramos plead guilty, pursuant to rule 11 of the Federal Rules of Criminal Procedure, to a violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A).  See Plea Agreement at 2.  Under 18 U.S.C. § 3143(a)(2), the Court "shall order that a person who has been found guilty of an offense in a case described in subparagraph (A), (B), or (C) of subsection (f)(1) of section 3142 and is awaiting imposition or execution of sentence be detained."  18 U.S.C. § 3143(a)(2).  When a defendant pleads guilty, pursuant to rule 11, to violations of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A), that mandatory detention provision applies unless: (i) the United States recommends that no sentence of imprisonment should be imposed; and (ii) the Court finds by clear-and-convincing evidence that the defendant is neither a flight risk nor a danger to the community.  See 18 U.S.C. §§ 3143(a)(2)(A)(ii), (B).  Offenses falling under 18 U.S.C. § 3142(f)(1)(A) through (C) include cases that involve:

> **(A)** a crime of violence, a violation of section 1591, or an offense listed in section 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed;

- 40 -

**(B)** an offense for which the maximum sentence is life imprisonment or death;

**(C)** an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), or chapter 705 of title 46 . . . .

18 U.S.C. § 3142(f)(1).  Again, Ramos plead guilty to a violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A), falling under the purviews of § 3142(f)(1)(C).

If the defendant cannot meet § 3143's requirements, the only way a defendant may remain out of custody pending sentencing is by showing that there are "exceptional reasons why detention would not be appropriate," and by showing by clear-and-convincing evidence that he or she is not a flight risk or a danger to the community.  18 U.S.C. § 3145(c).  Section 3145(c) provides:

**(c)**      **Appeal from a release or detention order.** -- An appeal from a release or detention order, or from a decision denying revocation or amendment of such an order, is governed by the provisions of section 1291 of title 28 and section 3731 of this title.  The appeal shall be determined promptly.  A person subject to detention pursuant to section 3143(a)(2) or (b)(2), and who meets the conditions of release set forth in section 3143(a)(1) or (b)(1), may be ordered released, under appropriate conditions, by the judicial officer, if it is clearly shown that there are exceptional reasons why such person's detention would not be appropriate.

18 U.S.C. § 3145(c).  Accordingly, given the procedural stature of Ramos' case, he must, as a threshold matter, demonstrate "exceptional reasons why detention would not be appropriate."  18 U.S.C. § 3145(c).

Ramos requests that the Court instead apply the standard governing post-sentencing release pending appeal, which he argues is less exacting.  See Appeal at 1; Appeal Tr. at 12:15-13:5 (Pori).  That standard, found under 18 U.S.C. § 3143(b), authorizes release pending appeal where the Court finds

(A) by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c) of this title; and

(B) that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in --

(i) reversal,

(ii) an order for a new trial,

(iii) a sentence that does not include a term of imprisonment, or

(iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.

18 U.S.C. § 3143(b).  The Court understands Ramos' argument to be that there is a tension between § 3143(a) and  § 3143(b), which the Court might resolve by cross-applying the standard for release pending appeal to this case, where Ramos requests release pending sentencing.  See Appeal Tr. at 12:3-9 (Pori).  He contends that, as a matter of pure logic and sound public policy, if he could be released after sentencing under 18 U.S.C. § 3143(b), there is no sound reason that the district court does not have the power to release him under 18 U.S.C. § 3143(a) and 18 U.S.C. § 31459(c) before sentencing.  See Appeal Tr. at 5:21-6:20 (Pori).  The Court appreciates Ramos' candor in explaining that such a conclusion would be endorsing a novel reading of the law.  See Appeal Tr. at 12:3-9 (Pori)("Your Honor, what I'm saying is there is a tension between 3143(A) and 3143(B)."); Appeal Tr. at 5:21-6:20 (Pori)(arguing that the standard used in the meritorious appeal post-sentencing context should be extended to the pre-sentencing context Ramos finds himself in at the present time).  Ramos does not suggest that there are exceptional circumstances in this case.  See Appeal Tr. at 2:1-4 (Pori).  The Court, however, can see no sound reason at this time to go outside the bounds of its authority to authorize such a reading of the law where the Tenth Circuit has not yet deemed such a reading even remotely plausible.  In

fact, the Tenth Circuit has recently made it clear that both § 3143(a) and § 3143(b) expressly govern cases with distinct procedural postures, and has not indicated any distaste with such an agreement.   Also, the statute's plain language creates a distinction.   See Navajo Health Foundation -- Sage Mem'l Hosp., Inc v. Burwell, 2016 WL 7257245, at *52 (D.N.M. 2016)(Browning, J.)(relying on statutory plain language)(citing Sebelius v. Cloer, 133 S.Ct. 1886, 1896 (2013)).   The court should not ignore the plain language that Congress wanted.   See United States v. Welbig, 2015 WL 2225963, at *26 (D.N.M. 2015)(Browning, J.)(refusing to ignore statutory plain language).   Finally, there are good, sound reasons why Congress created a distinction.   When a defendant pleads guilty, it is often before a Magistrate Judge, who has set conditions of release pending trial.   The Magistrate Judge will likely have an updated version of the bail report, largely different only in that it explains how the defendant performed on pretrial release.   The Magistrate Judge is doing what Magistrate Judges often do in determining release -- deciding whether a defendant is a flight risk or danger to the community, and whether there are exceptional circumstances.   Even if it is a district judge taking the plea, the focus at a plea is not on the merits of the case.

In context, § 3143(b) involves factors that Magistrate Judges, or even District Judges, consider when determining whether to release a defendant pretrial or after a plea.   Indeed, two of the § 3143(b) factors discuss sentencing, which only an Article III judge can do for a felony. First, the judge under § 3143(b) must determine whether the appeal is for the purpose of delay, and raises a substantial question of law or a fact likely to result in reversal.   See 18 U.S.C. § 3143(b)(B).   A Magistrate Judge taking a plea is unlikely to know much about the trial or pretrial matters that the District Judge decided, and is likely to be in a poor position to decide how serious the issue of appeal is.   In this case, unless the Magistrate Judge sits down and reads the

Court's 86-page MOO denying the Motion to Suppress, he or she is unlikely to be able to form an informed opinion, and, even then, it is awkward for the Magistrate Judge to say that the District Judge is likely to get reversed on appeal.  Second, even if there has been a trial, it is even less likely that the Magistrate Judge will know there is likely to be a new trial.  Third, only the sentencing judge is likely to know whether the sentence is likely not to include a term of imprisonment; even if there is a plea agreement that includes a proposed term of imprisonment, only the sentencing judge is likely to know whether he or she will accept it.  Finally, only the sentencing judge is likely to know whether a reduced sentence is likely to be less than the time already served plus the expected duration of the appeal process.

In the end, Congress wants the people to be released pending appeal to be people who are likely to win an appeal.  Even if the Court were to use 18 U.S.C. § 3143(b) now, in the presentencing context, the Court cannot say that it is likely that Ramos will be successful on appeal.  The Court worked hard on the Motion to Suppress.  It feels confident about its decision.  Ramos is likely to go to prison for a lengthy period of time for transporting such a large amount of methamphetamine.  Finally, it is not unjust for Ramos to serve some time in prison for his crime, which he readily admits he committed; if he escapes a lengthy prison term because the police blundered, it is no great injustice that he stay in prison -- for a relatively short period of time -- until the Court of Appeals decides that the Court should have granted a motion to suppress.[8]  Accordingly, the Court will apply the standard found pursuant to § 3143(a), which

---

[8]The Court has recognized that "both scholars and judges have posited that exclusion of probative, reliable evidence of a defendant's guilt is too high a price to pay for the unknown degree of deterrence that exclusion achieves."  United States v. Christy, 785 F. Supp. 2d 1044, 1039 n.8 (D.N.M. 2011)(Browning, J.)(citing Christopher Slobogin, Why Liberals Should Chuck the Exclusionary Rule, 1999 U. Ill. L. Rev. 363, 369-70, 442-43 (1999); Akhil Reed Amar, Fourth Amendment First Principles, 107 Harv. L. Rev. 757, 795-800 (1994)("[I]f deterrence is the key, the idea is to make the government pay, in some way, for its past misdeeds, in order to

governs Ramos' Appeal, because the Court has not yet sentenced Ramos.

## II.   RAMOS HAS NOT SHOWN EXCEPTIONAL REASONS TO JUSTIFY HIS RELEASE PENDING SENTENCING.

Ramos concedes that, "if we were here only with respect to exceptional circumstances and the presumption of detention, [] Ramos would remain detained."  Appeal Tr. at 2:1-4 (Pori). Ramos further concedes that "other family members are stepping up, and including -- I know his children are helping to the extent that they can."  Appeal Tr. at 3:18-20 (Pori).  Nevertheless, he engaged in a colloquy with the Court about his son starting college, his other son and daughter for whom he is the primary caregiver, and his mother for whom he is the primary dialysis caregiver.  See Appeal Tr. at 2:5-3:21 (Pori).  The Court considers Ramos' concession that exceptional circumstances do not exist as well founded and will conclude the same.  First, prison -- or the threat of imprisonment -- acts as a catalyst to reunite many criminal defendants with their families.  When the Court is about to sentence a defendant, it reads letters from the defendant's family who explain to the Court that the defendant is a changed man or woman.  The defendant will often tell the Court that he or she now realizes how important his or her children or family are.  Ramos' situation, while unfortunate, is not unique.  Second, as the case law demonstrates, repairing and maintaining family relationships is not a reason that Congress considered exceptional when it wrote § 3145(c).  See United States v. Velarde, 555 F. App'x at 841 (concluding that a defendant's need to resolve family and business matters before going to prison is not an exceptional reason under § 3145(c)); United States v. Rodella, 101 F. Supp. 3d at

---

discourage future ones.  But why should that payment flow to the guilty?  Under the exclusionary rule, the more guilty you are, the more you benefit."); Hon. Malcolm Richard Wilkey, A Call for Alternatives to the Exclusionary Rule, 62 Judicature 351 (1978-79); Hon. Malcolm Richard Wilkey, The Exclusionary Rule: Why Suppress Valid Evidence?, 62 Judicature 214 (1978-79)).

1133-37 (concluding that the defendant's health and family situation were insufficient reasons to warrant release).   As explained above, to be exceptional for family reasons, detention must impose "an unusually harsh effect of a personal nature not ordinarily experienced by an individual facing incarceration," United States v. Green, 250 F. Supp. 2d at 1150, combined with other factors that make the situation truly unusual, see United States v. Reyes, 9 F. Supp. 3d at 1213.

Ramos points to no extreme hardships.   He merely wants to maintain his relationship with his children and ailing mother.   See Appeal Tr. at 2:5-3:21 (Pori).   Although maintaining these relationships is admirable and may produce good consequences in the future, if the Court deemed Ramos' reason exceptional here, the exception would swallow the rule.   There are countless defendants with relationships they would like to mend and maintain relationships in the face of prison time.   Moreover, § 3145(c) does not seek to release defendants pending sentencing when release will have potentially good consequences.   It requires the situation to be "exceptional."   18 U.S.C. § 3145(c).   Detention's effect on Ramos' relationships is insufficient to warrant release pending sentencing, even when combined with Ramos' good performance on pretrial supervision.   Further, Ramos concedes people are stepping up in his large family to take care of his mother and children.   See Appeal Tr. at 2:5-3:21 (Pori).   Because Ramos' situation is not exceptional under § 3145(c), the Court denies his Appeal.

**IT IS ORDERED** that the Defendant's Appeal of an Order Revoking the Defendant's Pre-Trial Release, filed October 31, 2016 (Doc. 68), is denied.   The Court affirms the Honorable Judge Lynch, Magistrate Judge for the United States District Court for the District of New Mexico's Order, filed September 16, 2016 (Doc. 63).   Defendant Everett Ramos will remain in custody pending sentencing.

- 46 -

UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon P. Martinez
   United States Attorney
Paul Mysliwiec
   Assistant United State Attorney
Albuquerque, New Mexico

   *Attorneys for the Plaintiff*

Thomas B. Jameson
Brian A. Pori
   Assistant Federal Public Defenders
Albuquerque, New Mexico

   *Attorneys for the Defendant*